decision that would require interpretation of any claimed ambiguities in this Agreement against the Party that drafted it has no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent and agreement of the Parties and shall be construed as if all Parties prepared this Agreement.

**Section 19.    Complete Agreement**

This document constitutes the full and entire Agreement between the Parties hereto. There are no other understandings, oral or written, relating to the subject matter of this Agreement. This Agreement may not be changed, modified or amended, in whole or in part, except in writing, signed by all of the Parties.

**Section 20.    Time Of The Essence**

Time is of the essence hereof as to this Agreement and each and every individual term, covenant, provision, obligation and conditions hereof.

**Section 21.    Headings**

The section headings herein are used only for the purpose of convenience and shall not be deemed to limit the subject of the paragraphs of this Agreement or to be considered in their construction.

**Section 22.    Authority**

The undersigned hereby represent and warrant that each of them is authorized to execute this Agreement on behalf of the Parties and that this Agreement, when executed, shall be a valid and binding obligation, in accordance with its terms.

**Section 23.    Express Denial of Responsibility or Liability**

It is expressly understood and agreed that neither the execution of this Agreement, nor the performance of any obligation recited herein is intended or shall be understood as an acknowledgment of responsibility, admission of liability (excepting the liabilities, responsibilities, obligations and duties under this Agreement) or of any fact (excepting facts contained in the representations and warranties provisions and section 4.1 of this Agreement), or other expression reflecting upon the merits of any claim; and any such responsibility or liability is expressly denied.

IN WITNESS WHEREOF, the Parties have caused their duly authorized representatives or themselves to execute and enter into this Agreement as of the date first set forth above.

17

**AGREED AND ACCEPTED BY:**

By: _____
      DR. MARY S. RIEDINGER

By: _____
      TERRANCE QUATKEMEYER,
      aka TERRY QUINN


By: _____
      JEFFREY WEINSTEN*
    *(As to Sections 1.1, 5.1.5, 8.12 & 8.13, and 9-22 Only)

By: _____
      JAMES SMITH*

By: _____
      JAMES R. HARKESS

By: _____
      NORD S. SORENSEN

By: _____
      DAVID KAYE

By: _____
      PETER BABOS

**THE WINDSOR TRUST**

**THE WINDSOR TRUST**

By: _____
      JEFFREY WEINSTEN*
      Its: Trustee
      *(As to Sections 1.1, 8-22 Only)

By: _____
      JAMES SMITH*
      Its: Trustee

By: _____
      TERRANCE QUINN AKA TERRANCE
      QUATKEMEYER
      Its: Beneficiary

**A.B.B. SANITEC WEST, INC.**

By: _____
      JAMES R. HARKESS
      Its: Chief Executive Officer

18

703674.1

**AGREED AND ACCEPTED BY:**

By: _____          By:_____
     DR. MARY S. RIEDINGER                     TERRANCE QUATKEMEYER,
                             aka TERRY QUINN


By: _____          By:_____
    JEFFREY WEINSTEN*                            JAMES SMITH*
    *(As to Sections 1.1, 5.1.5, 8.12 & 8.13, and 9-22 Only)


By: _____          By:_____
    JAMES R. HARKESS                            NORD S. SORENSEN

By:_____          By:_____
    DAVID KAYE                                  PETER BABOS

**THE WINDSOR TRUST**                 **THE WINDSOR TRUST**


By: _____          By: _____
    JEFFREY WEINSTEN*                            JAMES SMITH*
    Its: Trustee                                Its:  Trustee
    *(As to Sections 1.1, 8-22 Only)


By: _____
    TERRANCE QUINN AKA TERRANCE
    QUATKEMEYER
    Its: Beneficiary


**A.B.B. SANITEC WEST, INC.**


By: _____
    JAMES R. HARKESS
    Its: Chief Executive Officer

AGREED AND ACCEPTED BY:

By: _____

    DR. MARY S. RIEDINGER

By: _____

    TERRANCE QUATKEMEYER,
    aka TERRY QUINN


By: _____

    JEFFREY WEINSTEN*
  *(As to Sections 1.1, 5.1.5, 8.12 & 8.13, and 9-22 Only)

By: _____

    JAMES SMITH*


By: _____

    JAMES R. HARKESS

By: _____

    NORD S. SORENSEN


By: _____

    DAVID KAYE

By: _____

    PETER BABOS


**THE WINDSOR TRUST**

**THE WINDSOR TRUST**


By: _____

    JEFFREY WEINSTEN*
    Its: Trustee
    *(As to Sections 1.1, 8-22 Only)

By: _____

    JAMES SMITH*
    Its: Trustee


By: _____

    TERRANCE QUINN AKA TERRANCE
    QUATKEMEYER
    Its: Beneficiary


**A.B.B. SANITEC WEST, INC.**


By: _____

    JAMES R. HARKESS
    Its: Chief Executive Officer


18

703674 1

AGREED AND ACCEPTED BY:

By: _____
    DR. MARY S. RIEDINGER

By: _____
    JEFFREY WEINSTEN*
  *(As to Sections 1.1, 5.1.5, 8.12 & 8.13, and 9-22 Only)

By: _____
    JAMES R. HARKESS

By: _____
    DAVID KAYE

THE WINDSOR TRUST

By: _____
    JEFFREY WEINSTEN*
    Its: Trustee
    *(As to Sections 1.1, 8-22 Only)

By: _____
    TERRANCE QUINN AKA TERRANCE
    QUATKEMEYER
    Its: Beneficiary

A.B.B. SANITEC WEST, INC.

By: _____
    JAMES R. HARKESS
    Its: Chief Executive Officer

By: _____
    TERRANCE QUATKEMEYER,
    aka TERRY QUINN

By: _____
    JAMES SMITH*

By: _____
    NORD S. SORENSEN

By: _____
    PETER BABOS

THE WINDSOR TRUST

By: _____
    JAMES SMITH*
    Its: Trustee

18

703674.1

AGREED AND ACCEPTED BY:

By: _____        By: _____
    DR. MARY S. RIEDINGER                 TERRANCE QUATKEMEYER,
                                          aka TERRY QUINN

By: _____        By: _____
    JEFFREY WEINSTEN*                     JAMES SMITH*
    *(As to Sections 1.1, 5.1.5, 8.12 & 8.13, and 9-22 Only)

By: _____        By: _____
    JAMES R. HARKESS                      NORD S. SORENSEN

By: _____        By: _____
    DAVID KAYE                            PETER BABOS

THE WINDSOR TRUST                   THE WINDSOR TRUST

By: _____        By: _____
    JEFFREY WEINSTEN*                     JAMES SMITH*
    Its: Trustee                          Its: Trustee
    (As to Sections 1.1, 8-22 Only)

By: _____
    TERRANCE QUINN AKA TERRANCE
    QUATKEMEYER
    Its: Beneficiary

A.B.B. SANITEC WEST, INC.

By: _____
    JAMES R. HARKESS
    Its: Chief Executive Officer

**AGREED AND ACCEPTED BY:**

By: _____
     DR. MARY S. RIEDINGER

By: _____
     TERRANCE QUATKEMEYER,
     aka TERRY QUINN

By: _____
     JEFFREY WEINSTEN*
   *(As to Sections 1.1, 5.1.5, 8.12 & 8.13, and 9-22 Only)

By: _____
     JAMES SMITH*

By: _____
     JAMES R. HARKESS

By: _____
     NORD S. SORENSEN

By: _____
     DAVID KAYE

By: _____
     PETER BABOS

**THE WINDSOR TRUST**

By: _____
     JEFFREY WEINSTEN*
     Its: Trustee
     *(As to Sections 1.1, 8-22 Only)

**THE WINDSOR TRUST**

By: _____
     JAMES SMITH*
     Its:  Trustee

By: _____
     TERRANCE QUINN AKA TERRANCE
     QUATKEMEYER
     Its: Beneficiary

**A.B.B. SANITEC WEST, INC.**

By: _____
     JAMES R. HARKESS
     Its: Chief Executive Officer

18

703674.1

**AGREED AND ACCEPTED BY:**

By: _____          By: _____
    DR. MARY S. RIEDINGER                        TERRANCE QUATKEMEYER,
                               aka TERRY QUINN


By: _____          By: _____
    JEFFREY WEINSTEN*                            JAMES SMITH*
   *(As to Sections 1.1, 5.1.5, 8.12 & 8.13, and 9-22 Only)


By: _____          By: _____
    JAMES R. HARKESS                             NORD S. SORENSEN


By: _____          By: _____ 10-2-05
    DAVID KAYE                                   PETER BABOS


**THE WINDSOR TRUST**                 **THE WINDSOR TRUST**


By: _____          By: _____
    JEFFREY WEINSTEN*                            JAMES SMITH*
    Its: Trustee                                 Its: Trustee
    *(As to Sections 1.1, 8-22 Only)


By: _____
    TERRANCE QUINN AKA TERRANCE
    QUATKEMEYER
    Its: Beneficiary


**A.B.B. SANITEC WEST, INC.**


By: _____
    JAMES R. HARKESS
    Its: Chief Executive Officer


18

703674.1

**SANITEC USA, INC.**

By: _____
    JAMES R. HARKESS
    Its: Chief Executive Officer

**SANITEC INDUSTRIES, INC.**

By: _____
    JAMES R. HARKESS
    Its: Chief Executive Officer

**APPROVED AS TO FORM:**

**LINER YANKELEVITZ SUNSHINE
  & REGENSTREIF LLP**

By: _____
    Michael Weinsten
    Attorney for DR. MARY RIEDINGER

**LAW OFFICES OF PETER J. BABOS**

By: _____
    Peter J. Babos
    Attorney for TERRANCE QUATKEMEYER AKA
    TERRY QUINN, PETER BABOS and THE WINDSOR TRUST

**WESTON, BENSHOOF, ROCHEFORT,
  RUBALCAVA & MacCUISH LLP**

By: _____
    Michael J. Hartley
    Attorney for JAMES R. HARKESS and
    NORD S. SORENSEN

19

703674.1

SANITEC USA, INC.

By: _____
      JAMES R. HARKESS
      Its: Chief Executive Officer


SANITEC INDUSTRIES, INC.


By: _____
      JAMES R. HARKESS
      Its: Chief Executive Officer



APPROVED AS TO FORM:

LINER YANKELEVITZ SUNSHINE
  & REGENSTREIF LLP


By: _____
      Michael Weinsten
      Attorney for DR. MARY RIEDINGER

LAW OFFICES OF PETER J. BABOS

By: _____ 10-20-05
      Peter J. Babos
      Attorney for TERRANCE QUATKEMEYER AKA
      TERRY QUINN, PETER BABOS and THE WINDSOR TRUST

WESTON, BENSHOOF, ROCHEFORT,
  RUBALCAVA & MacCUISH LLP


By: _____
      Michael J. Hartley
      Attorney for JAMES R. HARKESS and
      NORD S. SORENSEN

19

SANITEC USA, INC.

By: _____
       JAMES R. HARKESS
       Its: Chief Executive Officer

SANITEC INDUSTRIES, INC.

By: _____
       JAMES R. HARKESS
       Its: Chief Executive Officer

**APPROVED AS TO FORM:**

**LINER YANKELEVITZ SUNSHINE**
**& REGENSTREIF LLP**

By: _____
       Michael Weinsten
       Attorney for DR. MARY RIEDINGER

**LAW OFFICES OF PETER J. BABOS**

By: _____
       Peter J. Babos
       Attorney for TERRANCE QUATKEMEYER AKA
       TERRY QUINN, PETER BABOS and THE WINDSOR TRUST

**WESTON, BENSHOOF, ROCHEFORT,**
**RUBALCAVA & MacCUISH LLP**

By: _____
       Michael J. Hartley
       Attorney for JAMES R. HARKESS and
       NORD S. SORENSEN

19

703674 1

OVERLAND BORENSTEIN SCHEPER
    & KIM LLP

By: _____
        Mark E. Overland
        Attorney for DAVID KAYE

KNOTT & GLAZIER LLP

By: _____
        Joel A. Thvedt
        Attorney for A.B.B SANITEC WEST, INC.,
        SANITEC USA, INC. and SANITEC INDUSTRIES, INC.

20

**OVERLAND BORENSTEIN SCHEPER
& KIM LLP**

By: _____
        Mark E. Overland
        Attorney for DAVID KAYE

**KNOTT & GLAZIER LLP**

By: _____
        Joel A. Thvedt
        Attorney for A.B.B SANITEC WEST, INC.,
        SANITEC USA, INC. and SANITEC INDUSTRIES, INC.

20

**OVERLAND BORENSTEIN SCHEPER
    & KIM LLP**

By: _____

      Mark E. Overland
      Attorney for DAVID KAYE

**KNOTT & GLAZIER LLP**

By: _____

      Joel A. Thvedt
      Attorney for A.B.B SANITEC WEST, INC.,
      SANITEC USA, INC. and SANITEC INDUSTRIES, INC.

20

703674.1

# EXHIBIT A

1  MICHAEL J. HARTLEY (State Bar No. 189375)
2  LISA GILFORD (State Bar No. 171641)
   SCOTT J. LEIPZIG (State Bar No. 192005)
3  **WESTON BENSHOOF ROCHEFORT**
   **RUBALCAVA & MacCUISH LLP**
4  333 South Hope Street
   Sixteenth Floor
5  Los Angeles, California 90071
   Telephone: (213) 576-1000
6  Facsimile: (213) 576-1100

7  Attorneys for Plaintiff and Cross-Defendant
   JAMES HARKESS

8          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9              **FOR THE COUNTY OF LOS ANGELES**

10

11 | JAMES HARKESS,                          | Case No.: BC 311681
12 |                    Plaintiff,           | (Assigned for All Purposes to the
   |                                         | Honorable James R. Dunn – Dept. 26)
13 |          v.                             | **STIPULATION AND [PROPOSED]**
14 | TERRENCE QUINN aka TERRANCE LEE         | **ORDER RE: ENTRY OF FINAL**
   | QUATKEMEYER, and DOES 1 through 10,     | **JUDGMENT**
15 | inclusive,                              |
16 |                    Defendants.          |
17 | AND RELATED CROSS-ACTION.               |
18

19 TO: THE HONORABLE JAMES R. DUNN, ALL PARTIES IN INTEREST, AND THEIR

20 RESPECTIVE ATTORNEYS OF RECORD:

21         Plaintiff and Cross-Defendant James Harkess ("Harkess"), Defendant and

22 Cross-Complainant Terrence Quinn aka Terrance Lee Quatkemeyer ("Quinn"), and

23 Defendants and Cross-Complainants James H. Smith ("Smith") and Jeffrey Weinsten

24 ("Weinsten"), as Trustees of the purported Windsor Trust, u/d/t dated June 21, 2002

25 ("Windsor Trust") (collectively the "Parties"), by and through their counsel of record, hereby

26 stipulate as follows:

27         1.      Quinn, on behalf of himself, and Smith and Weinsten on behalf of

28 themselves and the Windsor Trust, hereby waive all rights to appeal or otherwise challenge

                                          1
                STIPULATION AND [PROPOSED] ORDER RE: ENTRY OF FINAL JUDGMENT
   694191.1

DRAFT

the Court's Statement of Decision and Final Judgment (copies of which are attached as

Exhibits A and B hereto) and stipulate to immediate entry of the Statement of Decision and

Final Judgment as the final judgment of the Court.

        2.    Harkess hereby withdraws his memorandum for costs and waives his

right to those costs as the prevailing party, so that all parties shall bear their own costs and

attorneys' fees in this case.

        **IT IS SO STIPULATED.**

DATED: ~~September~~ oct 10, 2005

_____
JAMES R. HARKESS, individually

DATED: September ___, 2005

_____
TERRANCE QUATKEMEYER,
aka TERRY QUINN, individually

DATED: September ___, 2005

_____
JAMES H. SMITH, individually

DATED: September ___, 2005

_____
JEFFREY WEINSTEN, individually

DATED: September ___, 2005    **THE WINDSOR TRUST**

By:_____
TERRANCE QUATKEMEYER,
aka TERRY QUINN
Its: Beneficiary

DATED: September ___, 2005    **THE WINDSOR TRUST**

By:_____
JAMES H. SMITH
Its: Trustee

2

694191.1

WESTON BENSHOOF ROCHEFORT RUBALCAVA MACCUISH LLP
333 South Hope Street, Sixteenth Floor
Los Angeles, California 90071

1  the Court's Statement of Decision and Final Judgment (copies of which are attached as

2  Exhibits A and B hereto) and stipulate to immediate entry of the Statement of Decision and

3  Final Judgment as the final judgment of the Court.

4          2.      Harkess hereby withdraws his memorandum for costs and waives his

5  right to those costs as the prevailing party, so that all parties shall bear their own costs and

6  attorneys' fees in this case.

7          **IT IS SO STIPULATED.**

8

9  DATED: October __, 2005

10  _____
                    JAMES R. HARKESS, individually

11

12  DATED: October __, 2005

13  _____
                    TERRANCE QUATKEMEYER,
14                  aka TERRY QUINN, individually

15  DATED: October 7, 2005

16  _____
                    JAMES H. SMITH, individually
17

18  DATED: October __, 2005

19

20  _____
                    JEFFREY WEINSTEN, individually

21  DATED: October __, 2005    **THE WINDSOR TRUST**

22

23  By:_____
                    TERRANCE QUATKEMEYER,
24                  aka TERRY QUINN
        Its: Beneficiary

25

26  DATED: October 7, 2005    **THE WINDSOR TRUST**

27  By:_____
                    JAMES H. SMITH
28      Its: Trustee

                    2
694191.1

1   the Court's Statement of Decision and Final Judgment (copies of which are attached as

2   Exhibits A and B hereto) and stipulate to immediate entry of the Statement of Decision and

3   Final Judgment as the final judgment of the Court.

4          2.      Harkess hereby withdraws his memorandum for costs and waives his

5   right to those costs as the prevailing party, so that all parties shall bear their own costs and

6   attorneys' fees in this case.

7          **IT IS SO STIPULATED.**

8
9   DATED: October ___, 2005

10  _____
                        JAMES R. HARKESS, individually

11
12  DATED: October ___, 2005

13  _____
                        TERRANCE QUATKEMEYER,
                        aka TERRY QUINN, individually

14
15  DATED: October ___, 2005

16  _____
                        JAMES H. SMITH, individually

17
18  DATED: October 7, 2005

19
20  _____
                        JEFFREY WEINSTEN, individually

21  DATED: October ___, 2005    THE WINDSOR TRUST

22
23  By:_____
                        TERRANCE QUATKEMEYER,
                        aka TERRY QUINN

24  Its:  Beneficiary

25
26  DATED: October ___, 2005    **THE WINDSOR TRUST**

27  By:_____
                        JAMES H. SMITH

28  Its:  Trustee

                                   2
_____
STIPULATION AND [PROPOSED] ORDER RE: ENTRY OF FINAL JUDGMENT

1     the Court's Statement of Decision and Final Judgment (copies of which are attached as

2     Exhibits A and B hereto) and stipulate to immediate entry of the Statement of Decision and

3     Final Judgment as the final judgment of the Court.

4             2.     Harkess hereby withdraws his memorandum for costs and waives his

5     right to those costs as the prevailing party, so that all parties shall bear their own costs and

6     attorneys' fees in this case.

7            **IT IS SO STIPULATED.**

8

9     DATED: October ___, 2005

10                              JAMES R. HARKESS, individually

11

12     DATED: October 7th 2005

13                              TERRANCE QUATKEMEYER,
                                       aka TERRY QUINN, individually

14

15     DATED: October ___, 2005

16                              JAMES H. SMITH, individually

17

18     DATED: October ___, 2005

19

20                              JEFFREY WEINSTEN, individually

21     DATED: October 7th 2005      THE WINDSOR TRUST

22

23                    By: _____
                             TERRANCE QUATKEMEYER,
                                 aka TERRY QUINN

24                    Its: Beneficiary

25

26     DATED: October ___, 2005      **THE WINDSOR TRUST**

27                    By: _____
                             JAMES H. SMITH

28                    Its: Trustee

404191.1

1  DATED: October ___, 2005          THE WINDSOR TRUST

2

3                                    By:_____
                                         JEFFREY WEINSTEN
4                                      Its: Trustee

5

6                                    ORDER

7          IT IS SO ORDERED. The clerk is directed to enter the Court's Statement of

8  Decision and Final Judgment as the final judgment in this case. Each party shall bear its own

9  costs and attorneys' fees.

10

11

12  DATED: _____          _____
                                    HONORABLE JAMES R. DUNN
                                    Judge of the Superior Court
13

14  APPROVED AS TO FORM:

15  DATED: October ___, 2005         MICHAEL J. HARTLEY
                                     LISA GILFORD
16                                   SCOTT J. LEIPZIG
                                     WESTON BENSHOOF ROCHEFORT
17                                      RUBALCAVA & MacCUISH LLP

18

19

20                                   _____
                                             Michael J. Hartley
                                     Attorneys for Plaintiff and Cross-Defendant
21                                   JAMES HARKESS

22  DATED: October 7, 2005           THE LAW OFFICES OF PETER J. BABOS

23

24                                   _____
                                            Peter J. Babos
25                                   Attorney for Defendant and Cross-Complainant
                                     TERRENCE QUINN aka TERRANCE LEE
26                                   QUATKEMEYER and Cross-Complainants JAMES H.
                                     SMITH and JEFFREY WEINSTEN, as Trustees of THE
27                                   WINDSOR TRUST

28
                                        3
         STIPULATION AND [PROPOSED] ORDER RE: ENTRY OF FINAL JUDGMENT

694191.1

DATED: October ___, 2005          THE WINDSOR TRUST

1

2

3                                  By: _____
                                        JEFFREY WEINSTEN
4                                    Its Trustee

5

6                                      ORDER

7         IT IS SO ORDERED.  The clerk is directed to enter the Court's Statement of

8   Decision and Final Judgment as the final judgment in this case.  Each party shall bear its own

9   costs and attorneys' fees.

10

11

12  DATED: _____        _____
                                      HONORABLE JAMES R. DUNN
13                                    Judge of the Superior Court

14  **APPROVED AS TO FORM:**

15

16  DATED: October ___, 2005          MICHAEL J. HARTLEY
                                      LISA GILFORD
17                                    SCOTT J. LEIPZIG
                                      **WESTON BENSHOOF ROCHEFORT**
18                                        **RUBALCAVA & MacCUISH LLP**

19

20                                    _____
                                            Michael J. Hartley
21                                    Attorneys for Plaintiff and Cross-Defendant
                                      JAMES HARKESS
22

23  DATED: October ___, 2005          **THE LAW OFFICES OF PETER J. BABOS**

24

25                                    _____
                                            Peter J. Babos
26                                    Attorney for Defendant and Cross-Complainant
                                      TERRENCE QUINN aka TERRANCE LEE
27                                    QUATKEMEYER and Cross-Complainants JAMES H.
                                      SMITH and JEFFREY WEINSTEN, as Trustees of THE
28                                    WINDSOR TRUST

                                            3
                 STIPULATION AND [PROPOSED] ORDER RE: ENTRY OF FINAL JUDGMENT
    694191 1

1

2    DATED:  October ___, 2005        **THE WINDSOR TRUST**

3                                      By:_____

4                                          JEFFREY WEINSTEN
                                          Its:  Trustee

5

6                           <u>**ORDER**</u>

7            IT IS SO ORDERED.  The clerk is directed to enter the Court's Statement of

8    Decision and Final Judgment as the final judgment in this case.  Each party shall bear its own

9    costs and attorneys' fees.

10

11

12   DATED: _____
                                      _____
13                                    HONORABLE JAMES R. DUNN
                                      Judge of the Superior Court

14   **APPROVED AS TO FORM:**

15
     DATED: October ___, 2005        MICHAEL J. HARTLEY
16                                    LISA GILFORD
                                      SCOTT J. LEIPZIG
17                                    **WESTON BENSHOOF ROCHEFORT
                                          RUBALCAVA & MacCUISH LLP**
18

19
                                      _____
20                                              Michael J. Hartley
                                      Attorneys for Plaintiff and Cross-Defendant
21                                    JAMES HARKESS

22
     DATED: October ___, 2005        **THE LAW OFFICES OF PETER J. BABOS**
23

24

25                                    _____
                                             Peter J. Babos
26                                    Attorney for Defendant and Cross-Complainant
                                      TERRENCE QUINN aka TERRANCE LEE
27                                    QUATKEMEYER and Cross-Complainants JAMES H.
                                      SMITH and JEFFREY WEINSTEN, as Trustees of THE
28                                    WINDSOR TRUST

                                     3
     _____
                  STIPULATION AND [PROPOSED] ORDER RE: ENTRY OF FINAL JUDGMENT
     694191.1

**ORIGINAL FILED**

AUG 1 8 2005

**LOS ANGELES
SUPERIOR COURT**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| JAMES HARKESS, | ) | Case No.: BC 311681 |
| Plaintiff, | ) | |
| v. | ) | |
| TERRENCE QUINN aka TERRANCE LEE QUATKEMEYER, and DOES 1 through 10, inclusive, | ) | **JUDGMENT IN FAVOR OF JAMES HARKESS** |
| Defendants. | ) | |
| AND RELATED CROSS-ACTION. | ) | |

This action came on regularly for trial before the Court on March 28, 2005, at 8:30 a.m. in Department 26 of the above court. Michael Harley and Scott Leipzig of Weston Benshoof Rochefort Rubalcava & MacCuish LLP appeared on behalf of Plaintiff and Cross-Defendant James Harkess ("HARKESS"). Mark Hathaway of Slater Hathaway LLP and Peter Babos of the Law Offices of Peter Babos appeared on behalf of Defendants and Cross-Complainants Terrance Lee Quatkemeyer aka Terrence Quinn ("QUINN") and James H. Smith, as Trustee of The Windsor Trust, dated June 21, 2002 ("SMITH" and "TRUST") and Jeffrey Weinsten ("WEINSTEN"), as Co-Trustee of the TRUST.

The Court having heard and considered testimony, documentary evidence, and arguments

1

JUDGMENT IN FAVOR OF JAMES HARKESS

1  presented by or on behalf of the parties, and having issued a Statement of Decision (hereinafter,

2  "Decision"), hereby orders the following Judgment to be entered in favor of HARKESS consistent

3  with the Statement of Decision, with specific reference to the following findings of the Court:

4

5      (1)    The purported TRUST "was not legally in existence and had no assets at the time

6  of the transfer" of Windsor Holdings, LLC ("Windsor") from David Kaye ("Kaye") to HARKESS.

7  (Decision, p. 1.) Any purported ownership of Windsor claimed by SMITH and WEINSTEN "is

8  purely derivative based on their status as trustees of the Trust, and the court has found that the Trust

9  was not legally in existence during the time of the transfer from Kaye to Harkess." (Decision, p.

10  2.)

11

12     (2)    The transfer of Windsor from "Kaye to Harkess was effective to transfer ownership

13  of Windsor to Harkess." (Decision, p. 1.) Windsor was formed in July 2001 and David Kaye

14  became the managing member, and sole owner, of Windsor; Quinn set up the Windsor structure in

15  such a way as to create apparent authority/ownership in Kaye; Harkess became the managing

16  member, and sole owner, of Windsor upon transfer from Kaye in July 2003.  The undisputed

17  evidence presented by both sides, which constituted the underlying premise for the need for this

18  Court to determine ownership of Windsor, was that since July 2001, Windsor owned Sanitec

19  Worldwide, Ltd. ("Worldwide"), and Worldwide was the majority shareholder of Sanitec, Ltd.

20  ("Limited").

21

22     (3)    QUINN and those acting on his behalf, including SMITH and WEINSTEN, "are

23  barred by the equitable doctrines of unclean hands and equitable estoppel from asserting ownership

24  in Windsor." (Decision, p. 2.) "In the exercise of its equitable powers, this court will not permit

25  Quinn to now assert an ownership interest in Windsor." (Decision, p. 7.)

26

27     NOW THEREFORE, IT IS HEREBY ADJUDGED AND DECREED THAT:

28

2

JUDGMENT IN FAVOR OF JAMES HARKESS

1   (1)   Judgment is entered FOR Plaintiff and Cross-Defendant HARKESS
2         and AGAINST Defendants and Cross-Complainants QUINN,
3         SMITH and WEINSTEN on Plaintiff's Complaint for Declaratory
4         Relief and on Defendants' Cross-Complaint for Declaratory Relief.
5         The Court declares that HARKESS is the sole owner of Windsor and
6         Windsor's assets, including but not limited to, Windsor's ownership
7         interests in Worldwide and Limited.  Neither QUINN, SMITH,
8         WEINSTEN, nor any successor trustees or beneficiaries of the
9         purported TRUST have any right, title or interest in Windsor and/or
10        any Windsor asset, including but not limited to, Windsor's
11        ownership interests in Worldwide and Limited;
12
13  (2)   QUINN, SMITH, WEINSTEN and the successor trustees and
14        beneficiaries of the purported TRUST, and each of them, as well as
15        anyone acting on their behalf or in concert with them (hereinafter,
16        "ENJOINED PARTIES"), are restrained and permanently enjoined
17        from claiming any right, title or interest in Windsor and/or any
18        Windsor asset, including but not limited to, Windsor's ownership
19        interests in Worldwide and Limited.  The ENJOINED PARTIES are
20        specifically restrained and permanently enjoined from making any
21        representations that they have any ownership interest in or control
22
23  ////
24
25  ////
26
27
28

3
JUDGMENT IN FAVOR OF JAMES HARKESS

1    over Windsor and/or any Windsor asset, including but not limited to, Windsor's

2    ownership interests in Worldwide and Limited.

3

4    DATED: ___AUG 1 8 2005___

5                                          **JAMES R. DUNN**

6                                          JAMES R. DUNN
                                           Judge of the Superior Court

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JRD:cr    26
Harkess.jmt
8/18/05    27

28

4

JUDGMENT IN FAVOR OF JAMES HARKESS

1
2
3
4
5
6
7

# ORIGINAL FILED

· AUG 1 8 2005

## LOS ANGELES
## SUPERIOR COURT

8       SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            FOR THE COUNTY OF LOS ANGELES

10

| | | |
|---|---|---|
| 11  JAMES HARKESS, | ) | Case No.: BC 311681 |
| 12          Plaintiff, | ) | |
| 13    v. | ) | |
| 14  TERRENCE QUINN aka TERRANCE LEE | ) | **STATEMENT OF DECISION** |
| 15  QUATKEMEYER, and DOES 1 through 10, inclusive, | ) | |
| 16          Defendants. | ) | |
| 17 _____ | ) | |
| 18  AND RELATED CROSS-ACTION. | ) | |
| _____ | ) | |

19      The   court   finds   FOR   PLAINTIFF/CROSS-DEFENDANT   AND   AGAINST

20  DEFENDANTS/CROSS-COMPLAINANTS on Plaintiff's Complaint for Declaratory Relief and

21  on Defendants' Cross-Complaint for Declaratory Relief. The court declares that plaintiff James

22  Harkess ("Harkess" herein) is the rightful owner of Windsor Holdings, LLC, ("Windsor" herein)

23  and that defendants have no right, title or interest therein. Further, defendants, and each of them,

24  are permanently enjoined from claiming any right, title or interest in Windsor.

25

26      The court finds that the Windsor Trust ("Trust" herein) was not legally in existence and had

27  no assets at the time of the transfer of Windsor from David Kaye ("Kaye" herein) to Harkess.

28  Defendant Terrence Quinn aka Quatkemeyer ("Quinn" herein), in July 2001, through a series of

1    companies and transactions, none of which bear his name or other indicia of his ownership,
2    transferred ownership and apparent authority to Kaye as managing member of Windsor. Thereafter,
3    back-dated documents were created virtually overnight, transferring ownership of Windsor from
4    Kaye to Harkess in July 2003. This transfer of ownership of Windsor was relied on not only by
5    Harkess, but by many other parties and attorneys, including a federal judge. The court finds that
6    the transfer from Kaye to Harkess was effective to transfer ownership of Windsor to Harkess in July
7    2003. The court further finds that, in any event, Quinn and those acting on his behalf are barred by
8    the equitable doctrines of unclean hands and equitable estoppel from asserting ownership in
9    Windsor. Any purported ownership claimed by James H. Smith ("Smith" herein) or Jeffrey
10   Weinsten ("Weinsten" herein) is purely derivative based on their status as trustees of Trust, and the
11   court has found that the Trust was not legally in existence during the time of the transfer from Kaye
12   to Harkess.

13

14   FACTUAL BACKGROUND

15       There are many different companies and individuals involved in the various lawsuits here,
16   in Ohio and elsewhere, but the essential entities for purposes of this lawsuit are Windsor, Sanitec
17   Worldwide ("Worldwide" herein) and Sanitec Limited ("Limited" herein). Windsor is a California
18   limited liability company formed on July 17, 2001. The undisputed evidence at trial was that,
19   through a series of transfers and a corporate re-organization by Quinn, in late July 2001, Windsor
20   became the sole owner of Worldwide. It was also undisputed at trial that Worldwide was the
21   majority owner of Limited and that Mr. Weinsten's company, Salem Associates, owned a minority
22   interest in Worldwide. (Ex. 189, 223) The basic premise argued by both parties at trial was that
23   whoever owns Windsor controls the other two by virtue of this ownership structure.

24

25       This court has been asked to make a ruling on a single, narrow question: who owns
26   Windsor? The court is mindful that there are other lawsuits in Ohio, and perhaps elsewhere, which
27   may be impacted by this decision, and that there may be issues between various parties impacted
28   by what the court decides here. Beyond the findings that support the Court's decision, however,

2
STATEMENT OF DECISION

1    this court makes no findings regarding the merits of any other lawsuits or any purported claims that

2    the parties may have against one another or others.

3

4        Plaintiff contends that he is the owner of Windsor by virtue of a transfer from Kaye, the

5    managing member of Windsor.  Defendants contend that the Trust is the owner of Windsor.

6    Defendants presented evidence that in June 2002, defendant/cross-complainant Quinn was suffering

7    from a terminal illness and was facing an impending prison term, and therefore set up the Trust with

8    cross-complainant Smith and Weinsten as the trustees, and concurrently therewith transferred all

9    the assets of Windsor to Trust.  Therefore, at the time of transfer of Windsor from Kaye to Harkess,

10   defendants assert that Windsor had already been transferred to the Trust and there was nothing to

11   transfer.

12

13   THE TRUST

14       The circumstances in existence in or about June 2002, that is the illness and the impending

15   sentencing, are consistent with a desire by Mr. Quinn to form a trust to hold his property.  What is

16   missing, however, is a signed original trust document and any credible evidence that such a

17   document was ever signed by Quinn in June 2002, or at any time before he was released from prison

18   in late September 2003.  Also, like the ownership structure that Quinn set up for Windsor, the

19   structure he set up for his Trust was also incomplete.  The final, and necessary, steps were never

20   taken to consummate the Trust.

21

22       The court makes the following findings which support its conclusion that no Trust was

23   formed in June 2002 or at any time before the Kaye-Harkess transfer.

24

25   1.    The court found Smith to be a credible witness, but by his own testimony and that of others,

26         he was only a figurehead.  It was Weinsten that wrote all the letters for him to sign, and it

27         was Weinsten that monitored the litigation in Ohio.  Virtually everything that Smith knew,

28         he knew because Weinsten told him.  He had virtually no firsthand knowledge of facts.

3

STATEMENT OF DECISION

1

2   2.   There is no original Trust signed by Quinn which bears a date in June 2002.  In fact, no

3        signed original at all was offered in evidence.

4

5   3.   While there is evidence that the Litwin law firm prepared drafts of a trust in June 2002, and

6        Smith signed some version of a trust, Smith testified that he does not know whether Quinn

7        signed it.  (Ex. 265)

8

9   4.   Weinsten testified that he sent the Trust document which had been signed by others to

10        Quinn for him to sign.  He did not see Quinn sign the Trust document.  Weinsten claims that

11        he received a signature back from Mr. Quinn in June 2002, but the Court does not find this

12        claim credible in light of Mr. Weinsten's other testimony in depositions and pleadings

13        regarding ownership of Windsor (see below), and his prior conviction introduced for

14        purposes of impeachment.   No one had personal knowledge about whether Quinn ever

15        signed before he was released.

16

17   5.   Quinn testified that he did sign it in June 2002, but the court does not find his testimony to

18        be credible.  On the stand Mr. Quinn repeatedly shifted responsibility for various actions

19        from himself to his attorneys, and said he would sign virtually anything his lawyers told him

20        to sign.  This, along with his observed demeanor while testifying, and his two felony

21        convictions for fraud-related offenses, cause the court to disregard his testimony.  Thus,

22        there is no independent, corroborating evidence that Quinn ever signed before he got out of

23        prison.

24

25   6.   There is no credible evidence that shares or other indicia of ownership of Windsor were ever

26        transferred to the Trust.

27

28   7.   Quinn testified that he fired Kaye as managing member of Windsor in June 2002 by letter,

4

STATEMENT OF DECISION

1    but there is no evidence other than the testimony of Quinn himself that the letter was ever

2    sent, and court does not find his testimony credible. Kaye denies ever receiving it, and the

3    only copy introduced in evidence apparently came from Weinsten's file.

4

5        In addition to these points, Weinsten who along with Smith was a co-trustee, denied twice

6    in depositions in other cases that he knew who owned Windsor. One can infer from this that he

7    either knew the trust had never been signed by Quinn, or that there was never any transfer of

8    Windsor assets to the Trust. It was Weinsten who was monitoring the Ohio litigation and

9    apparently was concerned enough about protecting his 48% interest in Worldwide that he attempted

10   to intervene in the Ohio litigation. In several pleadings filed in connection therewith he never

11   mentioned the Trust. (Ex. 118, 122) Even when Smith sent the letter to John Climaco, Ohio

12   counsel for Limited, et al., he did not mention the Trust. And finally, the two independent

13   witnesses who may have been able to corroborate the Trust, attorney Litwin who drafted it, and

14   attorney Mark Geragos (who was allegedly present when the Trust was signed in his office) were

15   not called by the defendants to testify.

16

17       The defendants have not met their burden of showing that the Trust was legally formed and

18   in existence at the time of the Kaye-Harkess transfer.

19

20   THE TRANSFER TO HARKESS

21       By virtue of the failure of the Trust to be formed in June 2002, the assets of Windsor were

22   still in Windsor at the time of the transfer from Kaye to Harkess. In July 2003, never referencing

23   the Trust in his letter, Smith wrote to John Climaco, Esq., Ohio counsel for Limited and Windsor

24   ("Climaco" herein), claiming that Harkess had no authority to represent Limited in the Ohio

25   litigation and that he (Climaco) was discharged as counsel. (Apparently this was one of the letters

26   written for him by Weinsten.) (Ex. 210) In response to this letter Climaco sent an urgent message

27   to Babos demanding to know who had authority to speak for Limited and who he should listen to.

28   (Ex. 211.1, 212) He was obviously very agitated and wanted answers immediately. He was

5

1   particularly upset over the fact that he was being put in a position to embarrass himself before a

2   federal judge.  In response to that inquiry, within hours Babos, with the concurrence of Harkess and

3   Kaye, created back-dated documents that showed that Harkess was the owner of Limited.  (Ex. 168)

4   Kaye (for Limited) and Harkess (for Sanitec West) had been managing the Ohio litigation and they

5   needed to show they had authority to do so.  (It is not altogether clear which parties Babos was

6   actually representing as counsel in all these transactions; Climaco had repeatedly asserted that

7   Quinn needed separate counsel due to a perceived conflict of interest; Babos had served as corporate

8   counsel for some of the Sanitec companies and Quinn individually over the years.)  (Ex. 212)  These

9   hastily created documents showed that Kaye, acting as managing member and owner of Windsor,

10  transferred his member/owner status to Harkess.  Babos continued to reaffirm that Harkess was the

11  owner of Windsor for weeks after Quinn was released from prison in September 2003.  He testified

12. that it was only later he realized that he had made a mistake in having the documents prepared and

13  started making efforts to reverse position.  By then, however, the representations to the Ohio federal

14  court and counsel had already been made and actions had been taken in reliance on Harkess'

15  apparent authority to represent Limited, (based on his ownership of Windsor) and commitments had

16  been made and documents signed.

17

18      Quinn is responsible for creating the environment and business structure that made this

19  possible.  Windsor was formed on July 17, 2001, at Quinn's direction, with the filing of Windsor's

20  Articles of Organization with the Secretary of State, showing Kaye as the manager.  This was the

21  only documentation for Windsor.  Nowhere did Quinn's name appear.  In late July 2001, he then

22  asked Kaye to front for him in an attempt to sell Limited and in fact Kaye acted as managing

23  member/owner in the Eden transaction and in dealing with Stericycle.  He also was sent by Quinn

24  to Limited back East to monitor operations and represent himself as the managing member of

25  Windsor.  Quinn claims that Kaye was only appointed to deal with specific sales or activities, but

26  Quinn is the one who put him in a position to represent himself as owner of Windsor.  It was Quinn

27  who set up Windsor but never set up any formal ownership structure or had any documents prepared

28  which identified him as being involved in Windsor.  All of the assets that went through the various

6

STATEMENT OF DECISION

1  re-organizations ended up in Windsor. Windsor became a holding company with no ownership

2  structure, and no connnection with Quinn.  When it was to his advantage in having Kaye step

3  forward for specified transactions that benefitted Quinn, he validates his authority.  The court does

4  not recognize, however, such selective delegations of authority, especially in a case where there is

5  no documentation showing an owner of Windsor at all.  Mr. Babos and Mr. Mitchell R. Miller (a

6  corporation lawyer who drew up the Windsor documents for the Secretary of State) both testified

7  that Quinn never set up any ownership structure because he wasn't sure how he wanted to do it.

8  The only person placed in a position of apparent authority/ownership was Kaye.  There is no

9  evidence that either Quinn, or Babos or Miller did anything at all to remedy this uncompleted

10 ownership structure after Quinn went to prison, thus enabling the later events to occur.  The Court

11 finds that Mr. Kaye was the sole managing member, and therefore sole owner, of Windsor Holdings

12 from its inception in July 2001 through the transfer to Mr. Harkess in July 2003.

13

14    When the Climaco emergency came, Mr. Kaye did not step forward to act as owner/

15 manager, rather he wanted out, so it was agreed that he would transfer his member/owner status to

16 Harkess.  Rather than explain the dilemma to Mr. Climaco and seek a resolution with the Ohio

17 court, counsel Babos, with the concurrence of Harkess and Kaye prepared the back-dated

18 documents within a matter of hours and sent them to Climaco.  Those documents were sent to Ohio

19 with the knowledge that they were to be presented by Mr. Climaco, an officer of the court, to a

20 federal judge representing that Mr. Harkess was the owner of Windsor.  And then everyone sat back

21 and allowed others to rely on that representation.  This court finds that Mr. Harkess is the owner

22 of Windsor and became the owner with the transfer from Mr. Kaye in July 2003.  That entire chain

23 of events was created by the anonymous and incomplete creation of Windsor by Quinn, and the

24 attempt to selectively assign ownership/authority to Kaye.

25

26    The court is mindful that defendant contends that there was an agreement that Harkess was

27 only taking the shares of Windsor temporarily and that he was to give them back after Quinn was

28 released. Mr. Babos supports this purported agreement, as does Quinn, but Harkess vehemently

7
STATEMENT OF DECISION

1  denies it.  There is evidence that Harkess said "If I own Limited by virtue of my ownership of
2  Windsor, then I want the documents."  This would suggest, however, that Harkess did indeed
3  believe he owned Windsor although had some question as to what impact it had on ownership of
4  Limited.  Whether there was or was not such a private agreement between Quinn and Harkess is
5  between them.  As far as the rest of the world is concerned, Mr. Kaye transferred ownership of
6  Windsor to Harkess and Harkess, Kaye and Babos represented to the federal court and the litigants
7  that Harkess was the owner of Windsor.  The transfer to Harkess was effective.
8
9  UNCLEAN HANDS AND EQUITABLE ESTOPPEL
10      Further, in the exercise of its equitable powers, this court will not permit Quinn to now
11  assert an ownership interest in Windsor.  Plaintiff spent a great deal of the trial laying out the series
12  of transactions involving the original purchase of Limited by Quinn with investor money and the
13  use of various corporations to do so.  Plaintiff made the point that Mr. Quinn's name personally did
14  not appear on any of the documentation of these companies.  For the most part the court found that
15  to be true, based on the limited evidence presented on those issues.  This court is being asked to take
16  note of a pattern of ownership and apparent evasion of accountability to creditors and suppression
17  of identity in order to establish the defense of unclean hands.  This court is not making any findings
18  as to whether Mr. Quinn defrauded the original investors in connection with his use of their funds
19  to purchase Limited.  This court does take note, however, of this trail of companies, re-
20  organizations and the resultant anonymity of Quinn for purposes of whether Quinn was attempting
21  to hide his assets, (i.e., Windsor's controlling interest in Worldwide and through Worldwide,
22  ownership of Limited) in order to avoid any claims these investors might have, and comes before
23  this Court with unclean hands.  The court also takes note of the fact that Quinn never used any of
24  his own money to purchase these companies.  The court did not find credible his testimony that he
25  also put his own money into Limited from the sale of luxury cars.  No documentary or other
26  evidence was presented to support that assertion.
27
28      All of this is corroboration for the testimony of Mr. Quinn himself.  Quinn testified on the

8
STATEMENT OF DECISION

1   stand that he created Windsor to "keep the assets of Sanitec away from Barbara Sager, Steve Ventre,

2   Joe Delloiacovo and the investors in Ohio that were laying claim to those assets." He further

3   testified that he asked Mr. Kaye to be the managing member because he was "having difficulties"

4   and "troubles" at the time. It is clear that Quinn did not want his assets in his own name and in fact

5   his apparent 80% interest in Sanitec West was in the name of his friend Mary Reidiger rather than

6   himself. This is sufficient evidence for the court to conclude that Quinn was secreting his assets

7.   to defeat the claims of his creditors and that he comes to this court with unclean hands. (*See*

8   <u>Allstead vs. Laumeister</u> (1911) 16 Cal.App. 59 and <u>Belling vs. Croter</u> (1943) 57 Cal.App.2d 296.)

9

10        In addition, the court invokes the doctrine of equitable estoppel. While Mr. Quinn himself

11   did not make the representations to those who relied and acted on them (the Ohio federal court and

12   counsel and others related to that litigation), he is directly responsible for setting in motion the chain

13   of events that led to those representations. He put Kaye and Harkess in the position of having

14   apparent authority for and ownership of Windsor, from the point of view of the court and the parties

15   in the East, to accomplish his own ends of selling off Limited without having his name in any way

16   associated with the sale. Many have relied on the resulting representations about Harkess'

17   ownership of Windsor to their potential detriment in the event that transactions consummated in

18   reliance thereon were to be overturned. Quinn is estopped from now claiming that the

19   representations regarding ownership of Windsor are false, or that Kaye did not have authority to

20   transfer the company to Harkess.

21

22        Plaintiff/Cross-Defendant Harkess to prepare the judgment consistent with this Tentative

23   Ruling. This Tentative Ruling shall be the Statement of Decision unless within ten days either party

24   specifies controverted issues or makes proposals not covered in the Tentative Ruling.

25

JRD:cr
Harkess.sd
8/18/05

26   Dated: _____ AUG 1 8 2005 _____

**JAMES R. DUNN**

27                              JAMES R. DUNN

28                              Judge of the Superior Court

# EXHIBIT B

1    Guy P. Glazier, SBN 162628
     Joel A. Thvedt, SBN 130577
2    Deborah M. Parker, SBN 228203
     KNOTT & GLAZIER LLP
3    601 South Figueroa Street
     Suite 1950
4    Los Angeles, California 90017
     Telephone:    (213) 312-9200
5    Facsimile:    (213) 312-9201

6    Attorneys for Plaintiff,
     Sanitec Industries, Inc.
7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                     FOR THE COUNTY OF LOS ANGELES

10

11   SANITEC INDUSTRIES, INC.,                  Case No. BS 095182

12              Plaintiff,

13        v.                                    **STIPULATION OF PARTIES FOR
                                                ABANDONMENT OF APPEAL**
14   TERRY QUATKEMEYER, aka TERRY
     QUINN,
15
                Defendant.
16

17
        TO THE CLERK OF THE ABOVE-ENTITLED COURT:
18
        SANITEC INDUSTRIES, INC., and TERRY QUATKEMEYER, aka TERRY QUINN
19
     (together, the "Parties"), by and through their counsel of record, HEREBY STIPULATE AND
20
     AGREE, that, pursuant to the Settlement Agreement and Mutual Release, dated _____, by
21
     and between the Parties and others, the Appeal in this matter be abandoned.  THE PARTIES
22
     FUTHER STIPULATE AND AGREE that they shall bear their own costs and attorney's fees.
23

24   SANITEC INDUSTRIES, INC.

25

26   _____          Dated: _____

27   By  Joel A. Thvedt, Esq.
     Knott & Glazier, LLP
28   Counsel to Appellant Sanitec Industries, Inc.

Knott & Glazier
LLP
694183.1
                       STIPULATION FOR ABANDONMENT OF APPEAL

1
2      TERRY QUATKEMEYER, aka TERRY QUINN
3
4      By  Peter Babbs, Esq.                              Dated:  _October 7, 2005_
5      Counsel to Respondent Terry Quatkemeyer
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Knott & Glazier
LLP

6941S3.1

STIPULATION FOR ABANDONMENT OF APPEAL

# EXHIBIT C

624854.1

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):* | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):*    TELEPHONE NO.:
Michael J. Hartley, Esq. (SBN 189375)    (213) 576-1000
Lisa Gilford, Esq. (SBN 171641)
WESTON BENSHOOF ROCHEFORT RUBALCAVA & MacCUISH LLP
333 South Hope Street, 16th Floor
Los Angeles, CA  90071
ATTORNEY FOR *(Name):* Defendants JAMES HARKESS and NORD SORENSEN

Insert name of court and name of judicial district and branch court if any:
Superior Court of the State of California, County of Los Angeles
111 North Hill Street, Los Angeles, CA  90012

PLAINTIFF/PETITIONER: MARY S. RIEDINGER, et al

DEFENDANT/RESPONDENT:JAMES R. HARKESS, et al.

| REQUEST FOR DISMISSAL | CASE NUMBER: |
|---|---|
| ☐ Personal Injury, Property Damage, or Wrongful Death<br>    ☐ Motor Vehicle   ☐ Other<br>☐ Family Law<br>☐ Eminent Domain<br>☒ Other *(specify):* Individual and Derivative Complaint Re: Corporate Ownership | BC 322202 |

— A conformed copy will not be returned by the clerk unless a method of return is provided with the document. —

1. TO THE CLERK: Please dismiss this action as follows:
   a- (1) ☒ With prejudice    (2) ☐ Without prejudice
   b (1) ☒ Complaint    (2) ☐ Petition
      (3) ☒ Cross-complaint filed by *(name):* A.B.B. Sanitec West, Inc.    on *(date):* May 5, 2005
      (4) ☐ Cross-complaint filed by *(name):*    on *(date):*
      (5) ☒ Entire action of all parties and all causes of action
      (6) ☐ Other *(specify):** ·

Date: October   , 2005

LINER YANKELEVITZ SUNSHINE
& REGENSTREIF LLP

Michael Weinsten
(TYPE OR PRINT NAME OF ☒ ATTORNEY ☐ PARTY WITHOUT ATTORNEY)
  * If dismissal requested is of specified parties only, of specified causes of
  action only specified cross-complaints so state and identify
  the parties, causes of action or cross-complaints to be dismissed

                 (SIGNATURE)
Attorney Or party without attorney for:
☒ Plaintiff/Petitioner    ☐ Defendant/Respondent
☐ Cross-complainant

2. TO THE CLERK: Consent to the above dismissal is hereby given **

Date: October   , 2005

KNOTT & GLAZIER LLP

Joel A. Thvedt
(TYPE OR PRINT NAME OF ☒ ATTORNEY ☐ PARTY WITHOUT ATTORNEY)
  ** If a cross-complaint—or Response (Family Law) seeking affirmative
  relief—is on file, the attorney for cross-complainant (respondent) must
  sign this consent if required by Code of Civil Procedure section 581(i)
  or (j).

                 (SIGNATURE)
Attorney Or party without attorney for:
☐ Plaintiff/Petitioner    ☐ Defendant/Respondent
☒ Cross-complainant  A.B.B. SANITEC, WEST, INC.

*(To be completed by clerk)*

3. ☐ Dismissal entered as requested on *(date):*
4. ☐ Dismissal entered on *(date):*    as to only *(name):*
5 ☐ Dismissal **not** entered as requested for the following reasons *(specify):*

6. ☐ a. Attorney or party without attorney notified on *(date):*
     b. Attorney or party without attorney not notified. Filing party failed to provide
      ☐ a copy to conform    ☐ means to return conformed copy

Date:               Clerk, by                        , Deputy

Form Adopted by the
Judicial Council of California
982(a)(5) [Rev January 1. 1997]

REQUEST FOR DISMISSAL

Code of Civil Procedure, § 581 et seq.
Cal Rules of Court, rules 383, 1233
American LegalNet, Inc.
www.USCourtForms.com

# EXHIBIT D

# CONSENT AND RELEASE AGREEMENT

This Consent and Release Agreement (the "Agreement") is entered into as of the 31st day of July 2004 by and between Sanitec Industries, Inc., a California corporation (the "Company"), Sanitec USA, Inc., a California corporation ("Sanitec USA"), and the existing shareholder of shares of common stock of Sanitec USA (the "Sanitec USA Shares"), and/or the holder of warrants (collectively, the "Warrants") to purchase the common stock of A.B.B. Sanitec West, Inc., a California corporation ("Sanitec West"), and/or debenture holder of (a) one or more 14% secured notes, (b) one or more 12% secured notes  or (c) one or more 14% secured notes and one or more 12% secured notes originally issued by Sanitec West, and assumed by Sanitec USA, Inc. (collectively, the "Note"), who is listed as the "Holder" in the signature block of this Agreement (the "Holder"), with respect to the following facts.

## R E C I T A L S

A.  Holder owns the amount of Note listed beneath the Holder's signature to this Agreement and, if applicable, the number of Sanitec USA Shares listed beneath the Holder's signature to this Agreement.

B.  The Company desires to convert the Note into shares of the Company's common stock at a conversion rate of one share of the Company's common stock for each $2.00 of principal and interest due and payable on the Note as of June 30, 2004.  Interest accrued after June 30, 2004 will not be paid on Notes tendered for conversion.

C.  The holder of the Sanitec USA Shares desires to exchange all of the Sanitec USA Shares into shares of the Company's common stock at a conversion rate of one share of the Company's common stock for each Sanitec USA Share tendered for exchange.

D.  The Company is willing to allow the holders of the Warrants who also convert their Notes into shares of the common stock of the Company to exercise them on the date of conversion only to purchase an equivalent number of shares of the common stock of the Company.

E.  The Board of Directors of the Company has approved the offer of Note conversion, warrant exercise to be permitted for Company common stock, and exchange of Sanitec USA Shares for shares of the Company's common stock (collectively, the "Conversion and Exchange Plan").

F.  By executing this Agreement, the Holder approves the Conversion and Exchange Plan, as described in that certain Executive Summary, dated June 15, 2004, relating to the Rights Offering for Debenture Holders.  The shares of the Company's common stock issued in the Conversion and Exchange Plan are hereby collectively referred to as the "Shares".

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged by the parties to this Agreement, and in light of the recitals stated above, the parties to this Agreement hereby agree as follows:

1.    Consent to Conversion and Exchange Plan.

The Holder hereby consents to and approves of the Conversion and Exchange Plan as described in the Executive Summary, dated June 15, 2004, for the Rights Offering for Debenture Holders, including

financial statements of the Company, Sanitec USA, and the Company and Sanitec USA on a combined pro forma basis, and Exhibits A through G thereto (the "Summary").

2.     Access to Information.

The Holder hereby represents and warrants that prior to the execution of this Agreement by the Holder, the Holder has carefully reviewed the updated business plan and related financial and other information provided by the Company to the Holder and the Summary (collectively, the "Information"), and has had a complete opportunity to ask questions of, and receive additional information from, the Company's management.

3.     Sophistication and Knowledge.

The Holder has sufficient experience in financial and business matters to be capable of utilizing such information to evaluate the merits and risks of the Holder's investment, and to make an informed decision relating thereto. The Holder expressly represents and warrants that the Holder satisfies all of the criteria necessary to qualify for participation in the Conversion and Exchange Plan, as further confirmed in the Holder's completed and signed Purchaser Questionnaire.

4.     Evaluation of Risks.

The Holder has evaluated the risks of this investment in the Company, including those risks particularly described in the Information, and has determined that the investment is suitable for the Holder. The Holder has adequate financial resources for an investment of this character, and at this time the Holder could bear a complete loss of this investment. The Holder understands that any projections in the Information are mere estimates and may not reflect the actual results of the Company's operations.

5.     No Federal Registration.

The Holder understands that the Shares are not being registered under the Securities Act of 1933, as amended (the "1933 Act") on the ground that the issuance thereof is exempt under Section 4(2) of the 1933 Act and Regulation D promulgated thereunder as a transaction by an issuer not involving any public offering, and that reliance on such exemption is predicated in part on the truth and accuracy of the undersigned's representations and warranties, and those of the other recipients of Shares.

6.     No State Registration.

The Holder understands that the Shares are not being registered under the securities laws of certain states on the basis that the issuance thereof is exempt as an offer and sale not involving a public offering in such state. The Holder understands that reliance on such exemptions is predicated in part on the truth and accuracy of the Holder's representations and warranties and those of other recipients of Shares. The undersigned covenants not to sell, transfer or otherwise dispose of a Share unless such Share has been registered under the applicable state securities laws, or an exemption from registration is available.

7.     Acknowledgment of No Liquidity.

The Holder has no need for any liquidity in this investment and is able to bear the economic risk of this investment for an indefinite period of time. The Holder has been advised and is aware that (a) it may not be possible to liquidate the investment readily; (b) the Holder must bear the economic risk of his investment in the Shares for an indefinite period of time because the Shares have not been registered under the 1933 Act or state law and, therefore, cannot be sold unless they are subsequently registered under the 1933 Act and applicable state law or an exemption from such registration is available; (c) a

legend as to the restrictions on transferability of the Shares referred to herein will be made on the document evidencing the Shares, and (d) a notation in the appropriate records of the Company will be made with respect to any restrictions on transfer of Shares. The restrictive legend on the certificate will essentially state as follows:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE AACT"), NOR UNDER ANY STATE SECURITIES LAWS. THESE SECURITIES MAY NOT BE SOLD, TRANSFERRED, CONVEYED, HYPOTHECATED OR OTHERWISE ASSIGNED UNLESS THEY ARE REGISTERED UNDER THE ACT OR UNLESS AN OPINION OF COUNSEL OR OTHER EVIDENCE REASONABLY SATISFACTORY TO THE COMPANY IS PRESENTED INDICATING THAT AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

8.    Reliance - No Oral Representations.

The Holder has relied solely upon the Information and independent investigations made by the Holder or his purchaser representative with respect to the Shares acquired herein, and no oral or written representations beyond the Information have been made to the Holder.

9.    Authority.

If the Holder is a partnership, corporation or trust, it has been duly formed, is validly existing, has full power and authority to make this investment, and has not been formed for the specific purpose of investing in the Shares. This Agreement and all other documents executed in connection with this acquisition of Shares are valid, binding and enforceable agreements of the Holder.

10.    Indemnification.

The Holder hereby agrees to indemnify and hold harmless the Company and all of its affiliates, attorneys, accountants, employees, officers, directors, shareholders and agents from any liability, claims, costs, damages, losses or expenses incurred or sustained by them as a result of the Holder's representations and warranties herein being untrue or inaccurate, or because of a breach of this Agreement by the Holder.

11.    Acknowledgment of Investment Risks.

The Holder hereby understands and acknowledges the risk factors relating to this investment, including but not limited to those described in the Information, and that the acquisition of the Shares is highly speculative and subject to a high degree of risk.

12.    Reaffirmation of Purchase of Sanitec USA Shares.

If the Holder purchased Sanitec USA Shares directly or through exercise of Warrants prior to the date of this Agreement, such Holder hereby reaffirms said purchase and does not desire rescission thereof, after carefully reviewing the Summary and all of the rest of the Information, including but not limited to the risk factors described therein.

13.    Survival of Representations and Warranties.

The representations and warranties of each party hereto shall survive and shall not be affected by the closing.

14.    Release of Claims.

Effective on July 15, 2004, the Holder fully and forever releases and discharges the Company, Sanitec USA, Sanitec West and any of their past, present and future affiliates, employees, officers, directors, shareholders, attorneys, accountants, agents, representatives, successors and predecessors (collectively, the "Sanitec Affiliates") from any and all claims, demands, obligations, losses, damages, or causes of action of any nature relating to the Company, its business, its securities, or relating to any other claims which the Holder may have against the Company or any of the Sanitec Affiliates, whether based in tort, contract or any other theory of recovery, and whether for compensatory or punitive damages, that now exist or may hereafter accrue based on actions occurring prior to the effective date of this release.

15.    Representations Relating to Release.

The Holder agrees that the releases in Paragraph 14 of this Agreement shall not be considered admissions by any party of any liability or wrongdoing. The Holder warrants that no promise or inducement has been offered except as herein set forth. The Holder is of legal age and legally competent to execute this release and accept full responsibility therefor. The Holder declares that the terms of this full and final release of claims have been completely read by the Holder and are fully understood and voluntarily accepted for the purpose of making a full and final compromise and settlement. The Holder hereto hereby represents and warrants that he has not assigned any of his above referenced released claims to any third party. The Holder further agrees that all rights under Section 1542 of the Civil Code of California, and any similar law of any state or territory of the United States or other jurisdiction, are hereby expressly waived. Said Section reads as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."**

_____
Initials of
Holder

16.    Injunctive Relief.

16.1    Damages Inadequate

Each party acknowledges that it would be impossible to measure in money the damages to the other party if there is a failure to comply with any covenants or provisions of this Agreement, and agrees that in the event of any breach of any covenant or provision, the other party to this Agreement will not have an adequate remedy at law.

16.2    Injunctive Relief

It is therefore agreed that the other party to this Agreement who is entitled to the benefit of the covenants or provisions of this Agreement which have been breached, in addition to any other rights or remedies which they may have, shall be entitled to immediate injunctive relief to enforce such covenants and provisions, and that in the event that any such action or proceeding is brought in equity to enforce them, the defaulting or breaching party will not urge a defense that there is an adequate remedy at law.

17.    Waivers.

If any party shall at any time waive any rights hereunder resulting from any breach by the other party of any of the provisions of this Agreement, such waiver is not to be construed as a continuing waiver of other breaches of the same or other provisions of this Agreement. Resort to any remedies referred to herein shall not be construed as a waiver of any other rights and remedies to which such party is entitled under this Agreement or otherwise.

18.    Successors and Assigns.

Each covenant and representation of this Agreement shall inure to the benefit of and be binding upon each of the parties, their personal representatives, assigns and other successors in interest.

19.    Entire and Sole Agreement.

This Agreement constitutes the entire agreement between the parties and supersedes all other agreements, representations, warranties, statements, promises and undertakings, whether oral or written, with respect to the subject matter of this Agreement. This Agreement may be modified only by a written agreement signed by all parties.

20.    Governing Law.

This Agreement will be governed by the laws of California without giving effect to applicable conflict of laws provisions. With respect to any litigation arising out of or relating to this Agreement, each party agrees that it will be filed in and heard by the state or federal courts with jurisdiction to hear such suits located in Los Angeles County, California.

21.    Counterparts.

This Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

22.    Attorneys' Fees and Costs.

In the event that either party must resort to legal action in order to enforce the provisions of this Agreement or to defend such action, the prevailing party shall be entitled to receive reimbursement from the nonprevailing party for all reasonable attorneys' fees and all other costs incurred in commencing or defending such action, or in enforcing this Agreement, including but not limited to post judgment costs.

23.    Further Acts.

The parties to this Agreement hereby agree to execute any other documents and take any further actions which are reasonably necessary or appropriate in order to implement the transactions contemplated by this Agreement.

24.    Authorized Signatures.

Each party to this Agreement hereby represents that the persons signing below are duly authorized to execute this Agreement on behalf of their respective party.

25.    Severability.

The provisions of this Agreement are severable and in the event that one or more of its provisions are deemed to be unenforceable or invalid for any reason, such finding will not affect the enforceability or validity of any other provision of this Agreement, which shall remain in full force and effect.

**IN WITNESS WHEREOF,** this Agreement has been entered into as of the date first above written.

**SANITEC USA:**                          **SANITEC USA, INC., a California corporation**


By: _____
    James R. Harkess, President


**COMPANY:**                              **SANITEC INDUSTRIES, INC., a California corporation**


By: _____
    James R. Harkess, President


**HOLDER:**                               _____
                                          Signature

                                          _____
                                          Print Name

                                          _____
                                          Street Address

                                          _____
                                          City, State and Zip Code

                                          _____
                                          Telephone Number