# EXHIBIT 9

 **News Release**

For Immediate Release:                        Contact: 202-247-0130, adamdubitsky@yahoo.com
Monday July 11, 2005

EDITORS:  Graphics and video available upon request and at www.sanitecindustries.com

# Sanitec Industries Acquires SafeWaste;
## Deal Creates World's Largest Processor of Medical Waste Using No-Hazardous-Emission Microwave Technology.

Washington, DC—July 11—Sanitec Industries, Inc. (www.sanitecindustries.com)  the global patent holder for the Sanitec® Microwave Disinfection System™ and leader in no-hazardous-emission medical waste processing announced today its acquisition of Mount Holly, NC-based SafeWaste, Inc.

The deal between the two closely held firms creates the world's largest mobile and on-site processor of medical waste using no hazardous emission Sanitec® microwave technology.  Utilized by hundreds of healthcare providers ranging from large Veteran's Administration hospitals to single practitioner doctors offices, the Sanitec system is a turnkey solution that transforms dangerous hospital waste into low-volume, unrecognizable non-infectious material that requires no further treatment and can be safely disposed of in municipal landfills.

SafeWaste has become the US's largest provider of on and off-site treatment of biohazardous waste using Sanitec technology, serving more than 1,000 healthcare facilities in the Southeast," said Mr. James Harkess, President of Sanitec Industries.  "We are excited to now have a presence on both coasts as an increasing number of facilities rely on Sanitec's mobile and on-site Microwave Disinfection System to safely and affordably treat and dispose of their medical waste," Mr. Harkess said.

About the size of a bus, the on-site and mobile (truck-based) Sanitec® units are fully automated, self-contained and are approved for use in all 50 states and DC.  Unlike incineration and autoclaves, which merely transform biohazard material into other dangerous waste products including dioxin, Sanitec® systems are self-contained disposal units that utilize a patented microwave disinfection system that completely eliminates all bacterial and viral pathogens with no hazardous emissions.

**About Sanitec Industries, Inc. (www.sanitecindustries.com)**
Sanitec Industries, Inc. is the global patent holder for the Sanitec® Microwave Healthcare Waste Disinfection System™ technology, the most efficient environmentally friendly process available to process dangerous medical waste.  Sanitec systems are operating both at hospitals and at regional waste treatment centers in the United States and in six foreign countries (Brazil, England, Canada, Japan, Korea, and Saudi Arabia), have processed over 300 million pounds of infectious medical waste. And, each month Sanitec units process an additional 7+ million pounds plus of waste.

**About the Sanitec® Microwave Healthcare Waste Disinfection System™**
Used by over 1,000 hospitals and healthcare facilities on four continents, the Sanitec® Microwave Healthcare Waste Disinfection System™ transforms dangerous hospital waste into low-volume, non-infectious material that requires no further treatment and can be safely disposed of in municipal landfills.  The system is entirely self-contained and emits no harmful vapors, wastewater or byproducts.  Unlike incineration and autoclaves, which merely transform biohazard material into other dangerous waste products including dioxin, Sanitec systems are self-contained disposal units that utilize a patented microwave disinfection system that completely eliminates all bacterial and viral pathogens.  The end product meets the highest standards for municipal landfill disposal.

**CONTACT: For information, interviews or graphics contact 202-247-0130 or adamdubitsky@yahoo.com.  For a detailed description of the Sanitec® Microwave Healthcare Waste Disinfection System™, please visit www.sanitecindustries.com.**

-- 30 --

# EXHIBIT 10

 **News Release**

For Immediate Release:
August 22, 2005

Contact: 202-247-0130, adamdubitsky@yahoo.com

EDITORS: Graphics and video available upon request and at www.sanitecindustries.com

# Good Samaritan Hospital of Los Angeles
# Signs Two Year Medical Waste Deal with Sanitec Industries;
### Innovative Zero-Emission Microwave Technology Transforms
### Medical Waste Into Non-Hazardous, Low-Volume Landfill Ready Material

Sun Valley, CA —August 22, 2005—Sanitec Industries, Inc., (www.sanitecindustries.com) the global patent holder for the Sanitec® Microwave Healthcare Waste Disinfection System,™ announced today that Good Samaritan Hospital (www.goodsam.org) of Los Angeles has signed a two-year contract with the zero-emission healthcare waste processing firm. Using either onsite or mobile units, Sanitec® systems transform dangerous healthcare waste into low-volume, unrecognizable non-infectious material that requires no further treatment and can be safely disposed of in municipal landfills. Sanitec is the world's largest processor of healthcare waste using microwave technology.

Founded in 1885 and located in the heart of Los Angeles, the 408 bed not-for-profit Good Samaritan Hospital performs approximately 4,200 in-patient surgeries and receives 25,400 emergency room visits each year.

"We are delighted to announce that Good Samaritan Hospital is now among one thousand-plus healthcare facilities in the US, ranging from large Veteran's Administration hospitals to single practitioner doctors' offices, that turn to Sanitec Industries to safely and affordably treat and dispose of healthcare waste," said James Harkess, President of Sanitec Industries. "Throughout its history Good Samaritan has been a model corporate citizen, compassionately serving residents of Los Angeles. By implementing Sanitec systems, Good Samaritan is taking a leadership role in reducing the impact of healthcare waste on the local environment." Harkess said.

About the size of a bus, the on-site and mobile (truck-based) Sanitec® units are fully automated, self-contained and are approved for use in all 50 states and DC. Unlike incineration and autoclaves, which merely transform biohazard material into other dangerous waste products including dioxin, Sanitec® systems are self-contained disposal units that utilize a patented microwave disinfection system that completely eliminates all bacterial and viral pathogens.

**About Sanitec Industries**
Sanitec Industries, Inc. is the global patent holder for the Sanitec® Microwave Healthcare Waste Disinfection System™ technology, the most efficient environmentally friendly process available to process dangerous medical waste. Sanitec systems are operating both at hospitals and at regional waste treatment centers in the United States and in six foreign countries (Brazil, England, Canada, Japan, Korea, and Saudi Arabia), have processed over 300 million pounds of infectious medical waste. And, each month Sanitec units process an additional 7+ million pounds plus of waste.

-- more --                -- more --

CORPORATE HEADQUARTERS: 1250 24TH ST., NW  SUITE 350  WASHINGTON, DC 20007
PHONE 202.263.3630  FAX 202.466.3079
WEST COAST OFFICE:  9065 NORRIS AVE  SUN VALLEY, CA 91352
PHONE 866-SANITEC OR 818-504-0343  FAX 818-504-1180

**About the Sanitec® Microwave Healthcare Waste Disinfection System™**

Used by over 1,000 hospitals and healthcare facilities on four continents, the Sanitec® Microwave Healthcare Waste Disinfection System™ transforms dangerous hospital waste into low-volume, non-infectious material that requires no further treatment and can be safely disposed of in municipal landfills. The system is entirely self-contained and emits no harmful vapors, wastewater or byproducts. Unlike incineration and autoclaves, which merely transform biohazard material into other dangerous waste products including dioxin, Sanitec systems are self-contained disposal units that utilize a patented microwave disinfection system that completely eliminates all bacterial and viral pathogens. The end product meets the highest standards for municipal landfill disposal.

**CONTACT: For information, interviews or graphics contact 202-247-0130 or <u>adamdubitsky@yahoo.com</u>. For a detailed description of the Sanitec® Microwave Healthcare Waste Disinfection System™, please visit <u>www.sanitecindustries.com</u>.**

-- 30 --

# EXHIBIT 11



# News Release

For Immediate Release:
August 24, 2005

Contact: 202-247-0130, adamdubitsky@yahoo.com

EDITORS:  Graphics and video available upon request and at www.sanitecindustries.com

# Novant Health Signs Three Year Medical Waste Deal With Sanitec/SafeWaste;
## Innovative Zero-Emission Microwave Technology Eliminates Hazardous Health Waste In Local Landfills.

Washington, DC & Holly, NC—August 24, 2005—Sanitec Industries, Inc., (www.sanitecindustries.com) announced today that Winston-Salem based Novant Health (www.novanthealth.org)  has signed a three-year healthcare waste treatment contract with the zero-emission healthcare waste processing firm.   The global patent holder for the Sanitec® Microwave Healthcare Waste Disinfection System™ recently acquired Holly, NC-based SafeWaste, Inc. which had handled waste processing for two of Novant's facilities.

Novant Health is a not-for-profit, integrated healthcare system in western North Carolina that serves more than 3.4 million people in 32 counties reaching from southern Virginia to northern South Carolina.  In addition to leading hospitals, other facilities and programs of Novant Health include three philanthropic foundations, two nursing home and senior residential facilities, physician clinics, outpatient surgery and diagnostic centers, rehabilitation programs and community health outreach programs.

"Novant Health is a true leader and innovator when it comes to using technology to better the lives of their patients and the dozens of communities they serve and we are excited about entering this new and expanded phase of our relationship with them," said James Harkess, President of Sanitec Industries.  Novant is among over one thousand healthcare facilities in the US, ranging from large Veteran's Administration hospitals to single practitioner doctors' offices, that utilize Sanitec systems to transform dangerous healthcare waste into low-volume, unrecognizable non-infectious material that requires no further treatment and can be safely disposed of in municipal landfills.

About the size of a bus, the on-site and mobile (truck-based) Sanitec™ units are fully automated, self-contained and are approved for use in all 50 states and DC.  Unlike incineration and autoclaves, which merely transform biohazard material into other dangerous waste products including dioxin, Sanitec™ systems are self-contained disposal units that utilize a patented microwave disinfection system that completely eliminates all bacterial and viral pathogens.

-- more --      -- more --

**About Sanitec Industries (www.sanitecindustries.com)**
Sanitec Industries, Inc. is the global patent holder for the Sanitec® Microwave Healthcare Waste Disinfection System™ technology, the most efficient environmentally friendly process available to process dangerous medical waste. Sanitec systems are operating both at hospitals and at regional waste treatment centers in the United States and in six foreign countries (Brazil, England, Canada, Japan, Korea, and Saudi Arabia), have processed over 300 million pounds of infectious medical waste. And, each month Sanitec units process an additional 7+ million pounds plus of waste.

**About the Sanitec® Microwave Healthcare Waste Disinfection System™**
Used by over 1,000 hospitals and healthcare facilities on four continents, the Sanitec® Microwave Healthcare Waste Disinfection System™ transforms dangerous hospital waste into low-volume, non-infectious material that requires no further treatment and can be safely disposed of in municipal landfills. The system is entirely self-contained and emits no harmful vapors, wastewater or byproducts. Unlike incineration and autoclaves, which merely transform biohazard material into other dangerous waste products including dioxin, Sanitec systems are self-contained disposal units that utilize a patented microwave disinfection system that completely eliminates all bacterial and viral pathogens. The end product meets the highest standards for municipal landfill disposal.

**About Novant Health (www.novanthealth.org)**
Novant Health is a not-for-profit, integrated healthcare system in western North Carolina that serves more than 3.4 million people in 32 counties reaching from southern Virginia to northern South Carolina. In addition to leading hospitals, other facilities and programs of Novant Health include three philanthropic foundations, two nursing home and senior residential facilities, physician clinics, outpatient surgery and diagnostic centers, rehabilitation programs and community health outreach programs. Novant was formed July 1, 1997 by the merger of Carolina Medicorp of Winston-Salem, North Carolina and Presbyterian Health Services of Charlotte, North Carolina. Thomasville Medical Center joined the system in November 1997.

**CONTACT: For information, interviews or graphics contact 202-247-0130 or adamdubitsky@yahoo.com. For a detailed description of the Sanitec® Microwave Healthcare Waste Disinfection System™, please visit www.sanitecindustries.com.**

-- 30 --

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SANITEC WEST, et al. | ) | CASE NO. 1:02 CV 01582 |
| | ) | |
| Plaintiffs, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM IN SUPPORT OF |
| JOSEPH DELLOIACOVO, et al. | ) | MOTION TO INTERVENE |
| | ) | |
| Defendants. | ) | |

Jeffrey J. Weinsten and Salem Associates, Inc. (collectively referred to as "Intervenors") seek to intervene as Plaintiffs in the above captioned matter, pursuant to Federal Rule of Civil Procedure 24. Weinsten, through Salem Associates, is a 49% shareholder of Sanitec, LTD, one of the Plaintiffs in this case, yet his 49% interest in this closely held corporation has been completely ignored by the attorneys purporting to represent the corporation. Further, Intervenors have claims for substantial monies owed to them by Sanitec, LTD. The Intervenors currently have claims against the Defendants related to this case and, if those claims are not adjudicated here, either through trial or settlement, the matters involved herein cannot be fully resolved. Further, settlement of this case without Intervenors will likely give rise to an additional lawsuit and numerous additional claims, as Intervenors will likely have serious breach of fiduciary duty, self-dealing and malpractice claims to assert against Sanitec, LTD, its current officer and majority shareholder, and the attorneys purporting to represent Sanitec, LTD.

## STATEMENT OF THE FACTS

Salem Associates is a 49% shareholder of Sanitec Worldwide, LTD, which owns 100% of the stock of Sanitec, LTD, a Plaintiff in this case. Jeffrey Weinsten is the sole owner of Salem Associates. The majority, 51% shareholder of Sanitec Worldwide, LTD is Counterclaim Defendant Windsor Holdings, whose managing member and alleged owner is Counterclaim Defendant Terry Quinn. Pursuant to the relevant corporate By-Laws (attached hereto as Exhibit A), a 65% supermajority vote is required in order to "sell, transfer, or otherwise dispose of any of the assets of Sanitec, LTD." Therefore, both Quinn and Weinsten must agree for any such transfer to take place.

The other Plaintiff in this case is Sanitec West. Sanitec West is owned 20% by James Harkess, and 80% by Mary Riedinger. Riedinger is the live-in girlfriend of Quinn and is an owner in name only. In reality, this 80% is controlled by Quinn.

Plaintiffs Sanitec, LTD and Sanitec West filed this lawsuit in April 2002 against Defendants after Defendants conspired and illegally purported to transfer all of the assets of Sanitec, LTD to another corporation. On December 20, 2002, Defendants filed an answer in this matter. In their answer, they also asserted a counterclaim – which was, in fact, a third-party complaint – against the Intervenors. The Intervenors were not served with this pleading until January 9, 2003 and their answer was not due until January 29, well past the date trial was then scheduled to commence. Rather than seek dismissal for the prejudicially short notice, Intervenors retained counsel and began preparing a pleading and for trial. On January 29, Intervenors sought leave through Monday, February 3 to file their answer and counterclaims, but indicated that effort would nonetheless be made to file on Friday, January 31.

On Friday, January 31, this Court held a telephonic conference with counsel for all parties in attendance. During that conference, counsel for the Plaintiffs and Defendants indicated that settlement

negotiations were progressing. Intervenors, however, were not invited to join in, or consulted with regard to, those settlement discussions. Nonetheless, in response, Intervenors notified the Court that they would file their responsive pleading on February 3, rather than January 31, so as not to potentially interfere with settlement progress.

Meanwhile that same day, Intervenors were attempting to work with counsel for Plaintiffs with regard to internal disputes between them and Plaintiff Sanitec, LTD, so that those issues would not interfere with any potential settlement with Defendants. Counsel for Plaintiffs abruptly ended those discussions, however. The next day, Saturday, February 1, one of Plaintiffs' attorneys, Scott Simpkins, electronically filed *on behalf of the Defendants* a Notice of Voluntary Dismissal of Intervenors. (*See*, electronic notice attached hereto as Exhibit B indicating the filing was made by Simpkins.)

Plaintiffs and Defendants are clearly working together in an effort to prevent Intervenors from pursuing their rightful claims. If they succeed, Intervenors will be forced to file an additional lawsuit in order to pursue their current claims against Defendants, and in order to pursue their new claims against Plaintiffs and Plaintiffs' counsel that will potentially arise out of the current situation. The current settlement discussions, as Intervenors understand them, pose serious breach of fiduciary duty and self-dealing issues against Sanitec, LTD's majority shareholder and current president, and serious malpractice claims against Plaintiffs' counsel. Clearly the more proprietary route, the one that will best conserve judicial resources, is to require resolution of all claims by all parties in this action. For that to happen, Intervenors must be allowed to remain in the case and to participate fully in all settlement negotiations.

## LAW AND ARGUMENT

Federal Rule of Civil Procedure 24 provides for certain persons, in certain circumstances, to intervene as a matter of right in an action in which they are not otherwise a party. "Rule 24 is broadly construed in

favor of potential intervenors." *Purnell v. Akron*, 925 F.2d 941, 950 (6th Cir. 1991). Interpreting this Rule, the Sixth Circuit has delineated four elements an intervenor must establish in order to intervene as a matter of right: 1) that the motion to intervene is timely; 2) that the intervenors have a substantial legal interest in the subject matter of the case; 3) that the intervenors' ability to protect their interests may be impaired by the absence of intervention; and 4) that the parties already before the Court may not adequate represent the interests of the intervenors. *Grutter v. Bollinger*, 188 F.3d 394, 397-398 (6th Cir. 1999).

### 1. The Motion to Intervene is Timely

Defendants filed their "counterclaim" against Intervenors on December 20, 2002, with service accomplished on January 9. Therefore, up until approximately noon on Saturday, February 1, Intervenors were parties to this action and had no need to intervene. Now that Intervenors have been voluntarily dismissed, they are filing this Motion the first business day following that dismissal. The Motion, therefore, could not be timelier. The first element is met.

### 2. Intervenors Have a Substantial Legal Interest in the Subject Matter of the Case

The Sixth Circuit subscribes to a "rather expansive notion of the interest sufficient to invoke intervention of right." *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997). In fact, an intervenor does not have to have the same standing necessary to actually initiate the lawsuit in order to be granted the right to intervene. *Grutter*, 188 F.3d at 398.

The underlying and primary issue in this case is the question of who owns the assets and intellectual property of Sanitec, LTD, one of the two Plaintiffs in this case. Sanitec, LTD and its sister company, Sanitec USA National ("SUSAN"), owe substantial money to Intervenors by virtue of having both defaulted on loans and breached consulting contracts. The current amount due and owing to Intervenors and other Weinsten interests is substantial and grows every day. Sanitec, LTD's and SUSAN's inability to pay these debts is a

-4-

direct result of the wrongful actions taken by the Defendants herein and, therefore, Intervenors have standing to assert various claims against Defendants, including but not limited to, tortious interference with contract, civil conspiracy and breach of fiduciary duty.

In addition to the money owed to Intervenors, Weinsten, through Salem Associates, is a 49% shareholder of Sanitec Worldwide, LTD, with Windsor (Quinn) holding the remaining 51%. The other Plaintiff herein, Sanitec West, is unrelated to Sanitec, LTD other than through a Distributor Agreement between the corporations. Quinn is also the true owner of 80% of Sanitec West.

It appears from the course of settlement discussions and drafts of "Memorandums of Understanding" that Intervenors have seen, that it is contemplated by Plaintiffs and Defendants that the potential settlement will give Sanitec West the assets and intellectual property of Sanitec, LTD. Any such arrangement will be invalid, however, and will give rise to serious legal issues.

First, such a transfer cannot take place without Intervenors' consent, as the transfer requires a 65% supermajority vote to be effective. Second, Sanitec West has no right or legitimate interest in this property and if the majority shareholder (Quinn) and the current president (Third-Party Defendant David Kaye) of Sanitec, LTD purport to agree to such an arrangement, they will be breaching their fiduciary duty to Intervenors. Third, by such an arrangement, Quinn is simply taking what is in his left pocket (Sanitec, LTD) and putting it in his right pocket (Sanitec West) and in so doing, is leaving Intervenors with nothing, raising serious questions of self-dealing. Finally, Plaintiffs' counsel purports to represent the closely held "corporation" of Sanitec, LTD, but in so doing, have presumably dealt only with Quinn to the complete exclusion of Intervenors, giving rise to serious malpractice issues.

If Intervenors are not parties to this case, they cannot actively participate in the settlement negotiations. Without their active participation, the settlement proposals currently under consideration will give rise to new claims that will require additional resources to pursue. Intervenors, both as noteholders and

shareholders, clearly have a substantial interest in the subject matter of this case. Under the Sixth Circuit's "expansive notion" of sufficient interest, they should be allowed to intervene. *Grutter*, 188 F.3d at 398. The second element is met.

### 3.  Intervenors' Ability to Protect Their Interests May be Impaired

"To satisfy this element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied. This burden is minimal." *Grutter*, 188 F.3d at 399. In addition, "Courts view impairment in practical terms rather than legal terms. Courts generally allow intervention if a party might be practically disadvantaged by the disposition of the action." *Deutsche Fin. Servs. Corp. v. Schwartz Homes, Inc.*, 187 F.R.D. 542, 546 (N.D.Ohio 1999) (internal citation and quotation omitted).

Intervenors here have a substantial legal interest both in the money owed to them through loans and breached contracts, and through their 49% interest in Sanitec, LTD. These legal rights will be impaired if Intervenors are not allowed to insert themselves in this matter to speak on their own behalf. As the matter stands, if it proceeds to trial, Sanitec, LTD could be left with nothing, rendering Intervenors' 49% interest essentially worthless and leaving an open question as to if and from whom they can pursue their rights as creditors. If the matter settles in any form similar to the current proposals, the settlement will be invalid and the result of malpractice on the part of Plaintiffs' attorneys. Therefore, Intervenors' ability may be – and, in fact, will be – impaired, both legally and practically, if they are not allowed to protect themselves in this matter.

Furthermore, "'inadequacy of representation is or may be shown by proof of collusion between the representative and an opposing party.'" *St. Paul Fire & Marine Ins. Co. v. Summit-Warren Indus.*, 143 F.R.D. 129, 135 (N.D. Ohio 1992); quoting *Stadin v. Union Elec. Co.*, 309 F.2d 912, 919 (8th Cir. 1962). There could hardly be better proof of collusion between Plaintiffs and Defendants in this case than

the electronic filing by which *Defendants* purportedly voluntarily dismissed their claims against Intervenors, but which filing was actually made by *Plaintiffs'* counsel, Scott Simpkins. Surely Intervenors meet the "minimal" burden of demonstrating that their interests may be impaired if they are not allowed to intervene here.

### 4. The Existing Plaintiffs Will Not Adequately Represent Intervenors' Interests

Under this element, Intervenors must show that the current Plaintiffs may not adequately represent their interests. *Grutter*, 188 F.3d at 400. "This burden is minimal because it is sufficient that the movant[ ] prove that representation may be inadequate. One is not required to show that the representation will in fact be inadequate." *Michigan State AFL-CIO*, 103 F.3d at 1247 (internal quotes and citation omitted).

From the discussion above, it is clear that there is a good chance Plaintiffs in this case will not adequately represent Intervenors' interests. Quinn and Kaye, respectively the majority shareholder and president of Plaintiff Sanitec, LTD, seem content to "give away the farm" to Sanitec West. Quinn only stands to gain from such a transfer, as his interest in the relevant assets and intellectual property increases from 51% to 80%. Plaintiff Sanitec West certainly has no reason not to accept the valuable transfer of assets and has no reason or obligation to protect Intervenors' interests. Neither Plaintiff, therefore, appears to have any interest in protecting Intervenors' rights and, in fact, both seem motivated to intentionally interfere with those rights. The current Plaintiffs are clearly not adequately representing Intervenors' interests and the "minimal" burden of the fourth element is met.

This Court has already granted the class of individual investors the right to intervene. At the time this issue was discussed in open Court on January 23, all parties agreed the class intervenors should be allowed to intervene so that all issues could be resolved in one single action and all matters herein could be fully put to rest. Plaintiffs' and Defendants' collusive effort to exclude Intervenors now is clear evidence of the

intent of those parties to prevent Intervenors from protecting their rights. This strategy, if allowed to succeed, will only lead to new lawsuits in new courts involving the same parties currently congregated here in the Northern District of Ohio. Intervenors should be allowed to intervene for the same reason the class intervenors were allowed to do so; so that all the claims of all the parties can be decided once and for all in one action.

## CONCLUSION

For all of the foregoing reasons, Jeffrey J. Weinsten and Salem Associates, Inc., respectfully request that this Court allow them to intervene as Plaintiffs in this action.

Respectfully submitted,


OF COUNSEL:

GOODMAN WEISS MILLER LLP

s/ Kimberly Y. Smith
STEVEN J. MILLER (0014293)
KIMBERLY Y. SMITH (0066849)
100 Erieview Plaza, 27th Floor
Cleveland, Ohio 4414-1824
Tel. (216) 696-3366
Fax. (216) 363-5835
miller@goodmanweissmiller.com
smith@goodmanweissmiller.com

**Attorneys for Intervenors Jeffrey J. Weinsten and Salem Associates, Inc.**

# EXHIBIT 13

1   MICHAEL J. HARTLEY (State Bar No. 189375)
2   SCOTT J. LIEPZIG (State Bar No. 192005)
    **WESTON BENSHOOF ROCHEFORT**
        **RUBALCAVA & MacCUISH LLP**
3   333 South Hope Street
    Sixteenth Floor
4   Los Angeles, California 90071
    Telephone: (213) 576-1000
5   Facsimile: (213) 576-1100

6   Attorneys for Plaintiff and Cross-Defendant
    JAMES HARKESS
7

8            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                **FOR THE COUNTY OF LOS ANGELES**

10

11  | JAMES HARKESS,                               | Case No.: BC 311681                                        |
    | ------------------------------------------- | --------------------------------------------------------- |
    |               Plaintiff,                    | (Assigned for All Purposes to the Honorable               |
    |        v.                                   | James R. Dunn – Department 26)                            |
    | TERRENCE QUINN aka TERRANCE LEE             | **(Unlimited Civil Case – Value of Property**            |
    | QUATKEMEYER, WINDSOR TRUST, and             | **Exceeds $25,000)**                                      |
    | DOES 1 through 10, inclusive,               | **SECOND AMENDED COMPLAINT**                             |
    |               Defendants.                   | **FOR DECLARATORY RELIEF**                               |

17
18  TERRANCE QUINN, and JAMES H. SMITH,
    as Trustee of THE WINDSOR TRUST, u/d/t
19  dated June 21, 2002,

20           Cross-Complainants,

21       v.                                          Filing Date:        March 5, 2004
                                                     Amended SAC:        January 4, 2005
22  JAMES HARKESS, and ROES 1 through 10,            Trial Date:         March 28, 2005
    inclusive,                                       FSC Date:           March 22, 2005
23

24          Plaintiff JAMES HARKESS hereby alleges against Defendant TERRENCE

25  QUINN aka TERRANCE LEE QUATKEMEYER, on personal knowledge as to itself, and

26  otherwise on information and belief, as follows:

27

28

                                        1
573114.1

**INTRODUCTION**

1.     Plaintiff is seeking declaratory relief pursuant to California *Code of Civil Procedure* § 1060 *et seq.* to resolve a present dispute over the ownership of Windsor Holdings LLC.  Plaintiff is seeking a declaration that he owns the entire right, title and interest in Windsor Holdings and that defendants have no right, title or interest in Windsor.

**PARTIES**

2.     Plaintiff James Harkess ("Harkess") is a resident of Los Angeles County, California.

3.     Defendant Terrence Quinn aka Terrance Lee Quatkemeyer ("Quinn") is a resident of Bel Air, California.

4.     Defendant Windsor Trust ("Trust") is a trust allegedly created pursuant to an alleged Trust Agreement dated June 24, 2002.

5.     Plaintiff currently does not know the true names and capacities of the defendants sued as Does 1 through 10, inclusive, and therefore sues these defendants by fictitious names.  Plaintiff will amend its First Amended Complaint to allege the true names and capacities of these defendants when they are ascertained.  Each of the fictitiously named Doe defendants is responsible in some manner for the events and happenings alleged in this First Amended Complaint.

**FACTS**

6.     Quinn allegedly caused Windsor Holdings LLC ("Windsor") to be incorporated as a California limited liability company on or about July 17, 2001.  Windsor purports to own 51% of the stock in Sanitec Worldwide, Inc. ("Worldwide"), a Delaware corporation, and Worldwide in turn purports to own 100% of the stock in Sanitec ("Limited"), which is also a Delaware corporation.

7.     Quinn had used Limited and its affiliates as a vehicle in a scheme to defraud investors in connection with the Sanitec medical waste disposal technology.  He used millions of dollars of investor money to purchase the predecessor to Limited and then through a series of fraudulent corporate transactions, purported to place the entire ownership

2

573114.1

1    of that company (and subsequently Limited) in his hands for the sum of $1 and leaving the

2    investors with nothing. Windsor was the holding company that Quinn allegedly formed to

3    ultimately hold his purported interest in Limited. Quinn's name is nowhere to be found on

4    the incorporation papers.

5          8.    Immediately after Windsor was formed, David Kaye was admitted as

6    Manager, Original and Sole Member and Managing Member of Windsor.

7          9.    Peter Babos ("Babos"), a California attorney and Quinn's personal

8    lawyer, subsequently drafted Windsor's Operating Agreement on or about July 2003, which

9    named David Kaye ("Kaye") as Manager and original Member of Windsor. Babos dated the

10    Operating Agreement, and Kaye signed it, as of July 17, 2001.

11         10.    Babos also drafted the Written Consent of Manager and Member, in

12    which Kaye was elected President and Managing Member of Windsor. Babos dated the

13    Written Consent, and Kaye signed it, as of July 17, 2001.

14         11.    Prior to July 2003, no shares in Windsor had been issued.

15         12.    In approximately July 2003, Kaye signed a Resolution of Windsor,

16    adopted by written consent, withdrawing as original Member of Windsor and admitting

17    Harkess as new Member of Windsor. This document was also drafted by Babos and he

18    dated it, and Kaye signed it, as of November 21, 2002.

19         13.    In approximately July 2003, a certificate for 100 membership interests

20    of Windsor was issued to Harkess. Babos prepared the certificate, which Kaye signed as

21    Windsor's Manager and President. Babos dated this document, and Kaye signed it, as of

22    November 21, 2002.

23         14.    The share certificate was subsequently provided to Harkess as the sole

24    owner of Windsor. Harkess also signed an acknowledgment that he was admitted as a

25    member of Windsor, subject to the provision of Windsor's Operating Agreement. In signing

26    the acknowledgement and receiving the Windsor shares, Harkess understood and relied on

27    the fact that Kaye was the Member and Manager of Windsor. Babos prepared and dated this

28    document, and Harkess signed it, as of November 21, 2002.

573114.1

1    15.    Babos has acted as Quinn's attorney since at least 1998, and both he and

2    Quinn have consistently represented to third parties, including Kaye and Harkess, that Babos

3    is Quinn's attorney and that on matters that affect Quinn's interests he acts on Quinn's behalf

4    and at Quinn's direction. Babos represented to both Kaye and Harkess that he was acting on

5    Quinn's behalf in preparing the documentation relating to Windsor in July 2003, and Harkess

6    and Kaye both relied on that representation and on Quinn's history of holding out Babos as

7    his attorney and agent.

8    16.    After Harkess became owner of Windsor, he caused another company,

9    Sanitec Industries, Inc., to enter into a settlement agreement with certain investors that were

10   suing Quinn, Sanitec, Ltd. and others in Ohio courts in connection with the fraud described

11   above. The settlement has resulted in significant payments made by Industries to a fund

12   created for the benefit of these investors as well as future obligations owed by Industries to

13   the settlement investors, which has effectively reduced the liability owed by Quinn. Quinn

14   accepted the benefit of this settlement agreement, which was publicly filed and available,

15   and has never challenged it or attempted to set it aside.

16   17.    Harkess continues to own his membership interest in Windsor. The

17   value of that ownership interest is in excess of $25,000.

18   18.    Windsor Trust ("Trust") is a trust allegedly created by Quinn in June 24,

19   2002.

20   19.    The    Trustees    and    Successor    Trustees    are    Jeffrey    Weinsten

21   ("Weinsten"), a resident of North Salem, New York; James H. Smith ("Smith"), a resident of

22   San Mateo, California; and Teresa Lyman ("Lyman"), a resident of Los Angeles County,

23   California.

24   20.    Quinn and the Windsor Trust, either directly or through their agents

25   and/or attorneys, have asserted that Quinn owned Windsor and that Quinn transferred that

26   alleged ownership to the Windsor Trust.

27   21.    Windsor never issued any membership interest certificate to Quinn or to

28   the alleged Windsor Trust created by Quinn. Further, neither Quinn nor the alleged Windsor

4

573114.1

1  Trust was ever admitted to Windsor as Members.

2         22.    Quinn asserts that in May 2003, he sent a letter terminating Kaye as

3  Windsor's Manager. Kaye never received a copy of such a letter. Further, Quinn had no

4  authority to terminate Kaye given that Kaye was the sole Member and Managing Member of

5  Windsor pursuant to the documents prepared by Quinn's own lawyer, Babos.

6         23.    In *United States v. Terrance Lee Quatkemeyer*, CR 00-18 (C.D. Cal.),

7  Quinn pled guilty to violating 18 U.S.C. §§ 1014, 2, and 371 -- false statements, aiding and

8  abetting, and conspiracy. This was Quinn's second conviction for this type of activity. He

9  was convicted of a similar crime in the U.S. District Court for the Central District of

10  California in 1988 or 1989.

11        24.    On or about June 23, 1997, in *United States v. Jeffrey J. Weinsten*, 96-

12  cr-00702 FB (E.D.N.Y.), Weinsten was found guilty of violating 18 U.S.C. §§ 1014, 2, and

13  371, involving a scheme and artifice to defraud the Coast Guard and to obtain money and

14  property from the Coast Guard by false and fraudulent pretenses.

15                           **FIRST CAUSE OF ACTION**

16         (Declaratory Relief Pursuant to Code of Civil Procedure Section 1060)

17        25.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 22

18  as though fully set forth herein.

19        26.    An immediate, real, and justiciable controversy exists between the

20  parties to this action regarding the ownership of Windsor.

21        27.    Harkess owns the entire right, title and interest to Windsor.

22        28.    Kaye and Harkess had the right to rely on the representations made and

23  documents drafted by Babos in connection with Windsor.

24        29.    Windsor was a vehicle by which Quinn facilitated and/or continued his

25  fraud on investors, and he accepted the benefits of Sanitec Industries' settlement with those

26  investors after the transfer of Windsor from Kaye to Harkess.

27        30.    Quinn claims that he owned Windsor and transferred his ownership

28  interest to Windsor Trust. However, the claim of Quinn and those persons acting on his

1  behalf is without any right whatsoever, and Quinn had no legal or equitable right, claim, or

2  interest in Windsor that he could have transferred to Windsor Trust.  Further, Quinn's

3  alleged transfer of ownership of Windsor to the Windsor Trust was in furtherance of Quinn's

4  scheme to defraud investors and was a fraudulent transfer.

5          31.    Harkess therefore seeks a declaration, as a matter of law and of equity,

6  that the right, title and interest to Windsor is vested in Harkess alone and that the defendants

7  herein, and each of them, be declared to have no right, title or interest in Windsor and that

8  defendants and each of them, be enjoined from asserting any estate, right, title or interest in

9  Windsor adverse to Harkess.

10          WHEREFORE, Harkess respectfully requests:

11          1.    A declaration and determination that Harkess is the rightful owner of

12  Windsor, and defendants be declared to have no right, title or interest in Windsor;

13          2.    A preliminary and permanent injunction, enjoining defendants, and each

14  of them, from claiming any right, title or interest in Windsor;

15          3.    Attorneys' fees and costs of suit herein incurred; and

16          4.    Such other and further relief as the Court may deem proper.

17

18  DATED:  January 5, 2005        MICHAEL J. HARTLEY
                                   SCOTT J. LEIPZIG
19                                 **WESTON, BENSHOOF, ROCHEFORT,**
                                   **RUBALCAVA & MacCUISH LLP**
20

21

22                                 Scott J. Leipzig
                                   Attorneys for Plaintiff and Cross-Defendant
23                                 JAMES HARKESS

24

25

26

27

28

6

573114.1

**PROOF OF SERVICE**

I, Yolanda S. Ramos, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Weston, Benshoof, Rochefort, Rubalcava & MacCuish LLP, 333 South Hope Street, Sixteenth Floor, Los Angeles, CA 90071. I am over the age of eighteen years and not a party to the action in which this service is made.

On January 5, 2005, I served the document(s) described as SECOND AMENDED COMPLAINT FOR DECLARATORY RELIEF on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows:

☒    BY MAIL: I am "readily familiar" with this firm's practice for the collection and the processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, the correspondence would be deposited with the United States Postal Service at 333 South Hope Street, Los Angeles, California 90071 with postage thereon fully prepaid the same day on which the correspondence was placed for collection and mailing at the firm. Following ordinary business practices, I placed for collection and mailing with the United States Postal Service such envelope at Weston, Benshoof, Rochefort, Rubalcava & MacCuish LLP, 333 South Hope Street, Los Angeles, California 90071.

☐    BY FEDERAL EXPRESS    ☐ UPS NEXT DAY AIR    ☐ OVERNIGHT DELIVERY: I deposited such envelope in a facility regularly maintained by ☐ FEDERAL EXPRESS    ☐ UPS    ☐ Overnight Delivery [specify name of service: ] with delivery fees fully provided for or delivered the envelope to a courier or driver of ☐ FEDERAL EXPRESS    ☐ UPS    ☐ OVERNIGHT DELIVERY [specify name of service:] authorized to receive documents at Weston, Benshoof, Rochefort, Rubalcava & MacCuish LLP, 333 South Hope Street, Los Angeles, California 90071 with delivery fees fully provided for.

☐    BY FACSIMILE: I telecopied a copy of said document(s) to the following addressee(s) at the following number(s) in accordance with the written confirmation of counsel in this action.

☒    [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☐    [Federal]    I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 5, 2005, at Los Angeles, California.

_____
YOLANDA S. RAMOS

573114.1

*Harkess v. Quinn, et al.*
Los Angeles Superior Court, Case No. BC 311681

## SERVICE LIST

| | |
|---|---|
| Mark M. Hathaway, Esq.<br>Slater Hathaway LLP<br>200 South Los Robles Avenue, Suite 530<br>Pasadena, CA  91101-2432 | Attorneys for Defendant and Cross-Complainant TERRENCE QUINN aka TERRANCE LEE QUATKEMEYER and Cross-Complainants JAMES H. SMITH, as Trustee of THE WINDSOR TRUST, u/d/t dated June 21, 2002<br><br>Telephone:    (626) 795-1600<br>Facsimile:    (626) 795-1616 |

573114.1

# EXHIBIT 14

1
2
3
4

# SLATER HATHAWAY LLP

ATTORNEYS

200 SOUTH LOS ROBLES AVENUE, SUITE 530
PASADENA, CALIFORNIA 91101-2432
TELEPHONE: (626) 795-1600
FACSIMILE: (626) 795-1616

5   MARK M. HATHAWAY    SBN 151 332
6   Attorneys for TERRENCE QUINN and THE WINDSOR TRUST

7

8   ## SUPERIOR COURT OF THE STATE OF CALIFORNIA

9   ## FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

10

| | |
|---|---|
| 11  JAMES HARKESS, | ) Case No. BC311681 |
| 12              Plaintiff, | ) **CROSS-COMPLAINT FOR** |
| 13  v. | ) **DECLARATORY RELIEF** |
| 14  TERRANCE QUINN, and DOES 1-10, inclusive, | ) [Assigned for All Purposes to Hon. James R. Dunn, Dept. 26] |
| 15              Defendants. | ) |
| 16 | ) |
| 17  TERRANCE QUINN, and JAMES H. SMITH, as Trustee of THE WINDSOR TRUST, u/d/t dated June 21, 2002 | ) |
| 18 | ) |
| 19              Cross-Complainants, | ) |
| 20  v. | ) Complaint Filed: April 28, 2004 |
|     JAMES HARKESS, and ROES 1 through 10, | ) FSC: NONE SET |
| 21              Cross-Defendants. | ) Trial Date: NONE SET |
| 22 | ) |

23      COME NOW Cross-Complainants TERRANCE QUINN (hereafter sometimes

24  "Quinn") an individual, and THE WINDSOR TRUST, dated June 24, 2002 (hereafter

25  sometimes the "Windsor Trust"), who allege claims against cross-defendants, and each of

26  them, as follows:

27                          INTRODUCTION

28      1.      Cross-complainants are seeking declaratory relief to resolve a dispute as to

1

CROSS-COMPLAINT FOR DECLARATORY RELIEF

1   who is the true owner of Windsor Holdings, LLC., (hereafter sometimes "Windsor LLC"),

2   a California limited liability company, which was organized at the behest and instruction of

3   defendant and cross-complainant Quinn.   The Windsor Trust was formally organized and

4   incorporated with the California Secretary of State on July 17, 2001.  Quinn is a

5   co-beneficiary of the Windsor Trust, which is the real party in interest in that any

6   ownership interest that Quinn may have had in Windsor LLC was assigned to the Windsor

7   Trust on June 24, 2002.

8        2.    Cross-defendant JAMES R. HARKESS (hereinafter "Harkess") with the

9   assistance of others, wrongfully converted the corporate books and records of Windsor

10  LLC in or about July of 2003, and illegally declared himself as the 100% sole owner of the

11  company by directing the false issuance of a stock certificate in his name.  Such fraudulent

12  conduct and theft of Windsor Trust's true ownership of the company has substantially

13  affected cross-complainants' title, interest, benefits and control in and to substantial other

14  property rights and assets which belong to the Windsor Trust, not to Harkess.  These

15  ownership rights are essential to also determine which party has the right and authority to

16  bind and act on behalf of Windsor LLC in connection with other business affairs and

17  litigation that is pending in separate actions in the states of Ohio, Delaware and this state.

18       3.    Cross-complainants seek a declaration that it is the Windsor Trust which

19  owns the entire right, title and interest in Windsor LLC and that cross-defendant

20  HARKESS has no right, title or interest in Windsor LLC.

21

22                    GENERAL ALLEGATIONS

23       4.    Cross-complainant Quinn is, and at all times herein mentioned was, a

24  resident of the County of Los Angeles, State of California.

25       5.    Cross-complainant Windor Trust, is a valid irrevocable trust in good

26  standing, organized in accordance with and pursuant to the laws of the State of California,

27  having its co-trustee being James H. Smith herein, with a business address in Los Angeles

28  County, California.

6.    Cross-complainants are informed and believe, and based thereon allege, that at all times herein mentioned, cross-defendant Harkess is a resident of the County of Los Angeles, State of California.

7.    The true names and capacities of Roes 1 through 100, inclusive, are unknown to cross-complainants who, therefore, sues such cross-defendants by such fictitious names, and cross-complainants will amend this complaint to show their true names and capacities when the same has been ascertained. Based on information and belief, each of the fictitiously named cross-defendants acted as an agent, employee, servant, principal, partner, shareholder, or co-conspirator of the other cross-defendants, or is otherwise responsible for the acts and omissions alleged in this complaint.

8.    Cross-complainants are informed and believe, and based thereon allege, that at all times herein mentioned, cross-defendants, and each of them, were the agents, employees, servants, principals, partners, shareholders, or co-conspirators of the other cross-defendants, acted within the scope of their authority as such agents, employees, servants, principals, partners, shareholders, or co-conspirators of the other cross-defendants, and approved and ratified the alleged acts and omissions of the other cross-defendants.

9.    Windsor LLC was organized as a California limited liability company on July 17, 2001. Cross-complainant Quinn retained Mitchell R. Miller, attorney at law, to incorporate Windsor LLC. At the time of Windsor LLC's organization, Quinn was undecided as to how to take title and issue any stock or certificate(s) of interest. This decision however was made in or about May of 2002 when Quinn decided to form an irrevocable trust to hold the ownership title to Windsor LLC. On or about June 24, 2002, Quinn created the Windsor Trust, naming himself as a co-beneficiary and James H. Smith and Jeffrey J. Weinsten as co-trustees. At this time Quinn also assigned the ownership of Windsor LLC to the Windsor Trust. A true and correct copy of the Trust is attached hereto and marked as Exhibit "A".

10.    Cross-complainants are informed and believe, and based thereon allege, that

3

CROSS-COMPLAINT FOR DECLARATORY RELIEF

1  in or about July of 2003, cross-defendant Harkess, by and with the assistance of others,

2  fraudulently converted the original books and records of Windsor LLC and inserted his

3  name as the owner of the company, which was back dated to be effective November 21,

4  2002.  Harkess has since then illegally held himself out to be the sole owner of Windsor

5  LLC. This act of conversion was wilfully intended by Harkess to harm Quinn and outright

6  steal Quinn's ownership of Windsor LLC (now held by the Windsor Trust), which held

7  significant intellectual property rights as well as other assets.

8      11.     At no time whatsoever has Quinn or the Windsor Trust sold, gifted,

9  transferred, or conveyed its ownership of Windsor LLC to Harkess, or any other third

10  party. Nor has Quinn or the Windsor Trust ever authorized or instructed anyone to do so

11  on his behalf.

12     12.     Cross-complainants are informed and believe, and based thereon allege, that

13  at all times herein mentioned, cross-defendants, and each of them, knew that Quinn had

14  previously created the Windsor Trust, that he had assigned the ownership of Windsor LLC

15  to the Windsor Trust, and that he had never transferred his ownership, nor authorized any

16  issuance of stock ownership in Windsor LLC, to anyone since its inception.

17     13.     An immediate, real, and justiciable controversy now exists between the

18  parties to this action regarding the true ownership of Windsor LLC.

19     14.     Harkess claims that he owns Windsor LLC as a result of his wrongful

20  conversion of the original corporate books and records of the company and issuance of a

21  certificate of interest in his name, dated November 21, 2002.

22     12.     Cross-complainants therefore seeks a declaration that the right, title and

23  interest in and to Windsor LLC is vested in the name of the Windsor Trust alone, and that

24  Harkess be enjoined from asserting any estate, right, title and interest in Wiindsor LLC

25  adverse to the Windsor Trust.

26

27  WHEREFORE, Cross-Complainants pray for judgment as follows:

28     1.     A declaration and determination that the Windsor Trust is the rightful owner

---

4

CROSS-COMPLAINT FOR DECLARATORY RELIEF

1    of Windsor LLC, and that Harkess be declared to have no right, title or interest in Windsor

2    LLC;

3      2.    A preliminary and permanent injunction enjoining cross-defendants, and each

4    of them, from claiming any right, title or interest in Windsor LLC;

5      3.    For attorney's fees and costs incurred herein; and

6      4.    For such other relief as the court may deem just and proper.

7

8    Dated: July 19, 004.              Respectfully submitted,

9                              SLATER HATHAWAY, LLP

10

11                              By_____

12                                Mark M. Hathaway, Esq.

                                 Attorneys for Cross-complainants

13                                TERRANCE QUINN and THE

                                 WINDSOR TRUST, dated June 24, 2002

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROSS-COMPLAINT FOR DECLARATORY RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>PROOF OF SERVICE</u>

STATE OF CALIFORNIA       }
                          }  ss.
COUNTY OF LOS ANGELES     }

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 200 South Los Robles Avenue, Ste 530, Pasadena, California 91101-2432.

On July 19, 2004 I served the foregoing document, described as CROSS-COMPLAINT FOR DECLARATORY RELIEF on all interested parties listed below by transmitting to all interested parties a true copy thereof as follows:

Michael J. Hartley, Esq
Weston Benshoof et al LLP
333 S. Hope Street 16FL
Los Angeles, CA  90071-1406

☐ BY FACSIMILE TRANSMISSION from FAX No. (626) 795-1616 to the fax numbers set forth above.
      ☐ The facsimile machine I used complied with Rule 2003(3) and no error was reported by the machine. Pursuant to Rule 2005(i), I caused the machine to print a transmission record of the transmission, a copy of which is attached to this declaration.
☐ BY EXPRESS SERVICE: I caused such document to be deposited in a box or other facility regularly maintained by the express service carrier or delivered to an authorized courier or driver authorized by the express service carrier to receive documents, in an envelope or package designated by the express service carrier with delivery fees paid or provided for, addressed to the person on whom it is to be served.
☒ BY MAIL as follows:
      ☐ placing a true copy thereof in a sealed envelope addressed as stated on the ATTACHED MAILING LIST.
      ☒ placing ☐ the original ☒ a true copy thereof enclosed in a sealed envelope addressed as set forth above.
      ☐ I deposited such envelope in the mail at Pasadena, California. The envelope was mailed with postage thereon fully prepaid.

      ☒ I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Pasadena, California in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.
☐ BY PERSONAL SERVICE as follows: I delivered such envelope by hand to the offices of the addressee.
☐ FEDERAL - I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.
☒ STATE - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 19, 2004, at Pasadena, California.

Lindsay Zimmer

---

6

CROSS-COMPLAINT FOR DECLARATORY RELIEF

# EXHIBIT 15



1

2  **SLATER HATHAWAY** LLP
   ATTORNEYS

3  200 SOUTH LOS ROBLES AVENUE, SUITE 530
   PASADENA, CALIFORNIA 91101-2432

4  TELEPHONE: (626) 795-1600
   FACSIMILE: (626) 795-1616

5  MARK M. HATHAWAY    SBN 151 332
   Attorneys for WINDSOR TRUST and

6  TERRANCE QUATKEMEYER

7

8           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9        **FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

10

11  JAMES HARKESS,                          ) Case No. BC311681
                                            )
12              Plaintiff,                  ) **WINDSOR TRUST'S TRIAL BRIEF**
                                            )
13  v.                                      ) [Assigned for All Purposes to Dept. 26,
                                            ) Hon. Hon. James R. Dunn]
14  TERRANCE QUINN, WINDSOR TRUST,          )
    u/d/t dated June 21, 2002, and DOES 1-10, ) FSC Date: March 23, 2005
15  inclusive,                              ) Trial Date: March 28, 2005
                                            ) Time: 9::00a.m.
16              Defendants.                 ) Location: 111 N. Hill St., Dept. 26
                                            )
17  _____)
                                            )
18  AND RELATED CROSS-ACTION.               )
                                            )
19 _____)

20

21      This is a dispute over the sole and exclusive ownership of a California limited

22  liability company known as Windsor Holdings, LLC (hereafter "Windsor"). Two Federal

23  Judges in Ohio are awaiting this Court's resolution of the Windsor Holdings, LLC

24  ownership issue. See, February 25, 2002, Order of the Hon Sandra S. Beckworth, United

25  States District Judge for the Southern District of Ohio, *Finch, et al v. Fiorini, et al,* USDC

26  Case No. 1:02-cv-00132-SSB-TSH, Exhibit A to Defendants' Motion in Limine; See also,

27  *Sanitec West et al. v. Delloiacovo et al.* USDC Case No. 1:02-cv-01582-DCN, Court

28  Docket Item 167, Margin Order of the Hon. Donald C. Nugent, Exhibit B to Defendants'

    Motion in Limine.

                                      1

1   In addition there are two other cases involving other Sanitec related companies that
2   have brought suit against Plaintiff Harkess and others. These as well are both in Los
3   Angeles Superior Court identified as *Riedinger v. Harkess,* et al. Case No. BC322202
4   (involving claims against Harkess for diluting the majority stock ownership of ABB
5   Sanitec West, Inc.), and *Sanitec Worldwide, Ltd. v. Harkess,* et al. Case No. BC330528
6   (involving claims against Harkess for converting the valuable intellectual property rights
7   originally owned and belonging to Sanitec, Ltd.).

8       Finally, there are "note holder" actions in Federal and state court in Ohio, i.e. *Finch,*
9   *et al v. Fiorini, et al,* USDC Case No. 1:02-cv-00132-SSB-TSH.

10

11                              STATEMENT OF FACTS

12      Windsor was organized by Quinn's attorney, Mitchell R. Miller, on July 17, 2001.
13  It is undisputed that Windsor is the majority shareholder of Sanitec Worldwide, Ltd., which
14  is the sole owner of Sanitec. Ltd. On June 24, 2002 Quinn created an irrevocable living
15  trust and appointed Mr. James Smith and Mr. Jeffrey Weinsten as co-trustees. On August
16  19, 2002, Quinn began serving an eighteen-month Federal prison term for bank fraud.

17      In July of 2003, Harkess, with the assistance of David Kaye, caused to be created
18  and executed false corporate documents that would reflect Mr. Kaye was the original
19  managing member of Windsor, and that Harkess was the sole owner of the company. This
20  was done by the preparation of false first organizational minutes of the company, a false
21  operating agreement, and a false issuance of a Certificate of Interest in Harkess' name.
22  Harkess and Kaye used and duped Quinn's personal attorney, Peter J. Babos, to prepare
23  such false documents together with Mr. Kaye's business attorney, Mark J. Richardson. Mr.
24  Babos did so only based on false representations made by both Harkess and Kaye. These
25  false representations included that Quinn had previously and formally made Kaye the
26  managing member of Windsor, and that Harkess and Kaye would give the Windsor
27  company ownership back to Quinn in the next few months.

28      Mr. Babos and Mr. Richardson prepared the false documents for Windsor and Kaye

2

1  and Harkess signed them on or about July 17, 2003. These documents were necessary at
2  the time to convince Sanitec, Ltd.'s then attorney of record in the Ohio federal court
3  litigation that both Kaye and Harkess had proper authority to speak for Sanitec, Ltd. That
4  was the primary need for rushing to prepare such false corporate documentation.

5      In or about October of 2003 Quinn returned home from after serving his sentence.
6  He advised Mr. Babos that he never had formally made Kaye a managing member of
7  Windsor, nor did he ever agree to have Kaye or anyone transfer ownership of his stock in
8  Windsor to Harkess, or anyone else. He further advised Babos that he had finalized the
9  creation of a trust in July of 2003, and that the ownership of Windsor was transferred to the
10 Trust.

11     Babos was not aware of these events, and steps were taken to try and immediately
12 correct the situation. Babos immediately advised Harkess of the Trust, and irrespective of
13 the Trust, asked him and Kaye to make good on their earlier representations that Quinn
14 would be given back his original ownership of Windsor upon his return home. Harkess
15 continues to refuse to return the Windsor stock ownership to Quinn compelling this
16 declaratory relief action.

17

18                          ARGUMENT
19     A. Quinn Properly Transferred His Ownership Of Windsor To The Trust
20     Quinn created a proper irrevocable living trust on June 24, 2002. The evidence will
21 demonstrate that Quinn had been considering for some time how to retire from the business
22 world and appoint persons to take over the business of Sanitec, manage the several pending
23 litigation matters, and most importantly, see that the financial affairs, including paying off
24 the debt of all private investment money that was utilized in the acquisition and operation
25 of Sanitec, Ltd. would be paid. This was primarily due to his severe health problems,
26 impending prison term, and an awareness that he alone could not handle the enormous
27 work and effort needed to accomplish these goals.
28     As a result of Quinn's continuing concerns regarding his health and business

3

1  judgment and abilities at that time, he decided to form a trust and designated two

2  competent and credible individuals to act as co-trustees, James Smith and Jeffrey

3  Weinsten. Due to his having to begin serving a sentence in federal prison, Quinn finally

4  formed the Trust and appointed Smith and Weinsten as its co-trustees. The validity of the

5  Trust has never been questioned. Quinn assigned to it as its sole asset the entire stock

6  ownership of Windsor.   These events transpired well before Harkess' claim to own

7  Windsor by a phony certificate of interest, dated November 21, 2002 which was admittedly

8  only created in July of 2003.

9

10    B.  <u>Kaye Was Never A Legitimate Manager Or Member Of Windsor</u>

11        Pursuant to <u>California Corporation Code, Sec. 17001(w)</u>, a manager is a person

12  designated by a member to manage the LLC.

13        A member is a person who is admitted as a member and who has not ceased to be a

14  member. <u>Corp. Code Sec. 17001</u> provides in pertinent part:

15  (w) "<u>Manager</u>" means a person elected by the members of a limited liability company to
    manage the limited liability company if the articles of organization contain the statement
16  referred to in subdivision (b) of Section 17151 or, if the articles of organization do not
    contain that statement, "manager" means each of the members of the limited liability company.
17
    (x) "Member" means a person who:
18
    (1) Has been admitted to a limited liability company as a member in accordance with the
19  articles of organization or operating agreement, or an assignee of an interest in a limited
    liability company who has become a member pursuant to Section 17303.
20  (2) Has not resigned, withdrawn, or been expelled as a member or, if other than an
    individual, been dissolved.
21
    (y) "Member of record" means a member named as a member on the list maintained in
22  accordance with paragraph (1) of subdivision (a) of Section 17058.

23  (z) "Membership interest" means a member's rights in the limited liability company,
    collectively, including the member's economic interest, any right to vote or participate in
24  management, and any right to information concerning the business and affairs of the
    limited liability company provided by this title.
25
    (aa) "Officer" means any person elected or appointed pursuant to Section 17154.
26
    (ab) "Operating agreement" means any agreement, written or oral, between all of the
27  members as to the affairs of a limited liability company and the conduct of its business in
    any manner not inconsistent with law or the articles of organization, including all
28  amendments thereto, or, in the case of a foreign limited liability company, all documents
    that serve a like function under the laws of the jurisdiction in which the foreign limited

4

1  liability company is organized. The term "operating agreement" may include, without
2  more, an agreement between all the members to organize a limited liability company
   pursuant to the provisions of this title.

3  Managers are to be elected by the members of a limited liability company. <u>Corp. Code</u>
4  <u>Sec. 17152(a).</u>

5      The evidence will show that David Kaye was never formally designated by Quinn or
6  anyone else to be the manager of Windsor. Nor was he properly admitted by Quinn or
7  anyone else to be a member. The original organizer of Windsor on Quinn's behalf was his
8  attorney, Mitchell R. Miller. Miller never had instruction from Quinn as to who to appoint
9  as manager and who to admit as an original member. In fact, Miller had not created any
10 operating agreement or  first organizational minutes of Windsor at the time Harkess and
11 Kaye caused these false documents to be prepared and executed for their own self interests.
12 Harkess and Kaye then further caused Babos to obtain the original books and records of
13 Windsor from Miller to give to them, thereby completing their acts of conversion.

14     The evidence will show that Kaye never kept any formal books and records of
15 Windsor as otherwise required by <u>Corp. Code Sec. 17058</u> which provides:

16     **Information required to be maintained at office**
       (a) Each limited liability company shall maintain in writing or in any other form
17     capable of being converted into clearly legible tangible form at the office referred to
       in subdivision (a) of Section 17057 all of the following:
18     (1) A current list of the full name and last known business or residence address of
       each member and of each holder of an economic interest in the limited liability
19     company set forth in alphabetical order, together with the contribution and the share
       in profits and losses of each member and holder of an economic interest.
20

21     No shares of stock in Windsor were ever issued to Kaye and he was never made a
22 member. Nor was Kaye ever a proper manager of Windsor having any legal right to
23 transfer any stock ownership to Harkess.

24     C.  <u>Harkess Took Stock Ownership Of Windsor Without Consideration</u>

25     Not only was Plaintiff's creation of false corporate documents and conversion of the
26 books and records of Windsor illegal and fraudulent, Harkess paid absolutely no money or
27 other consideration for receiving his shares of stock in the company. Notwithstanding
28 Harkess' fraudulent conversion of the Windsor stock, the transaction and transfer of the

1  stock to him by Kaye is void and invalid for lack of consideration.

2      Plaintiff will attempt to show that he was and is the "better candidate" to take

3  control of Sanitec, Ltd., (by and through his purported but fraudulent ownership of

4  Windsor), and that he could pay off the loan obligations to those Ohio investors and other

5  debts, obligations which were never his to pay. Furthermore, the original intellectual

6  property rights belonging to Sanitec, Ltd. were never Harless' to convert yet again and hold

.7  title to in another company, Sanitec Industries, Inc. However, the evidence will show that

8  Plaintiff's complex and creative schemes to try and hold himself out as the true owner of

9  Windsor were all fraudulent, without any legal basis and authority, and without any

10  consideration paid or given whatsoever.

11

12                          CONCLUSION

13      Based on all the foregoing, together with the evidence and testimony to be adduced

14  at trial, Defendants urge the court to grant declaratory relief and judgment in their favor

15  holding that The Windsor Trust, dated June 24, 2002 is the rightful and legal owner of

16  Windsor Holdings, LLC.

17

18  Dated: March 25, 2005            SLATER HATHAWAY LLP

19

20

21                                  MARK M. HATHAWAY
                                    Attorneys for WINDSOR TRUST and TERRANCE
22                                  QUATKEMEYER

23

24

25

26

27

28

                                        6



# Sanitec, Ltd.

March 1984 - Est. as Combustion Engineering Plant Mgmt Systems, Inc.

March 1988 - Name Change to Environmental Projects, Inc.

Sept. 1990 - Name Change to ABB Sanitec, Inc. by Asea Brown Boveri

Dec 1993 - Obtains U.S. Patent 5,270,000, Apparatus for treating medical hazardous wastes

April 1995 - Acquired by HS Holdings (NV), Name Change to Sanitec, Inc

June 1996 - Obtains U.S. Patent 5,529,687, Filling sluice for appliances for the treatment of infectious waste

Aug 1996 - Obtains U.S. Trademark 1,991,211 for "Sanitec, Inc"

April 1999 - Obtains U.S. Trademark 2,233,405 for Sanitec®

Feb 1999 - Acquired by SICC (NJ) [Quinn] using some funds loaned to Quinn by Venture companies. [Steven Venture, Quinn's cousin].

April 2001 - Corporate reorganization - Sanitec Inc. merges with Sanitec Int'l Holdings (NV) and Standard Industrial Consulting Corp (NJ) by NJ law firm.

Standard Industrial Consulting Corp (NJ) by NJ law firm.

April 2001 - Change Name to Sanitec, Ltd.

Sole shareholder of Sanitec Ltd. is Sanitec Worldwide, Ltd./ (DE) which is in turn owned by Windsor Holdings LLC (102 shares.) [Windsor Trust] and Salem Associates, Inc. (DE) (98 shares) [Weinstein]

## Sanitec, Ltd Distributors

- Sanitec West (CA,OR,WA) [Harkess]
- Narita Trading (Taiwan)
- Steryl Medi Equip (India)
- SheGoTec, Inc. (Japan)
- Fkepco/Bassi (Kuwait)
- Sanitec of Kentucky [Guardian Investments/ Ventre companies] sold to Stericycle circa 2002

In April 2002, Sanitec Ltd. and Sanitec West sue Delloiacovo, Sanitec Group LLC, et al. The competing claims and counter claims are pending before the Hon. Donald C. Nugent, U.S. District Judge in the Northern District of Ohio, *Sanitec West et al v. Delloiacovo et al.* USDC Case No. 1:02-cv-01582-DCN.. Case is stayed pending resolution of California issue of ownership of Windsor Holdings LLC and who, therefore, represents the interests of Sanitec Ltd. — Jim Harkess or James Smith and Jeffrey Weinstein.

## Sanitec Group, LLC

Formed February 20, 2002 by Joe Delloiacovo, while he was an officer and director of SANITEC, LTD. and without its consent or knowledge. Delloiacovo resigned from Sanitec, Ltd on March 21, 2002 and began operating Sanitec Group, LLC, claiming that it now owned all of Sanitec, Ltd.'s assets and intellectual property.

Delloiacovo placed derogatory information about Sanitec West on the Internet, which interfered with Sanitec West's private placement memorandum efforts. Sanitec Ltd and Sanitec West sued Delloiacovo et al, which is pending before Judge Nugent

Sanitec Group LLC is a subsidiary of Guardian Investments, LLC, a Steve Ventre enterprise, which claim rights to Sanitec Ltd's assets by virtue of money loaned to Quinn by Ventre.

## Sanitec Industries, Inc.

California corporation formed by James Harkess on February 19, 2003, while an officer and director of Sanitec West [ABB Sanitec West, Inc.] Harkess now claims Sanitec Industries Inc holds all Sanitec, Ltd.'s intellectual assets, based on an assignment from Sanitec Group, LLC. At the same time, Harkess is claiming to represent the interest of Sanitec Ltd., in the litigation in Ohio against Sanitec Group, LLC, hence the dispute.

## Sanitec USA, Inc.

California corporation formed by James Harkess on January 2, 2004, while he was a director and officer Sanitec West. Harkess now claims Sanitec USA, operates the business that used to belong to Sanitec West. Those issues are pending in *Riedinger v. Harkess, et al.* Case No. BC322202 (involving claims against Harkess for diluting the majority stock ownership of ABB Sanitec West, Inc.)