# EXHIBIT 16

1

2

**SLATER HATHAWAY** LLP

ATTORNEYS

200 SOUTH LOS ROBLES AVENUE, SUITE 530
PASADENA, CALIFORNIA 91101-2432
TELEPHONE: (626) 795-1600
FACSIMILE: (626) 795-1616

MARK M. HATHAWAY    SBN 151332
Attorneys for WINDSOR TRUST and
TERRANCE QUINN

**ORIGINAL FILED**

APR 2 1 2005

LOS ANGELES
SUPERIOR COURT

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

JAMES HARKESS,

   Plaintiff,

v.

TERRANCE QUINN, WINDSOR TRUST,
u/d/t dated June 21, 2002, and DOES 1-10,
inclusive,

   Defendants.

AND RELATED CROSS-ACTION.

) Case No. BC311681
)
) **POST TRIAL BRIEF**
)
) [Assigned for All Purposes to Dept. 26,
) Hon. Hon. James R. Dunn]
)
) Trial Date: March 28, 2005
) Time: 9::00a.m.
) Location: 111 N. Hill St., Dept. 26
)
)
)
)
)

INTRODUCTION

  Plaintiff James R. Harkess brought this declaratory relief action to determine the

ownership of Windsor Holdings LLC, a California limited liability company formed by

defendant Terrance Quinn in July 2001. Defendant Terrance Quinn and defendants James

H. Smith and Jeffrey Weinsten, as trustees of the Windsor Trust u/d/t dated June 24, 2002,

contend that Mr. Quinn irrevocably assigned his economic and ownership interest in

Windsor Holdings LLC to the Windsor Trust in June 2002 and that the Windsor Trust is

the sole member of Windsor Holdings LLC. Plaintiff Harkess contends that he became the

sole member of Windsor Holdings LLC in mid-July 2003 with the assistance of David

Kaye and Peter Babos, Mr. Quinn's attorney.

1

1    Based upon testimony and document evidence presented at trial and for the reasons

2  set forth herein. the sole membership of Windsor Holdings LLC is vested in James H.

3  Smith and Jeffrey Weinstein. as trustees of the Windsor Trust u/d/t dated June 24, 2002.

4

5                    FORMATION OF WINDSOR HOLDINGS, LLC

6    Windsor Holdings LLC was established as part of a corporate restructuring of Mr.

7  Quinn's 1999 acquisition of Sanitec, Ltd.  Exh. 21.  Following the reorganization

8  performed by New Jersey law firm Lowenstein Sandler, Windsor Holdings LLC was to

9  hold the shares of Sanitec Worldwide. Ltd.. which in turn owned Sanitec Ltd., a

10 manufacturing company and owner of the Sanitec* trademark and patents.

11    Windsor Holdings LLC came into existence on July 17, 2001 when Mr. Quinn's

12 attorney filed articles of organization with the Secretary of State pursuant to Corp. Code §

13 17050(c).  Exh. 223.  The undisputed evidence shows that Windsor Holdings LLC was

14 organized by attorney Mitchell R. Miller. Esq. at the request of his client, Terrance Quinn,

15 and that Mr. Quinn paid for the organization of Windsor Holdings LLC.  Exh. 408.

16    A "limited liability company" or "domestic limited liability company" is an entity

17 with one or more members organized under the Beverly-Killea Limited Liability Company

18 Act. Corp. Code § 17001(t); Corp. Code § 17101.  A limited liability company may

19 conduct business. sue and be sued. and exercise all the powers of a natural person, in its

20 own name.  See Corp. Code § 17003.

21    An LLC has two basic organizational documents. The first is the "articles of

22 organization." a one-page statutory form, which must be filed with the Secretary of State.

23 Corp. Code § 17050(c).  The second is the "operating agreement," which may be any

24 agreement. written or oral. among the member(s) as to the affairs of the LLC and the

25 conduct of its business. Corp. Code § 17001(ab)  The operating agreement may be as

26 simple as an agreement or intent to organize an LLC.

27    An LLC must have at least one member (Corp. Code § 17050(b)) and members may

28 be natural persons. partnerships. limited partnerships, trusts, estates, associations,

                                    2

1  corporations. other LLCs. or other types of entities. whether domestic or foreign.  Corp.

2  Code § 17001(x). (ae).

3      On formation of an LLC, its member(s) is the persons. or person. who enter into its

4  operating agreement before or after filing of its articles of organization. Corp. Code §

5  17050(a). After an LLC is formed. a person may become a member only by acquiring a

6  membership interest from the LLC in conformity with its articles of organization or

7  operating agreement or. if those documents do not otherwise provide, by vote of a majority

8  in interest of the members. – excluding the vote of the person acquiring the membership

9  interest. – and only on becoming a party to the operating agreement.  Corp. Code §

10  17100(a)(1).

11      A "membership interest" refers to a member's rights in the limited liability company,

12  collectively. including the member's economic interest, any right to vote or participate in

13  management. and any right to information concerning the business and affairs of the

14  limited liability company.  Corp. Code § 17001(z).

15      An LLC may be managed either by all of its members or by one or more managers.

16  Corp. Code §§ 17150, 17151. The managers may be or include some of the members

17  (Corp. Code § 17151(a)) and do not need to be natural persons.  Corp. Code § 17151(c).

18  The LLC's business and affairs are to be managed by all of its members unless the articles

19  of organization state that an LLC will be managed by one or more managers. Corp. Code §

20  17151(b).  In this case. the articles of organization does state that management of Windsor

21  Holdings LLC is vested in only "one manager." who does not need to be a member under

22  Corp. Code § 17151(c).  See Exhibit 223, ¶ 5.

23      As of its formation on July 17, 2001, Mr. Quinn was the sole person entitled to an

24  economic interest in Windsor Holdings LLC and the sole person who could enter into an

25  operating agreement. – written or oral. – and was. therefore. its owner and sole member.

26      Shortly after Windsor Holdings LLC came into existence. Mr. Quinn, as the sole

27  director of Sanitec Worldwide. Ltd.. authorized the issuance of Sanitec Worldwide, Ltd.

28  shares to Windsor Holding LLC.  As a result of the corporate restructuring, Sanitec

1  Worldwide, Ltd. was the sole shareholder of Sanitec, Ltd., the company Mr. Quinn had
2  acquired in 1999. On or about July 27, 2001, Jeffery Weinsten and Joe Delloiacovo
3  executed share Certificate No. 3 to complete the issuance of Sanitec Worldwide, Ltd.
4  shares to Windsor Holdings LLC. Exh. 78, 408.

5      As of August 2001, Mr. Quinn was the sole owner or member of Windsor Holdings
6  LLC, which owned Sanitec Worldwide Ltd., which in turn owned Sanitec Ltd. (See, Exh.
7  21, 22 for complete history.) Mr. Quinn, who was undergoing medical treatment for
8  cancer and other health problems and was facing Federal indictment, was looking for
9  someone to act as manager and facilitate the sale of Sanitec, Ltd. to a third party.

10

11                      DAVID KAYE AS MANAGER

12      David Kaye is the principal of Strategic Financial Advisors and was retained by
13  Terrance Quinn to raise capital for the development of ABB Sanitec West, Inc. ("Sanitec
14  West") through private investment offerings. Mr. Kaye testified that Mr. Quinn was his
15  client and that he was Mr. Quinn's fiduciary.

16      It is not disputed that after the formation of Windsor Holdings LLC and following a
17  meeting with Mark J. Richardson, Esq., Mr. Kaye's securities lawyer, Mr. Quinn asked Mr.
18  Kaye to serve as manager of Windsor Holdings LLC and to represent himself as the
19  managing member in the potential sale of Sanitec Ltd. to Eden Environmental LLC.
20  (Quinn and Kaye Testimony)

21      On October 12, 2001, Mr. Kaye and Mr. Quinn memorialized their arrangement in a
22  hand-written memorandum. Exh. 217. The substance of the memorandum is that Mr.
23  David Kaye would execute the term sheet for Eden Environmental LLC's acquisition of
24  Sanitec, Ltd. as "managing member" of Windsor Holdings, LLC, if Mr. Quinn and the
25  Windsor Holdings LLC agreed to fully indemnify Mr. Kaye for representing himself as the
26  managing member.

27      Since the Windsor Holdings LLC articles of organization state that management is
28  vested in only "one manager." (Exh. 223, ¶ 5). David Kaye could serve as the one manager

1   without being a member. See. Corp. Code § 17151(c). This would be akin to a

2   corporation hiring a president or CEO who was not a shareholder. David Kaye's testimony

3   and the memorandum made it clear that Mr. Kaye was operating as a consultant to and

4   under the direction of Mr. Quinn and did not have any independent managing authority or

5   ownership interest. (Kaye Testimony p. 15-16) In addition to Mr. Kaye's testimony

6   regarding his being Mr. Quinn's fiduciary. an LLC manager owes the same fiduciary duties

7   to an LLC and to its members that a partner owes to a partnership and to the other partners.

8   Corp. Code § 17153; see Corp. Code § 16404 (describing partners' fiduciary duties).

9       David Kaye's actions as manager was limited to negotiation of the sale of Sanitec,

10  Ltd. to Eden Environmental LLC and the execution of several documents as managing

11  member. Exhs. 216, 458. 220.   There is no evidence that David Kaye acted as manager or

12  managing member of Windsor Holdings LLC after January 2002. Since Windsor Holdings

13  LLC is merely a holding company for the shares of Sanitec Worldwide Ltd., the need for

14  action by a manager is somewhat limited. Mr. Kaye's more significant roles were that of

15  president and chairman of Sanitec. Ltd. and the raising of private capital for Sanitec West

16  through his company Strategic Financial Advisors.

17      Mr. Kaye's compensation for his work on the Eden Environmental LLC transaction

18  was 1% of $9 Million sale price if the transaction was successful. Exh. 217, p. 2. This

19  compensation was in addition to substantial fees paid to Strategic Financial Advisors for

20  raising private capital for Sanitec West.

21      The arrangement did not grant Mr. Kaye any ownership or membership interest in

22  Windsor Holdings. LLC. Mr. Kaye's handwritten memorandum contradicts any claim that

23  Mr. Kaye acquired a membership interest in Windsor Holdings LLC or was, in fact, a

24  bonafide managing member.

25      No evidence was presented that David Kaye became a member of Windsor Holdings

26  LLC under the required procedures of Corp. Code § 17100(a)(1). Mr. Kaye was never a

27  party to any operating agreement with Mr. Quinn, oral or written. and did not agree to act

28  as manager until after Windsor Holdings LLC was formed. David Kaye never purchased,

1  subscribed to, or sought to acquire a membership interest in Windsor Holdings LLC. No
2  evidence was presented that Mr. Quinn ever intended to transfer his ownership of Windsor
3  Holdings LLC to Mr. Kaye. Mr. Kaye's only claim under the arrangement was for
4  indemnity and a 1% fee if the transaction was successful. Exh. 217. Even if he did acquire
5  some claim or right to an economic interest in Windsor Holdings LLC, David Kaye only
6  held any such claim or right as a fiduciary for the benefit of his client Terrance Quinn.

7      As of early May 2002, Sanitec Ltd. and Sanitec West were in Federal litigation
8  against Joe Delloiacovo and others for their theft of Sanitec, Ltd.'s intellectual property
9  and other torts (Exh. 114), and the sale to Eden Environmental LLC had fallen through due
10 to the litigation. Facing very uncertain health and a certain prison term, Mr. Quinn needed
11 to take steps to put some of his affairs in order.

12

13                          THE WINDSOR TRUST

14     In May 2002, Mr. Quinn turned to his friend James H. Smith, an experienced
15 businessman, and associate Jeffrey Weinstein, who had a significant history with Sanitec,
16 Ltd., and asked them to serve as trustees of an irrevocable trust. The sole asset of the
17 Windsor Trust was to be Mr. Quinn's economic interest and ownership of Windsor
18 Holdings LLC. Exh. 261, 262.

19     On May 13, 2002, Mr. Quinn wrote to Mr. Kaye and advised him that he was
20 creating a trust for his 100% ownership of Windsor Holdings LLC and notifying Mr. Kaye
21 that Mr. Kaye would no longer have any role with regard to Windsor Holdings LLC. Exh.
22 221. Mr. Kaye would continue as president and chairman of Sanitec, Ltd. and continue his
23 efforts to raise private capital for Sanitec West. By that time, the potential sale to Eden
24 Environmental LLC has fallen through and Windsor Holdings LLC was merely a holding
25 company for the shares of Sanitec Worldwide Ltd. which owned Sanitec Ltd. No evidence
26 was presented that Mr. Quinn had directed David Kaye to take any action as manager or
27 managing member of Windsor Holdings LLC since early January 2002.

28     With the assistance of New Jersey attorney Gerald Litwin and Jeffrey Weinstein, Mr.

                                6

1  Quinn created the Windsor Trust u/d/t dated June 24, 2002, assigning "100% of the

2  shares/ownership interest in Windsor Holdings LLC. Exh. 262.

3      Any contention that the Windsor Trust is invalid, or was created at some later date,

4  is directly contradicted by the correspondence among Mr. Weinsten, Mr. Litwin, and Mr.

5  Quinn (Exhs. 265-268) and the testimony of Mr. Quinn, Mr. Weinsten, Mr. Smith, Mr.

6  Peter Babos, and Mr. Miller (regarding validity of the trust), as well as the obvious

7  necessity that Mr. Quinn make such arrangements before surrendering to Federal custody

8  in the Summer of 2002.

9      As of July 2002, Mr. Quinn's interest in Windsor Holdings LLC (and thereby

10  Sanitec Worldwide Ltd. and Sanitec, Ltd) had been assigned to the Windsor Trust. David

11  Kaye continued to serve as officer and director of Sanitec, Ltd., which had no daily

12  business operations due to the litigation and continued to raise private capital for Sanitec

13  West. Dr. Mary Riedinger, Mr. Quinn's long-time "significant other", held their 80%

14  interest in Sanitec West, which managed by James R. Harkess. On August 19, 2002, Mr.

15  Quinn began serving his Federal sentence at a medical facility in Ft. Worth, Texas.

16      It was Mr. Quinn's hope and expectation that once the Sanitec litigation was

17  resolved, Mr. Smith and Mr. Weinsten would be able to successfully develop Sanitec, Ltd.

18  and sell the company to pay off Mr. Quinn's creditors, including the so-called "note-

19  holders" in Ohio.

20      Under the circumstances of the pending Sanitec litigation, it was appropriate for the

21  Windsor Trust trustees to monitor the litigation and settlement talks as they did and, if

22  necessary, take action through a vote of the LLC's shares of Sanitec Worldwide, Ltd.,

23  which in turn controlled Sanitec, Ltd. From late January 2003 until July 7, 2003, the

24  trustees monitored the process of the settlement proposals until it became apparent that the

25  attorneys purporting to represent Sanitec Ltd.'s interest were contemplating settlement

26  scenarios that would result in the transfer of Sanitec, Ltd.'s assets and intellectual property

27  to Mr. Harkess and result in Sanitec Ltd.'s bankruptcy and dissolution.

28      In June 2003, the trustees conducted the necessary corporate meetings, minutes, and

7

1  resolutions to install new officers and directors of Sanitec Ltd. and to assert their control

2  over Sanitec, Ltd.

3  On July 7, 2003, James H. Smith wrote to Ohio litigation counsel John R. Climaco

4  to advise him that the Climaco firm was terminated from further representation of Sanitec,

5  Ltd. and advising Mr. Climaco that neither Mr. Kaye nor Mr. Harkess had any authority to

6  act on behalf of Sanitec, Ltd. Exh. 210.

7

8  OHIO COUNSEL'S DEMAND FOR DOCUMENTATION

9  On Monday July 7, 2003, Peter Babos, John Climaco, David Kaye and James R.

10  Harkess received copies of James H. Smith's termination to letter. Exh. 201.

11  On Wednesday July 9, 2003, Peter Babos replied to Mr. Smith with a cease and

12  desist letter disputing Mr. Smith's claims to the control Sanitec, Ltd. Exh. 169.

13  On Tuesday morning, July 15, 2003, John R. Climaco send an email to Peter Babos,

14  David Kaye and James R. Harkess asking "WHO DO I REPRESENT AND WHO DO I

15  LISTEN TO?????" Exh. 211.1

16  On Thursday morning, July 17, 2003, Mr. Climaco demanded that Peter Babos, Mr.

17  Kaye and Mr. Harkess send documentation by 9:00 a.m. the next morning showing that

18  they had authority to act on behalf of Sanitec, Ltd. Exh. 212

19  Thursday evening at 9:32 p.m., Peter Babos transmitted by facsimile the documents

20  that had been created for Mr. Climaco showing that Windsor Holdings LLC was owned

21  100% by James R. Harkess.

22  The next morning, July 18, 2003, there was a conference call to discuss the

23  documents so that Mr. Climaco could make truthful representations to Judge Nugent on

24  Monday morning, July 21, 2003. Exh. 212.

25  The only reason James R. Harkess can make any claim to Windsor Holdings LLC

26  was because he, David Kaye and Peter Babos participated in a ruse to satisfy their litigation

27  attorney in Ohio and because no one could reach Mr. Quinn in Ft. Worth, Texas. Although

28  the cross-complaint alleges fraud, it is not known whether Mr. Harkess intended to take

8

1  Windsor Holdings LLC for himself at that particular time.  Mr. Harkess testified that he put

2  the certificates in a drawer, and that he did not think them significant.  The only purpose of

3  the documents was to satisfy Mr. Climaco's demand to provide documents by Friday

4  morning, July 18, 2003.

5      Mr. Kaye testified that before the false documents were prepared, Mr. Harkess told

6  him that he and Mr. Quinn had an arrangement, and that he would take the shares for Mr.

7  Quinn and settle the issue later when Mr. Quinn returned from prison.  Mr. Harkess later

8  wrote an email to Mr. Babos where he affirmatively referenced settling the issue with Terry

9  at some point later – "Until the issue gets resolved with Terry." Exh. 176, 177.  Mr. Babos

10  testified that both Mr. Kaye and Mr. Harkess told him that the documents were in Mr.

11  Quinn's best interest, that they would undo the transaction when Mr. Quinn got home, but

12  for reasons critical at that time, they needed to appease Mr. Climaco.  At some point,

13  however, it became clear the Mr. Harkess had decided that he no longer was representing

14  Mr. Quinn's interest and claimed Windsor Holdings LLC for himself.  Mr. Babos

15  attempted to undue the transaction and get the parties to talk, but to no avail.

16      In January 29, 2004, Mr. Harkess made false representations to Judge Nugent

17  concerning the documents that had been prepared on or about July 17, 2003.  Exh. 444,

18  Harkess testimony.

19                    QUINN RETURNS

20      In September of 2003, Mr. Quinn was release from Ft. Worth facility and contacted

21  Mitchell R. Miller again to complete any work that had been interrupted.  Mr. Miller

22  testified that the trust was a valid irrevocable trust with no protection from creditors and

23  that the membership of Windsor Holdings LLC is vested in James H. Smith and Jeffrey

24  Weinsten, as trustees of the Windsor Trust u/d/t dated June 24, 2002.

25

26            NO ACTUAL OR OSTENSIBLE AUTHORITY

27      Any claim by Mr. Harkess that he relied on the authority of Mr. Kaye and Mr.

28  Babos' (Mr. Quinn's attorney) to give him the LLC is directly contradicted by his own

9

1  statements to Mr. Kaye and Mr. Babos that he was accepting the certificate on behalf of

2  Mr. Quinn and would settle with Mr. Quinn later. (Babos and Kaye Testimony)    Neither

3  Mr. Kaye nor Mr. Babos had any membership interest of their own to give to Mr. Harkess

4  in July, 2003.  Neither Mr. Kaye nor Mr. Babos have any authority as Mr. Quinn's

5  fiduciaries to give Mr. Quinn's interests and rights away.  Because Harkess participated in

6  the deceit himself, he cannot satisfy Civil Code § 2334.  Harkess testified that he did not

7  pay a penny for the stock, and he has suffered no detriment.  Any claim as to this is false as

8  it was Sanitec Industries, Inc. (not Harkess individually) that might be able to claim it

9  incurred liability by virtue of its separate settlement agreement entered into with some of

10  the Ohio note-holders.

11

12                                CONCLUSION

13       Plaintiff has failed to prove that Defendant Quinn is guilty of unclean hands as set

14  forth in his opening statement.  There was no dispute that the funds used to acquire

15  Sanitec, Ltd. are traceable and should be repaid to the individual note-holders in Ohio.

16  Plaintiff further failed to prove that the Trust was an invalid instrument created by Quinn in

17  good faith and with proper purpose.  Finally, plaintiff has failed to prove that Kaye and/or

18  Babos had any actual or ostensible authority to transfer to him, for absolutely no

19  consideration whatsoever, the entire ownership of Windsor Holdings.  Such an act would

20  be well beyond anything imagined or intended by Quinn, or risked by his attorney, Babos

21  under any conceivable notion.  Ownership of Windsor Holdings, LLC should be decided in

22  favor of Quinn's trust.

23

24  Dated: March 22, 2005        SLATER HATHAWAY

25

26

27                               MARK M. HATHAWAY
                                 Attorneys for WINDSOR TRUST and TERRANCE QUINN

28

                                      10

# SANITEC

## Sanitec, Ltd.

March 1985 - Est. as Combustion Engineering Plant Mgmt Systems, Inc.
March 1988 - Name Change to Environmental Projects, Inc.
Sept. 1990 - Name Change to ABB Sanitec, Inc. by Asea Brown Boveri
Dec 1993 - Obtains **U.S. Patent 5,270,000.** Apparatus for treating medical hazardous wastes
April 1995 - Acquired by HS Holdings (NY), Name Change to Sanitec, Inc
June 1996 - Obtains **U.S. Patent 5,529,687.** Filling sluice for appliances for the treatment of infectious waste
Aug 1996 - Obtains **U.S. Trademark 1,991,211** for "Sanitec, Inc"
April 1999 - Obtains **U.S. Trademark 2,238,405** for Sanitec®
Feb 1999 - Acquired by SICC (NJ) **[Quinn]** using some funds [loaned to Quinn by Ventre companies. [Steven Ventre, Quinn's cousin].
April 2001 - Corporate reorganization - Sanitec Inc. merges with Sanitec Int'l Holdings (NV) and Standard Industrial Consulting Corp (DE.)
Standard Industrial Consulting Corp (NJ) by NJ law firm.
April 2001 - Change Name to Sanitec, Ltd.

Sole shareholder of Sanitec Ltd. is Sanitec Worldwide, Ltd. (DE) which is in turn owned by Windsor Holdings LLC (102 shares) [Windsor Trust] and Salem Associates, Inc. (DE) (98 shares) [Weinstein]

### Sanitec, Ltd Distributors

- **Sanitec West (CA,OR,WA) [Harkess]**
- **Narita Trading (Taiwan)**
- **Steryl Medi Equip (India)**
- **SheGoTec, Inc. (Japan)**
- **Ekepco/Bassi (Kuwait)**
- **Sanitec of Kentucky [Guardian Investments/Ventre companies] sold to Stericycle circa 2002**

In April 2002, Sanitec Ltd. and Sanitec West sue Delloiacovo, Sanitec Group LLC, et al. The competing claims and counter claims are pending before the Hon.Donald C. Nugent, U.S. District Judge in the Northern District of Ohio, *Sanitec West et al v. Delloiacovo et al,* USDC Case No. 1:02-cv-01582-DCN. Case is stayed pending resolution of California issue of ownership of Windsor Holdings LLC and who, therefore, represents the interests of Sanitec Ltd. – Jim Harkess or James Smith and Jeffrey Weinstein.

## Sanitec Group, LLC

Formed **February 20, 2002 by Joe Delolatovo**, while he was an officer and director of SANITEC, LTD, and without its consent or knowledge. Delloiacovo resigned from Sanitec, Ltd on March 21, 2002 and began operating Sanitec Group, LLC, claiming that it now owned all of Sanitec, Ltd.'s assets and intellectual property.

Delloiacovo placed derogatory information about Sanitec West on the Internet, which interfered with Sanitec West's private placement memorandum efforts. Sanitec Ltd. and Sanitec West sued Delloiacovo et al., which is pending before Judge Nugent

Sanitec Group LLC is a subsidiary of Guardian Investments, LLC, a Steve Ventre enterprise, which claim rights to Sanitec Ltd's assets by virtue of money loaned to Quinn by Ventre.

## Sanitec Industries, Inc.

California corporation formed by **James Harkess on February 19, 2003**, while an officer and director of Sanitec West [ABB Sanitec West, Inc.] Harkess now claims Sanitec Industries Inc holds all Sanitec, Ltd.'s intellectual assets, based on an assignment from Sanitec Group, LLC. At the same time, Harkess is claiming to represent the interests of Sanitec Ltd, in the litigation in Ohio against Sanitec Group, LLC, hence the dispute.

## Sanitec USA, Inc.

California corporation formed by **James Harkess on January 2, 2004**, while he was a director and officer Sanitec West. Harkess now claims Sanitec USA, operates the business that used to belong to Sanitec West. Those issues are pending in *Riedinger v. Harkess, et al.* Case No. BC322202 (involving claims against Harkess for diluting the majority stock ownership of ABB Sanitec West, Inc.)

## SANITEC TIMELINE

1. 2/99     HS Holdings, owner of Sanitec, sold to SICC (NJ)
2. 3/99     SICC (NJ) issues only stock certificate to SIH (NV)
3. 2/99     SIH (NV) issues stock certificate to T. Quinn making Quinn the sole owner of Sanitec. Inc.
4. 4/01     Reorganization of Sanitec companies by Lowenstein Sandler at the direction and control of TQ.
5. 4/01     Companies merged into Sanitec, Inc. which changed its name to Sanitec, Ltd.
6. 4/01     Sanitec, Ltd. issues shares only to Sanitec Worldwide.
7. 7/17/01     Quinn forms Windsor Holdings through attorney Mitch Miller.
8. 7/29/01     Sanitec Worldwide issues only shares to Windsor Holdings, T. Quinn retaining full control and ownership.
9. 7-8/01     Quinn asks Kaye if he would be manager of Windsor Holdings upon a possible sale of Sanitec, Ltd.
10. 10/12/01     Kaye writes Quinn a memo. Says he understands Quinn is the "actual controlling shareholder of Windsor" and agrees to execute the Eden term sheet as Managing Member of Windsor "as an accommodation" to Quinn if Quinn would indemnify him from "any liabilities that may arise due to my representing myself as the managing member…"
11. 10/31/02     Kaye signs term sheet as managing member of Windsor.
12. 1/03/02     Kaye signs corporate resolution as Managing Member.
13. 5/13/02     Quinn sends Kaye a letter terminating him from any role he might have had as managing member.
14. 6/24/02     Windsor Trust created and Quinn transfers in 100% of his ownership interest in Windsor Holdings.
15. 7/7/03     Smith writes termination letter to Climaco because his proposed settlement will take all assets from Sanitec, cheating Sanitec Ltd. creditors and shareholders.
16. 7/14-7/15/03     Climaco demands Babos, Kaye and Harkess present documentary evidence as to who owns and controls Sanitec Ltd. And Windsor Holdings.

17. 7/15-    Babos, Kaye and Harkess fabricate documents creating the
    7/17     appearance that Kaye was the member and manager of Windsor
             and had transferred total ownership of Windsor to Harkess back
             on November 21, 2002.

18. 9/03     Terry Quinn returns home. Discovers false documentation
             contrary to his intentions via the Windsor Trust.

19. 12/03-   Babos attempts to get all parties to correct mistakes and resolve
    1/04     other issues. His attempts are ignored by Harkess, Kaye, et al.

20. 5/04     Quinn advises Mitch Miller, the original attorney and organizer
             for Windsor Holdings, to finalize ownership and control of
             the compoany in the name of the Windsor Trust.

***

PROOF OF SERVICE

STATE OF CALIFORNIA }
COUNTY OF LOS ANGELES } ss.

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 200 South Los Robles Avenue, Ste 530, Pasadena, California 91101-2432.

On April 21, 2005 the foregoing document, described as    POST TRIAL BRIEF  on all interested parties listed below by transmitting to all interested parties a true copy thereof as follows:

Michael J. Hartley
Weston Benshoof et al LLP
333 S. Hope Street 16FL
Los Angeles, CA  90071-1406

☐ BY FACSIMILE TRANSMISSION from FAX No. (626) 795-1616 to the fax numbers set forth above.
    ☐ The facsimile machine I used complied with Rule 2003(3) and no error was reported by the machine. Pursuant to Rule 2005(i), I caused the machine to print a transmission record of the transmission, a copy of which is attached to this declaration.

☐ BY EXPRESS SERVICE: I caused such document to be deposited in a box or other facility regularly maintained by the express service carrier or delivered to an authorized courier or driver authorized by the express service carrier to receive documents, in an envelope or package designated by the express service carrier with delivery fees paid or provided for, addressed to the person on whom it is to be served.

☒ BY MAIL as follows:
    ☐ placing a true copy thereof in a sealed envelope addressed as stated on the **ATTACHED MAILING LIST.**
    ☒ placing  ☐ the original ☒ a true copy thereof enclosed in a sealed envelope addressed as set forth above.
    ☐ I deposited such envelope in the mail at Pasadena, California. The envelope was mailed with postage thereon fully prepaid.

    ☒ I am 'readily familiar' with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Pasadena, California in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

☐ BY PERSONAL SERVICE as follows: I delivered such envelope by hand to the offices of the addressee.
☐ FEDERAL - I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.
☒ STATE - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on April 21, 2005 at Pasadena, California.

Marilyn Hathaway

11

# EXHIBIT 17

RUFF0406.TXT

22  STANDARD TRUST TO TRANSFER THE SHARES BACK TO -- TO

23  SANITEC WORLDWIDE, WHAT THE STANDARD TRUST WAS DOING

24  HERE WAS RELEASING ALL OF ITS RIGHTS AND CLAIMS FOR ALL

25  TIME, THAT IT MAY'VE HAD SEPARATE AND APART FROM THE

26  STOCK WHICH IT NEVER HAD IN THE FIRST PLACE.

27      Q.    AND THAT'S WHAT YOU TESTIFIED TO IN

28  DEPOSITION IN DELAWARE?

         HARKESS VS. QUINN ROUGH DRAFT ASCII (TRIAL 4/06/05)     155

1       A.    I DON'T RECALL THAT.

2       THE COURT:  LET'S MOVE ON TO SOMETHING ELSE.

3       MR. HARTLEY:  OKAY.

4  BY MR. HARTLEY:

5       Q.    UH LAST QUESTIONS, MR. QUINN?

6       A.    MR. WEINSTEN.

7       Q.    UH MR. WEINSTEN YOU HAVE -- YOU SAY YOU

8  HAVE A 49 PERCENT INTEREST IN WIND SOAR IN UH SANITEC

9  WORLDWIDE THROUGH YOUR THROUGH SALE AND ASSOCIATES?

10      A.    I HAVE 98 SHARES ISSUED AND UH-H-H --

11  WINDSOR HOLDINGS HAS A HUNDRED AND 2 SHARES ISSUED.

12      Q.    AND YOU OBTAINED THOSE SHARES FROM WIND OR

13  HOLDING I MEAN FROM SANITEC WORLD WIDE IN APPROXIMATELY

14  MAY OF 2 NOW AND 2?

15      A.    THAT'S CORRECT.

16      Q.    AND DURING THAT AND AT THE R THAT PERIOD OF

17  TIME THERE WAS LITIGATION PENDING THE DELLOICOVO

18  LITIGATION AND OTHER OTHER LITIGATIONS OVER THE ASSETS

19  OF SANITEC LIMITED?

20      A.    THAT'S CORRECT.

21      Q.    AND YOUR TESTIMONY IN IN DELAWARE WAS THAT

22  YOU PAID A NOMINAL CONSIDERATION FOR THOSE SHARES

23  CORRECT?

RUFF0406.TXT

24      A.      THAT'S CORRECT.

25         MR. HARTLEY:  NO FURTHER QUESTIONS, YOUR HONOR.

26   {NOTE:   2 NOW AND 1 IS 2,000 AND 1 THROUGHOUT.   END

27   NOTE}.

28         MR. HATHAWAY:  I'D LIKE TO SHOW WHAT I MARKED

           HARKESS VS. QUINN ROUGH DRAFT ASCII (TRIAL 4/06/05)     156

 1   TRUST EXHIBIT FOR IDENTIFICATION.

 2         THE COURT:  IS THIS THE TRUST OR --.

 3         MR. HATHAWAY:  THIS IS THE ALL UM LETTER THAT THE

 4   WITNESS WROTE TO DANIEL DRIESBACH** AFTER HIS UM

 5   DEPOSITION IN DELAWARE THAT CORRECTS THE RECORD {NOTE:

 6   5 31.  END NOTE}.

 7         THE COURT:  DID YOU SHOW THIS TO COUNSEL.

 8         MR. HATHAWAY:  I'LL SHOW IT TO COUNSEL.

 9         MR. HARTLEY:  YOUR HONOR WE'VE NEVER SEEN THIS.

10         THE COURT:  DON'T SHOW IT TO ANYONE.

11         THE COURT:  SHOW IT TO COUNSEL.

12         MR. HATHAWAY:  I'VE SHOWN HAVE --

13         MR. HARTLEY:  YOUR HONOR, I MOVE THAT THIS -- THIS

14   SHOULD NOT BE ADMITTED.  THIS IS -- THIS IS -- STUFF

15   THAT'S CLEARLY BEEN REQUESTED -- DOCUMENT REQUESTED.  IT

16   HAD ACTUALLY EXISTED AT THE TIME.

17              (SPOKE SIMULTANEOUSLY; UNINTELLIGIBLE.)

18   .

19         MR. HARTLEY:  THERE'S NO INDICATION THAT THIS

20   HAS --

21         MR. HATHAWAY:  I -- I WILL REPRESENT TO THE COURT

22   THAT THERE HAS BEEN AN UNDERSTANDING AND AGREEMENT, I

23   BELIEVE IN WRITING THAT THE PARTIES WERE NOT GONNA

24   REPRODUCE TO EACH OTHER DOCUMENTS THAT WERE CONTAINED OR

25   PART OF THE OTHER LITIGATIONS.  THERE'S A DELAWARE
                   Page 146

# EXHIBIT 18

1

2

3

4

5

6

7

```
┌─────────────────────────────┐
│   ORIGINAL FILED            │
│                             │
│      JUL 1 1 2005           │
│                             │
│     LOS ANGELES             │
│   SUPERIOR COURT            │
└─────────────────────────────┘
```

8    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9    FOR THE COUNTY OF LOS ANGELES

10

11   JAMES HARKESS,                          )    Case No.: BC 311681
                                            )
12              Plaintiff,                   )
                                            )
13        v.                                 )    **TENTATIVE RULING**
                                            )    **AND (PROPOSED)**
14   TERRENCE QUINN aka TERRANCE LEE        )    **STATEMENT OF DECISION**
     QUATKEMEYER, and DOES 1 through 10,     )
15   inclusive,                              )
                                            )
16              Defendants.                  )
                                            )
17   _____  )
     AND RELATED CROSS-ACTION.               )
18                                           )
                                            )
19                                           )

20        The    court    finds    FOR    PLAINTIFF/CROSS-DEFENDANT    AND    AGAINST

21   DEFENDANTS/CROSS-COMPLAINANTS on Plaintiff's Complaint for Declaratory Relief and

22   on Defendants' Cross-Complaint for Declaratory Relief. The court declares that plaintiff James

23   Harkess ("Harkess" herein) is the rightful owner of Windsor Holdings, LLC, ("Windsor" herein) and

24   that defendants have no right, title or interest therein. Further, defendants, and each of them, are

25   permanently enjoined from claiming any right, title or interest in Windsor.

26

27        The court finds that the Windsor Trust ("Trust" herein) was not legally in existence and had

28   no assets at the time of the transfer of Windsor from David Kaye ("Kaye" herein) to Harkess.

1

TENTATIVE RULING AND (PROPOSED) STATEMENT OF DECISION

1  Defendant Terrence Quinn aka Quatkemeyer ("Quinn" herein), through a series of companies and
2  transactions, none of which bear his name or other indicia of his ownership, transferred ownership
3  and apparent authority to Kaye as managing member of Windsor. Thereafter, back-dated documents
4  were created virtually overnight, transferring ownership of Windsor from Kaye to Harkess. This
5  transfer of ownership of Windsor was relied on not only by Harkess, but by many other parties and
6  attorneys, including a federal judge. The court finds that the transfer from Kaye to Harkess was
7  effective to transfer ownership of Windsor to Harkess. The court further finds that, in any event,
8  Quinn and those acting on his behalf are barred by the equitable doctrines of unclean hands and
9  equitable estoppel from asserting ownership in Windsor. Any purported ownership claimed by
10 James H. Smith ("Smith" herein) or Jeffrey Weinsten ("Weinsten" herein) is purely derivative based
11 on their status as trustees of Trust, and the court has found that the Trust was not legally in existence
12 during the time of the transfer from Kaye to Harkess.

13

14 FACTUAL BACKGROUND

15     There are many different companies and individuals involved in the various lawsuits here,
16 in Ohio and elsewhere, but the essential entities for purposes of this lawsuit are Windsor, Sanitec
17 Worldwide ("Worldwide" herein) and Sanitec Limited ("Limited" herein). Through a series of
18 transfers and a corporate re-organization by Quinn, Windsor became the sole owner of Worldwide,
19 and Worldwide became the majority owner of Limited (Weinsten owned a minority interest in
20 Worldwide). (Ex. 189, 223) Whoever owns Windsor controls the other two by virtue of this
21 ownership structure.

22

23     This court has been asked to make a finding on a single, narrow question: who owns
24 Windsor? The court is mindful that there are other lawsuits in Ohio, and perhaps elsewhere, which
25 may be impacted by this decision, and that there may be issues between various parties impacted by
26 what the court decides here. This court makes no findings regarding the merits of any other lawsuits
27 or any purported claims that the parties may have against one another or others.

28

TENTATIVE RULING AND (PROPOSED) STATEMENT OF DECISION

1    Plaintiff contends that he is the owner of Windsor by virtue of a transfer from Kaye, the
2  managing member of Windsor.  Defendants contend that the Trust is the owner of Windsor.
3  Defendants presented evidence that in June 2002, defendant/cross-complainant Quinn was suffering
4  from a terminal illness and was facing an impending prison term, and therefore set up the Trust with
5  cross-complainant Smith and Weinstein as the trustees, and concurrently therewith transferred all the
6  assets of Windsor to Trust.  Therefore, at the time of transfer of Windsor from Kaye to Harkess,
7  defendants assert that Windsor had already been transferred to the Trust and there was nothing to
8  transfer.

9

10  THE TRUST

11    The circumstances in existence in or about June 2002, that is the illness and the impending
12  sentencing, are consistent with a desire by Mr. Quinn to form a trust to hold his property.  What is
13  missing, however, is a signed original trust document and any credible evidence that such a
14  document was ever signed by Quinn in June 2002, or at any time before he was released from prison
15  in late September 2003.  Also, like the ownership structure that Quinn set up for Windsor, the
16  structure he set up for his Trust was also incomplete.  The final, and necessary, steps were never
17  taken to consummate the Trust.

18

19    The court makes the following findings which support its conclusion that no Trust was
20  formed in June 2002 or at any time before the Kaye-Harkess transfer.

21

22  1.    The court found Smith to be a credible witness, but by his own testimony and that of others,
23        he was only a figurehead.  It was Weinstein that wrote all the letters for him to sign, and it
24        was Weinstein that monitored the litigation in Ohio.  Virtually everything that Smith knew,
25        he knew because Weinstein told him.  He had virtually no firsthand knowledge of facts.

26

27  2.    There is no original Trust signed by Quinn which bears a date in June 2002.  In fact, no
28        signed original at all was offered in evidence.

3

3.   While there is evidence that the Litwin law firm prepared drafts of a trust in June 2002, and Smith signed some version of a trust, Smith testified that he does not know whether Quinn signed it. (Ex. 265)

4.   Weinsten testified that he sent the Trust document which had been signed by others to Quinn for him to sign. He had no knowledge whether Quinn signed it or not. No one had personal knowledge about whether Quinn ever signed before he was released.

5.   Quinn testified that he did sign it in June 2002, but the court does not find his testimony to be credible. On the stand Mr. Quinn repeatedly shifted responsibility for various actions from himself to his attorneys, and said he would sign virtually anything his lawyers told him to sign. This, along with his observed demeanor while testifying, and his two felony convictions for fraud-related offenses, cause the court to disregard his testimony. Thus, there is no independent, corroborating evidence that Quinn ever signed before he got out of prison.

6.   There is no credible evidence that shares or other indicia of ownership of Windsor were ever transferred to the Trust.

7.   Quinn testified that he fired Kaye as managing member of Windsor in June 2002 by letter, but there is no evidence other than the testimony of Quinn himself that the letter was ever sent, and court does not find his testimony credible. Kaye denies ever receiving it, and the only copy introduced in evidence apparently came from Weinsten's file.

In addition to these points, Weinsten who along with Smith was a co-trustee, denied twice in depositions in other cases that he knew who owned Windsor. One can infer from this that he either knew the trust had never been signed by Quinn, or that there was never any transfer of Windsor assets to the Trust. It was Weinsten who was monitoring the Ohio litigation and apparently was concerned enough about protecting his 48% interest in Worldwide that he attempted to intervene

4

1  in the Ohio litigation. In several pleadings filed in connection therewith he never mentioned the
2  Trust. (Ex. 118, 122) Even when Smith sent the letter to John Climaco, Ohio counsel for Limited,
3  et al., he did not mention the Trust. And finally, the two independent witnesses who may have been
4  able to corroborate the Trust, attorney Litwin who drafted it, and attorney Mark Geragos (who was
5  allegedly present when the Trust was signed in his office) were not called by the defendants to
6  testify.

7

8      The defendants have not met their burden of showing that the Trust was legally formed and
9  in existence at the time of the Kaye-Harkess transfer.

10

11  THE TRANSFER TO HARKESS

12      By virtue of the failure of the Trust to be formed in June 2002, the assets of Windsor were
13  still in Windsor at the time of the transfer from Kaye to Harkess. In July 2003, never referencing the
14  Trust in his letter, Smith wrote to John Climaco, Esq., Ohio counsel for Limited and Windsor
15  ("Climaco" herein), claiming that Harkess had no authority to represent Limited in the Ohio
16  litigation and that he (Climaco) was discharged as counsel. (Apparently this was one of the letters
17  written for him by Weinsten.) (Ex. 210) In response to this letter Climaco sent an urgent message
18  to Babos demanding to know who had authority to speak for Limited and who he should listen to.
19  (Ex. 211.1, 212) He was obviously very agitated and wanted answers immediately. He was
20  particularly upset over the fact that he was being put in a position to embarrass himself before a
21  federal judge. In response to that inquiry, within hours Babos, with the concurrence of Harkess and
22  Kaye, created back-dated documents that showed that Harkess was the owner of Limited. (Ex. 168)
23  Kaye (for Limited) and Harkess (for Sanitec West) had been managing the Ohio litigation and they
24  needed to show they had authority to do so. (It is not altogether clear which parties Babos was
25  actually representing as counsel in all these transactions; Climaco had repeatedly asserted that Quinn
26  needed separate counsel due to a perceived conflict of interest; Babos had served as corporate
27  counsel for some of the Sanitec companies and Quinn individually over the years.) (Ex. 212) These
28  hastily created documents showed that Kaye, acting as managing member and owner of Windsor,

TENTATIVE RULING AND (PROPOSED) STATEMENT OF DECISION

1  transferred his member/owner status to Harkess. Babos continued to reaffirm that Harkess was the
2  owner of Windsor for weeks after Quinn was released from prison in September 2003. He testified
3  that it was only later he realized that he had made a mistake in having the documents prepared and
4  started making efforts to reverse position. By then, however, the representations to the Ohio federal
5  court and counsel had already been made and actions had been taken in reliance on Harkess'
6  apparent authority to represent Limited, (based on his ownership of Windsor) and commitments had
7  been made and documents signed.

8

9      Quinn is responsible for creating the environment and business structure that made this
10  possible. Originally Quinn had a registration for Windsor filed with the Secretary of State showing
11  Kaye as the manager. This was the only documentation for Windsor. Nowhere did Quinn's name
12  appear. He then asked Kaye to front for him in an attempt to sell Limited and in fact Kaye acted as
13  managing member/owner in the Eden transaction and in dealing with Stericycle. He also was sent
14  by Quinn to Limited back East to monitor operations and represent himself as the managing member
15  of Windsor. Quinn claims that Kaye was only appointed to deal with specific sales or activities, but
16  Quinn is the one who put him in a position to represent himself as owner of Windsor. It was Quinn
17  who set up Windsor but never set up any formal ownership structure or had any documents prepared
18  which identified him as being involved in Windsor. All of the assets that went through the various
19  re-organizations ended up in Windsor. Windsor became a holding company with no ownership
20  structure, and no connnection with Quinn. When it was to his advantage in having Kaye step
21  forward for specified transactions that benefitted Quinn, he validates his authority. The court does
22  not recognize, however, such selective delegations of authority, especially in a case where there is
23  no documentation showing an owner of Windsor at all. Mr. Babos and Mr. Mitchell R. Miller (a
24  corporation lawyer who drew up the Windsor documents for the Secretary of State) both testified
25  that Quinn never set up any ownership structure because he wasn't sure how he wanted to do it. The
26  only person placed in a position of apparent authority/ownership was Kaye. There is no evidence
27  that either Quinn, or Babos or Miller did anything at all to remedy this uncompleted ownership
28  structure after Quinn went to prison, thus enabling the later events to occur.

TENTATIVE RULING AND (PROPOSED) STATEMENT OF DECISION

1     When the Climaco emergency came, Mr. Kaye did not step forward to act as owner/ manager,
2    rather he wanted out, so it was agreed that he would transfer his member/owner status to Harkess.
3    Rather than explain the dilemma to Mr. Climaco and seek a resolution with the Ohio court, counsel
4    Babos, with the concurrence of Harkess and Kaye prepared the back-dated documents within a
5    matter of hours and sent them to Climaco. Those documents were sent to Ohio with the knowledge
6    that they were to be presented by Mr. Climaco, an officer of the court, to a federal judge representing
7    that Mr. Harkess was the owner of Windsor. And then everyone sat back and allowed others to rely
8    on that representation. This court finds that Mr. Harkess is the owner of Windsor. That entire chain
9    of events was created by the anonymous and incomplete creation of Windsor by Quinn, and the
10    attempt to selectively assign ownership/authority to Kaye.

11

12     The court is mindful that defendant contends that there was an agreement that Harkess was
13    only taking the shares of Windsor temporarily and that he was to give them back after Quinn was
14    released. Mr. Babos supports this purported agreement, as does Quinn, but Harkess vehemently
15    denies it. There is evidence that Harkess said "If I own Limited by virtue of my ownership of
16    Windsor, then I want the documents." This would suggest, however, that Harkess did indeed believe
17    he owned Windsor although had some question as to what impact it had on ownership of Limited.
18    Whether there was or was not such a private agreement between Quinn and Harkess is between
19    them. As far as the rest of the world is concerned, Mr. Kaye transferred ownership of Windsor to
20    Harkess and Harkess, Kaye and Babos represented to the federal court and the litigants that Harkess
21    was the owner of Windsor. The transfer to Harkess was effective.

22

23    UNCLEAN HANDS AND EQUITABLE ESTOPPEL

24     Further, in the exercise of its equitable powers, this court will not permit Quinn to now assert
25    an ownership interest in Windsor. Plaintiff spent a great deal of the trial laying out the series of
26    transactions involving the original purchase of Limited by Quinn with investor money and the use
27    of various corporations to do so. Plaintiff made the point that Mr. Quinn's name personally did not
28    appear on any of the documentation of these companies. For the most part the court found that to

1  be true, based on the limited evidence presented on those issues. This court is being asked to take

2  note of a pattern of ownership and apparent evasion of accountability to creditors and suppression

3  of identity in order to establish the defense of unclean hands.  This court is not making any findings

4  as to whether Mr. Quinn defrauded the original investors. This court does take note, however, of this

5  trail of companies, re-organizations and the resultant anonymity of Quinn. The court also takes note

6  of the fact that Quinn never used any of his own money to purchase these companies.  The court did

7  not find credible his testimony that he also put his own money into Limited from the sale of luxury

8  cars. No documentary or other evidence was presented to support that assertion.

9

10  All of this is corroboration for the testimony of Mr. Quinn himself. Quinn testified on the

11  stand that he created Windsor to "keep the assets of Sanitec away from Barbara Sager, Steve Ventre,

12  Joe Delloiacovo and the investors in Ohio that were laying claim to those assets." He further

13  testified that he asked Mr. Kaye to be the managing member because he was "having difficulties"

14  and "troubles" at the time. It is clear that Quinn did not want his assets in his own name and in fact

15  he also put his 80% interest in Sanitec West in the name of his friend Mary Reidiger rather than

16  himself. This is sufficient evidence for the court to conclude that Quinn was secreting his assets to

17  defeat the claims of his creditors and that he comes to this court with unclean hands. (*See* Allstead

18  vs. Laumeister (1911) 16 Cal.App. 59 and Belling vs. Croter (1943) 57 Cal.App.2d 296.)

19

20  In addition, the court invokes the doctrine of equitable estoppel. While Mr. Quinn himself

21  did not make the representations to those who relied and acted on them (the Ohio federal court and

22  counsel and others related to that litigation), he is directly responsible for setting in motion the chain

23  of events that led to those representations. He put Kaye and Harkess in the position of having

24  apparent authority for and ownership of, Windsor from the point of view of the court and the parties

25  in the East, to accomplish his own ends of selling off Limited without having his name in any way

26  associated with the sale. Many have relied on the resulting representations about Harkess' ownership

27  of Windsor to their potential detriment in the event that transactions consummated in reliance

28  thereon were to be overturned. Quinn is estopped from now claiming that the representations

TENTATIVE RULING AND (PROPOSED) STATEMENT OF DECISION

1  regarding ownership of Windsor are false, or that Kaye did not have authority to transfer the

2  company to Harkess.

3

4      Plaintiff/Cross-Defendant Harkess to prepare the judgment consistent with this Tentative

5  Ruling. This Tentative Ruling shall be the Statement of Decision unless within ten days either party

6  specifies controverted issues or makes proposals not covered in the Tentative Ruling.

7

8  Dated: *7/11/05*

9

10                                     JAMES R. DUNN

11                                     JAMES R. DUNN
                                       Judge of the Superior Court

12

13

14

15

EP: 7/11/05     16
HARKESS.ten
                17

18

19

20

21

22

23

24

25

26

27

28

TENTATIVE RULING AND (PROPOSED) STATEMENT OF DECISION

# EXHIBIT 19

1

2  Mark M. Hathaway, Inc.
   A PROFESSIONAL LAW CORPORATION
3  801 S. FIGUEROA STREET, 11TH FLOOR
   LOS ANGELES, CALIFORNIA 90017
4  TELEPHONE: (213) 624-7200
   FACSIMILE: (213) 624-7220

5  MARK M. HATHAWAY  SBN 151332
   Attorney for WINDSOR TRUST and
6  TERRANCE QUATKEMEYER

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9          FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

10

11  JAMES HARKESS,                          )  Case No. BC311681
                                            )
12              Plaintiff,                  )  DEFENDANTS' OBJECTIONS
                                            )  TO COURT'S PROPOSED
13  v.                                      )  STATEMENT OF DECISION AND
                                            )  PROPOSALS
14  TERRANCE QUINN, WINDSOR TRUST,          )
    u/d/t dated June 21, 2002, and DOES 1-10, )  [C.C.P. 632; CRC 232]
15  inclusive,                              )
                                            )  Judge: Hon. James R. Dunn
16              Defendants.                 )  Dept:  26
                                            )
17  _____)
                                            )
18  AND RELATED CROSS-ACTION.               )
                                            )

19

20      Come now Defendants THE WINDSOR TRUST u/d/t, dated June 21, 2002, and

21  TERRANCE QUINN, who submit their objections and proposals to the Court's Tentative

22  Ruling and Proposed Statement of Decision as follows:

23

24      Under California law a court's statement of decision should pertain to "principal"

25  issues which are relevant and essential to the judgment, and closely and directly related to

26  the trial court's determination of the ultimate issues in the case. See *Kuffel v. Seaside Oil

27  Co.* (1977) 69 C.A. 3d 555. Findings are not required on every "subsidiary" matter on

28  which evidence is received at trial, even though the subsidiary matter may be relevant to

                                         1

1   the ultimate issues of fact. *Kuffel* at p. 565.

2        As the Court has noted in its Tentative Ruling and throughout the trial itself, this

3   case involves many issues that pertain to, or may have a significant impact upon, claims by

4   other parties and other cases pending in other courts. Accordingly, this case deserves even

5   greater scrutiny in setting forth the Court's findings and determinations.

6

7                              OBJECTIONS:

8        Defendants object to any principal issue findings by the Court other than the

9   following:

10       A.    Its finding that no valid trust entity was created by Quinn.

11       Notwithstanding this finding by the Court, Defendants do not believe any evidence

12  supported a determination that "like the ownership structure that Quinn set up for Windsor,

13  the structure he set up for his trust was also incomplete. The final and necessary steps were

14  never taken to consummate the Trust." (See page 3, lines 15-17 of Tentative Ruling). Mr.

15  Babos testified having received a fully executed copy of the Trust sometime in July of

16  2003, well before Mr. Quinn returned home. Mr. Weinsten and Mr. Smith testified that

17  they signed the trust after seeing that Mr. Quinn had signed it on or about June 21, 2002.

18  This corroboration by these witnesses as to the existence of a fully executed Trust

19  document was all well before Mr. Quinn returned home in September of 2003. Mr. Miller

20  further testified as to the legal effect and validity of the Trust document itself.

21       B.    Its finding that Kaye had the legal authority to transfer the ownership of

22             Windsor to Harkess.

23       Notwithstanding this finding by the Court, Defendants seek clarification as to

24  whether the court finds that Kaye was given authority to act only as the *manager* of

25  Windsor Holdings, or was he given authority to act as *managing member* whereby he was

26  given ownership of the company at the time Mr. Quinn asked Kaye to act on his behalf.

27  Testimony by witnesses for both parties, including that of Mr. Kaye, seem to concur that

28  Kaye was asked to act rather as a manager only, and that it was not intended that he receive

1  any ownership interest from Mr. Quinn at the time he requested Kaye to act on his behalf.

2       Defendants further maintain that Mr. Quinn did not try and hide assets to defeat the

3  claims of his creditors, but that he knowingly and intentionally chose the trustees of his

4  Trust to manage and control his original interest in Sanitec, including the satisfaction of

5  any and all creditors of Sanitec, Ltd. By establishing a Trust back in June of 2002, he

6  chose his trustees to accomplish these objectives rather than the likes of Kaye or Harkess.

7  Instead of completing the corporate formalities of Windsor Holdings , LLC, Mr. Quinn

8  created the Trust entity as a bona fide substitute. This Court states it "is not making any

9  findings as to whether Mr. Quinn defrauded the original investors." (P. 8, lines 3-4 of

10 Tentative Ruling). But, then the Court goes on to state in lines 16-17, "This is sufficient

11 evidence for the court to conclude that Quinn was secreting his assets to defeat the claims

12 of his creditors and that he comes to this court with unclean hands." Defendants seek

13 clarification here as this seems to be an ambiguous and inconsistent finding by the Court.

14       C.   Its finding that James Harkess is the rightful owner of Windsor Holdings,

15            LLC.

16       Notwithstanding this finding, Defendants seek clarification as to the Court's

17 finding, if any, as to when, specifically, Windsor Holdings legally came into existence –

18 what specific date or time frame. Was it (a) at the time that Mr. Miller merely filed

19 Articles of Organization with the Secretary of State in July of 2001, or (b) at the time

20 Harkess, Kaye and Babos created back dated documents, which included the company's

21 initial operating agreement, organizational minutes, issuance of stock, and statement of

22 information – all done in July of 2003.

23       The Court notes in its own Tentative Ruling that it has been asked to make a finding

24 on a *single, narrow question: who owns Windsor"?*   The Court is careful to acknowledge

25 and further states:  ". . . that there are other lawsuits in Ohio, and perhaps elsewhere,

26 which may be impacted by this decision, and that there may be issues between various

27 parties impacted by what the court decides here. This court makes no findings regarding

28 the merits of any other lawsuits or any purported claims that the parties may have against

1  one another or others." (See page 2, lines 23-27 of Tentative Ruling). Accordingly,

2  Defendants maintain that the ultimate principal findings in this case, including any factual

3  or legal basis supporting such findings, and any clarifications thereto, should be limited to

4  those three (3) issues set forth in A through C above.

5

6       The Court's Statement of Decision should not include any of the following:

7       A.    Any finding as to who owns Sanitec Worldwide, Ltd.

8       The ownership issue of Sanitec Worldwide is one of several issues that will further

9  be contested in the related case of *Sanitec Worldwide, Ltd. v. Harkess, et al.* Case No.

10  BC330528 presently before this Court as *a related* case. A finding by this Court at this

11  time may impact the determinations to be made in that case. However, should the Court

12  choose to make any finding that Windsor Holdings is the majority 51% shareholder of

13  Sanitec Worldwide, the Court should also make a further finding that Salem Associates,

14  Inc. is the minority 49% shareholder. This evidence was put before the Court and was

15  undisputed by the parties. Defendants believe that the Court should then also make a

16  further finding that establishes the date or time frame that these ownership interests took

17  effect.

18       B.    Any finding as to who owns Sanitec, Ltd.

19       C.    Any finding as to who owns A.B.B. Sanitec, West.

20       This issue is presently being litigated in a pending case entitled *Riedinger v.*

21  *Harkess,* et al. Case No. BC322202 pending before the Honorable Alice E. Altoon in

22  Department 28 of this Court.

23       D.    Any finding that Windsor Holdings, LLC ever held or owned any specific

24           assets.

25       This issue, including the assets rightfully belonging to any of the other Sanitec

26  companies, are being litigated in the related Ohio federal court action entitled *Sanitec West*

27  *et al. v. Delloiacovo et al.* USDC Case No. 1:02-cv-01582-DCN, and the *Riedinger v.*

28  *Harkess* and *Sanitec Worldwide, Ltd. v. Harkess* actions, supra.

DEFENDANTS' OBJECTIONS TO PROPOSED STATEMENT OF DECISION

1    While there was evidence presented as to the structure and chain of title of several

2  of the Sanitec companies, these were primarily submitted to aid the court in understanding

3  the history of these companies.  They were not "principal" issues in the case, and neither

4  party sought declaratory relief as to the legal ownership of any company other than

5  Windsor Holdings.

6    The above five (5) issues were subsidiary issues to the declaratory relief claims in

7  this case, and were not fully tried before this Court.  Defendants maintain that such issues,

8  in addition to others, are also pending between these very same parties, as well as other

9  third parties, in related but separate actions pending before this Court as well as in Ohio.

10  Any finding as to such issues were beyond the scope and adjudication for this Court, and

11  may very well prove to be prejudicial to Defendants and such other third parties.

12

13                              PROPOSALS:

14    Defendants request that their counsel be permitted to submit an amended proposed

15  statement of decision consistent with the above for the Court's consideration and approval.

16  Defendants further request an opportunity for oral argument to be scheduled in this matter

17  pursuant to CRC 232(f).

18

19

20  Dated: July 21, 2005

21                              _____
                               MARK M. HATHAWAY
                               Attorney for WINDSOR TRUST and TERRANCE
22                             QUATKEMEYER

23

24

25

26

27

28

                              5
DEFENDANTS' OBJECTIONS TO PROPOSED STATEMENT OF DECISION

1

<u>PROOF OF SERVICE</u>

2    STATE OF CALIFORNIA    }
                             } ss.
3    COUNTY OF LOS ANGELES  }

4    I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 801 S. Figueroa St. 11ᵗʰ Floor, Los Angeles, California 90017.

5    On July 21, 2005 I served the foregoing document, described as DEFENDANTS' OBJECTIONS TO COURT'S PROPOSED STATEMENT OF DECISION AND PROPOSALS on all interested parties listed below by transmitting to all interested parties a true

6    copy thereof as follows:

7

8    Michael J. Hartley, Esq.
     Weston Benshoof Rochefort Rubalcava & MacCuish LLP.
     333 S. Hope Street 16th Floor

9    Los Angeles, CA 90071-1406
     Telephone: 213-576-1000

10   Facsimile: 213-576-1100
     E-mail: mhartley@wbcounsel.com

11

12   ☐ BY FACSIMILE TRANSMISSION from FAX No. (626) 795-1616 to the fax numbers set forth above.
          ☐ The facsimile machine I used complied with Rule 2003(3) and no error was reported by the machine. Pursuant to

13   Rule 2005(i), I caused the machine to print a transmission record of the transmission, a copy of which is attached to this

14   declaration.
     ☐ BY EXPRESS SERVICE: I caused such document to be deposited in a box or other facility regularly maintained by the

15   express service carrier or delivered to an authorized courier or driver authorized by the express service carrier to receive
     documents, in an envelope or package designated by the express service carrier with delivery fees paid or provided for,

16   addressed to the person on whom it is to be served.
     ☒ BY MAIL as follows:

17        ☐ placing a true copy thereof in a sealed envelope addressed as stated on the ATTACHED MAILING LIST.
          ☒ placing ☐ the original ☒ a true copy thereof enclosed in a sealed envelope addressed as set forth above.

18        ☐ I deposited such envelope in the mail at Pasadena, California. The envelope was mailed with postage thereon fully
          prepaid.

19
          ☒ I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that

20   practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los
     Angeles, California in the ordinary course of business. I am aware that on motion of party served, service is presumed

21   invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in
     affidavit.

22   ☐ BY PERSONAL SERVICE as follows: I delivered such envelope by hand to the offices of the addressee.
     ☐ FEDERAL - I declare that I am employed in the office of a member of the bar of this court at whose direction the service was

23   made.
     ☒ STATE - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

24   Executed on July 21, 2005 at Los Angeles, California.

25                                              Jenny Hsu

26

27

28

6

DEFENDANTS' OBJECTIONS TO PROPOSED STATEMENT OF DECISION