# EXHIBIT 20

1  MICHAEL J. HARTLEY (State Bar No. 189375)
   LISA GILFORD (State Bar No. 171641)
2  SCOTT J. LEIPZIG (State Bar No. 192005)
   **WESTON BENSHOOF ROCHEFORT**
3     **RUBALCAVA & MacCUISH LLP**
   333 South Hope Street
4  Sixteenth Floor
   Los Angeles, California 90071
5  Telephone: (213) 576-1000
   Facsimile:  (213) 576-1100
6
   Attorneys for Plaintiff and Cross-Defendant
7  JAMES HARKESS

8

          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9

               FOR THE COUNTY OF LOS ANGELES

10

11  JAMES HARKESS,                        | Lead Case No.:  BC 311681
                                           | [Related with Case Nos. BC 330528 and BC
12            Plaintiff,                    | 330527]

13      v.                                 | (Assigned for All Purposes to the
                                           | Honorable James R. Dunn – Dept. 26)
14  TERRENCE QUINN aka TERRANCE LEE
   QUATKEMEYER, and DOES 1 through 10,     | **PLAINTIFF AND CROSS-DEFENDANT**
15  inclusive,                             | **JAMES R. HARKESS' OPPOSITION**
                                           | **AND COUNTER-PROPOSALS TO**
16            Defendants.                   | **DEFENDANTS' OBJECTIONS TO**
                                           | **COURT'S PROPOSED STATEMENT**
17  _____    | **OF DECISION**

18  AND RELATED ACTIONS.

19

20                                          | Filing Date:      March 5, 2004
                                           | Amended:         May 10, 2004
21

22

23

24

25

26

27

28

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUL 2 6 2005

John A. _____ uve Officer/Clerk
                              Deputy
By _____
         W. Bailey

I.    **INTRODUCTION**

Both sides in this case asked the Court to determine who owns Windsor Holdings LLC ("Windsor") and therefore controls Sanitec Worldwide, Ltd. ("Worldwide") and Sanitec, Ltd. ("Limited") for purposes of the federal litigations in Ohio. Defendants are the ones that contested control of Windsor, and forced an expensive, year-long litigation, lengthy trial, and detailed court decision in order to establish Mr. Harkess' ownership. Now that the decision has gone against them, defendants are essentially asking the Court to gut its ruling so that they can start the process all over again in other cases here and in Ohio and perhaps elsewhere.

Mr. Harkess respectfully submits that the Court should do exactly the opposite. Instead the Court should further clarify its findings in light of defendants' objections, so that it removes any possible basis for defendants' further argument on these issues before this or any other Court. Mr. Harkess also requests that the Court deny defendants' request for oral argument and promptly enter final judgment so that the decision can be filed immediately with the federal court in Ohio. The matter of who controls Windsor, Worldwide and Limited can then finally be put to bed.

II.    **SPECIFIC COUNTER-PROPOSALS IN RESPONSE TO DEFENDANTS' OBJECTIONS**

Those of defendants' objections that do not simply rehash the evidence are designed to do one thing: lay the foundation for claiming that Windsor never really owned a majority interest in Worldwide, has no assets, and controls nothing – in other words, that the Court's decision on who owns Windsor is meaningless.

For example, defendants now suddenly do not want a finding that Windsor is the majority owner of Worldwide (Objections at 4) (despite asking for it earlier, and arguing it to the Court). They are now claiming in Ohio federal court that in January 2005, two months <u>before trial</u>, Mr. Weinsten exercised an option agreement (that, not surprisingly, he drafted and only he and Quinn are witnesses to) giving <u>him</u> the majority interest in

1

PLAINTIFF AND CROSS-DEFENDANT JAMES R. HARKESS' OPPOSITION AND COUNTER-PROPOSALS TO
DEFENDANTS' OBJECTIONS TO COURT'S PROPOSED STATEMENT OF DECISION

674011.1

1   Worldwide, despite testifying <u>at trial</u> that Windsor, not he, was the majority owner of

2   Worldwide (see attached Exhibit A (Supplemental Status Report)).    That is the veiled

3   reference to "ownership issues" for Worldwide that defendants claim will be litigated in

4   Case No. BC 330528 (Objections at 4:8-10) and allow that case to survive the Court's

5   decision.    That option is just as fictitious as the Trust.

6   Similarly, defendants do not want a finding that Windsor was formed in July

7   2001 (Objections at 3) (when its articles were filed with the Secretary of State), so that they

8   can argue that the transfer of Worldwide stock to Windsor in 2001 was invalid because

9   Windsor did not exist at the time (and therefore that Windsor did not and does not own

10  anything).    Almost all of defendants' objections are in this same vein, suggesting that what

11  Mr. Harkess won were the rights to a company that owns and controls nothing.    If indeed

12  that were the case, why did defendants fight so hard to try to obtain a decision that Mr.

13  Harkess does not own and control Windsor?

14  We believe that the Court did an admirable job in making the appropriate

15  factual findings on the issues underpinning its decision, in a way that fairly reflects the

16  evidence, and that gives its ruling meaningful preclusive effect without stepping on the toes

17  of other courts.    Now that defendants have raised their issues, however, we propose that a

18  few sentences be added to the Court's decision so that its direction is clear and so that the

19  decision removes any ability for defendants to continue litigating these same issues in any

20  other case, or to argue that the Court did not make certain findings that it so obviously did.

21  To that end, we have attached a redlined version of the Tentative Ruling

22  (Exhibit B) and a new Proposed Judgment (Exhibit C) that propose the following

23  clarifications/confirmations of the Court's findings:

24  **(1)**    Windsor was formed on July 17, 2001, with the filing of its articles of

25  incorporation with the Secretary of State (Exh. B, at 2:20, 6:26-27 (proposed changes)).

26  Harkess pled and proved this fact (*see, e.g.,* Second Amended Complaint ¶6; Ex. 223)

27  because the timing is important.    It demonstrates that Windsor was part of (and actually the

28

2

PLAINTIFF AND CROSS-DEFENDANT JAMES R. HARKESS' OPPOSITION AND COUNTER-PROPOSALS TO
DEFENDANTS' OBJECTIONS TO COURT'S PROPOSED STATEMENT OF DECISION

674011.1

1    pinnacle of) the reorganization that Quinn undertook in order to hide his interest in the

2    Sanitec companies from his creditors. This is a fundamental aspect of Mr. Harkess' unclean

3    hands/equitable estoppel claim that this Court accepted.

4        (2)    Since July 20, 2001, Windsor has been the controlling shareholder of

5    Worldwide, which has, in turn, been the 100% owner of Limited. (Exh. B, at 2:21-22

6    (proposed changes)). Harkess pled and proved these facts as well (see, e.g., Second

7    Amended Complaint ("SAC") ¶6; PX 189). Defendants did not dispute them; Weinsten

8    confirmed them in response to questioning from the Court (RT 4/06/05 36:25-37:27). The

9    timing is important for the same reasons as the date Windsor was formed, and the ownership

10    structure is important because it establishes that Windsor holds certain assets (ownership of

11    Limited, through Worldwide) that Quinn was motivated to, and did, attempt to hide in

12    Windsor. Again, this is also a fundamental aspect of Mr. Harkess' unclean hands/equitable

13    estoppel claim.

14        (3)    David Kaye became the managing member, and therefore sole owner, of

15    Windsor in late July 2001. (Ex. B, at 7:1-2, 20-22 (proposed changes)). Harkess pled and

16    proved the timing of the transfer (see, e.g., SAC ¶¶8-14; PX 216) because it clearly links

17    Quinn's transfer of ownership and apparent authority to Kaye as part of Quinn's attempts to

18    hide his assets from creditors.

19        (4)    Harkess became the managing member, and therefore sole owner, of

20    Windsor in July 2003 with the transfer from David Kaye. (Ex. B, at 2:5, 8; 7:20-22; 8:4-5

21    (proposed changes)). Harkess plead and provided the timing of the transfer (see, e.g., SAC

22    ¶9-14; PX 165-68) because the timing establishes Harkess' control over the settlement

23    process and dismissals of the lawsuits in Ohio on behalf of Limited.

24        (5)    Weinsten testified that his company, Salem Associates, was issued a

25    minority interest in Worldwide by Quinn in May 2002, but the validity of that interest was

26    not directly before the Court in this case.

27        (6)    Mr. Harkess has proposed a few other minor word clarifications to

28

3

PLAINTIFF AND CROSS-DEFENDANT JAMES R. HARKESS' OPPOSITION AND COUNTER-PROPOSALS TO
DEFENDANTS' OBJECTIONS TO COURT'S PROPOSED STATEMENT OF DECISION

674011.1

1    address the claims raised by defendants (Ex. B, at 4:11, 14-17; 6:27-28). Most important, we

2    have proposed clarifications that: (a) Weinsten did claim that in June 2002 he received a

3    copy of the Trust that was signed by Quinn, but that claim was not credible in light of

4    Weinsten's other testimony; and (b) the Windsor articles filed with the Secretary of State in

5    2001 did not list anyone as a member or manager, not even Kaye (*see* PX 236).

6            Finally, Mr. Harkess submits that the Court should stick to its finding

7    regarding the fact that, like with Windsor Holdings and David Kaye, Quinn hid his

8    ownership interest in Sanitec West behind his friend, Mary Riedinger. Mr. Harkess proved

9    this fact through his own testimony, the testimony of David Kaye, and the admissions of

10   Weinsten in federal court in Ohio, and it went noticeably unrebutted by Mr. Quinn. It is an

11   important fact that demonstrates Quinn's overall scheme to hide his Sanitec assets in the

12   names of others, of which Windsor was a part. Whether and how this finding impacts Ms.

13   Riedinger's ability to maintain her lawsuit against Mr. Harkess, Mr. Kaye and the many

14   other defendants in the *Riedinger* Litigation is besides the point and will be litigated in that

15   case. Ms. Riedinger, who was not a party here, will have ample opportunity to show (if she

16   can), that she actually paid consideration for her interest in Sanitec West and was not just a

17   figurehead for Quinn and another way for him to hide assets.

18   **III.    CONCLUSION**

19           For all of the foregoing reasons, Mr. Harkess respectfully requests that the

20   Court make Mr. Harkess' proposed changes to the Tentative Ruling, and enter that amended

21   Ruling and the attached Proposed Judgment as the final statement of decision and judgment

22   of the Court.

23

24   DATED: July 26, 2005          Respectfully submitted,
                                   **WESTON, BENSHOOF, ROCHEFORT,**
25                                 **RUBALCAVA & MacCUISH LLP**

26                                 _____
27                                          Michael J. Hartley
                                   Attorneys for Plaintiff and Cross-Defendant
28                                 JAMES HARKESS

4

674011.1

**EXHIBIT A**

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| SANITEC WEST, et al. | ) | CASE NO. 1:02 CV 01582 |
| | ) | |
| Plaintiffs, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | PLAINTIFF SANITEC, LTD.'S |
| JOSEPH DELLOIACOVO, et al. | ) | MAY 17, 2005 SUPPLEMENT TO |
| | ) | ITS APRIL 29, 2005 STATUS |
| Defendants. | ) | REPORT |

Undersigned counsel for Sanitec, Ltd. has learned, and thus hereby gives notice to this Court and to counsel, that on January 11, 2005, Salem Associates, Inc. ("Salem") – already then the 49% shareholder of Sanitec Worldwide, Ltd ("Sanitec Worldwide") – exercised its option to purchase four percent (4%) of the issued and outstanding shares of Sanitec Worldwide, which resulted in the purchase by Salem of an additional 8.33 shares of Sanitec Worldwide, and as a result of which Salem owns 106.33 shares (representing 51.0392%) of Sanitec Worldwide.[1]

Respectfully submitted,

/s/ Steven J. Miller
STEVEN J. MILLER (0014293)
GOODMAN WEISS MILLER LLP
100 Erieview Plaza, 27th Floor
Cleveland, OH  44114-1882
Tel. (216) 696-3366 • Fax (216) 363-5835
miller@goodmanweissmiller.com
**Attorney for Plaintiff Sanitec, Ltd.**

---

[1] Following Salem's exercise of its purchase option, Windsor Holdings LLC's ownership of 102 shares of Sanitec Worldwide represents a 48.9608% interest.

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2005, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ Steven J. Miller
STEVEN J. MILLER

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SANITEC WEST, *et al.*,<br><br>               Plaintiffs,<br><br>   vs.<br><br>JOSEPH DELLOIACOVO, *et al.*,<br><br>               Defendants. | ) CASE No. 1:02 CV 1582<br>)<br>) JUDGE DONALD C. NUGENT<br>)<br>)<br>) RESPONSE TO MAY 17, 2005<br>) SUPPLEMENT TO THE APRIL 29, 2005<br>) STATUS REPORT FILED WITH THIS<br>) COURT BY STEVEN J. MILLER OF<br>) GOODMAN WEISS MILLER LLP |

This is submitted in response to the May 17, 2005 Supplement to the April 29, 2005 Status Report filed with this Court by Steven J. Miller of Goodman Weiss Miller LLP (Docket No. 174). Mr. Miller represents that he learned that Salem Associates, Inc. ("Salem"), an entity owned by Jeffrey Weinsten ("Weinsten"), purchased on January 11, 2005 four percent of the shares of Sanitec Worldwide, Ltd. ("Worldwide") and now owns the majority interest in that company.[1] However, either Mr. Miller is mistaken or certain persons committed perjury in a recent trial in California state court.

Weinsten, a convicted felon and disbarred attorney (*In re Weinsten*, 279 A.D.2d 130 (N.Y. App. Div. 2000)), is a trustee of a purported trust, the Windsor Trust, which allegedly owns the stock of Windsor Holdings, LLC. (Document No. 149 at 2 & n.2). As Miller previously represented here, Windsor Holdings, in turn, owns a majority of shares in Worldwide. (*Id.* at 1). In his February 2, 2004 brief filed with this Court, Miller stated that Worldwide is owned 51% by Windsor Holdings and 49% by Salem. (*Id.*).

The issue of the ownership of Windsor Holdings is the subject of the pending case in California, *Harkess v. Quinn*, Superior Court of Los Angeles County, California, No. BC311681.

---

[1]    Worldwide owns 100% of the shares of plaintiff, Sanitec, Ltd.

(*See* Document No. 169, 172). The Windsor Trust was a party to that action as a cross-complainant. (Ex. 1). Documents and evidence flatly contradict Mr. Miller's assertion that Salem had a majority interest in Worldwide on January 11, 2005. The evidence includes the following:

- Weinsten testified at trial in the Harkess case. On April 6, 2005, he testified that Salem had 98 shares of Worldwide and Windsor Holdings had 102 shares. (Ex. 2 at 155:5-11 (4/06/05). Obviously, Weinsten would not have given that sworn testimony if the purported option had been exercised in January 2005.

- In its post-trial brief, filed April 21, 2005, Windsor Trust included an attachment claiming that Worldwide is owned "by Windsor Holdings LLC (102 shares) (Windsor Trust) and Salem Associates, Inc. (DE) (98 shares) (Weinsten)." (Ex. 3 at 10).

In addition to that conclusive evidence of Worldwide's ownership, one of the co-trustees of the Windsor Trust that allegedly owns Windsor Holdings, James Smith ("Smith"), filed a lawsuit in Superior Court of Los Angeles County, California, on March 18, 2005, in which he expressly alleged that "Windsor Holdings is the majority shareholder of a Delaware corporation known as Sanitec Worldwide, Ltd." (Ex. 4 ¶ 8). Thus, Salem's purportedly purchase of four percent of the shares of Worldwide from Windsor Holdings in January 2005 was unknown to Smith, a co-trustee with Weinsten of the Windsor Trust.

Therefore, the clear and unambiguous evidence, including sworn testimony and judicial admissions, are contrary to the representations in the May 17 filing by Mr. Miller.

Dated: May 23, 2005

Respectfully submitted,

/s/ Richard J. Oparil
RICHARD J. OPARIL (D.C. Bar No. 409723)
Patton Boggs LLP
2550 M Street, N.W.
Washington, DC 20037-1350
Telephone:  (202) 457-6000
Facsimile:   (202) 457-6315
E-Mail:      roparil@pattonboggs.com

DAN L. MAKEE (0029602)
DAVID B. CUPAR (0071622)
McDonald Hopkins Co., LPA
Suite 2100
600 Superior Avenue, East
Cleveland, Ohio  44114-2643
Telephone:  (216) 348-5400
Facsimile:   (216) 348-5474
E-Mail:      dmakee@mcdonaldhopkins.com
             dcupar@mcdonaldhopkins.com

Attorneys for Plaintiffs Sanitec, Ltd.
and A.B.B. Sanitec West, Inc.

- 3 -

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing was filed electronically with this Court on May 23, 2005. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Richard J. Oparil
RICHARD J. OPARIL (D.C. Bar No. 409723)
Patton Boggs LLP
2550 M Street, N.W.
Washington, DC 20037-1350
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
E-Mail: roparil@pattonboggs.com

Attorneys for Plaintiffs Sanitec, Ltd.
and A.B.B. Sanitec West, Inc.

#3866175

Exhibit 1

1

# SLATER HATHAWAY LLP
2
### ATTORNEYS
200 SOUTH LOS ROBLES AVENUE, SUITE 530
3
PASADENA, CALIFORNIA 91101-2432
TELEPHONE: (626) 795-1600
4
FACSIMILE: (626) 795-1616
5
MARK M. HATHAWAY    SBN 151 332
6
Attorneys for TERRENCE QUINN and THE WINDSOR TRUST

7

8
## SUPERIOR COURT OF THE STATE OF CALIFORNIA
9
## FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT
10

11
JAMES HARKESS,                          ) Case No. BC311681
12                                        )
              Plaintiff,                 ) **CROSS-COMPLAINT FOR**
13                                        ) **DECLARATORY RELIEF**
    v.                                    )
14                                        ) [Assigned for All Purposes to Hon.
TERRANCE QUINN, and DOES 1-10,           ) James R. Dunn, Dept. 26]
15  inclusive,                            )
              Defendants.                 )
16  _____      )
                                          )
17  TERRANCE QUINN, and JAMES H.          )
    SMITH, as Trustee of THE WINDSOR      )
18  TRUST, u/d/t dated June 21, 2002      )
                                          )
19          Cross-Complainants,           )
                                          )
20    v.                                  )
                                          )
21  JAMES HARKESS, and ROES 1 through     ) Complaint Filed: April 28, 2004
    10,                                   ) FSC: NONE SET
22                                        ) Trial Date: NONE SET
            Cross-Defendants.             )
23  _____      )

24          COME NOW Cross-Complainants TERRANCE QUINN (hereafter sometimes

25  "Quinn") an individual, and THE WINDSOR TRUST, dated June 24, 2002 (hereafter

26  sometimes the "Windsor Trust"), who allege claims against cross-defendants, and each of

27  them, as follows:

28                              INTRODUCTION

        1.    Cross-complainants are seeking declaratory relief to resolve a dispute as to

                                         1
                CROSS-COMPLAINT FOR DECLARATORY RELIEF

1   who is the true owner of Windsor Holdings, LLC., (hereafter sometimes "Windsor LLC"),

2   a California limited liability company, which was organized at the behest and instruction of

3   defendant and cross-complainant Quinn.   The Windsor Trust was formally organized and

4   incorporated with the California Secretary of State on July 17, 2001.  Quinn is a

5   co-beneficiary of the Windsor Trust, which is the real party in interest in that any

6   ownership interest that Quinn may have had in Windsor LLC was assigned to the Windsor

7   Trust on June 24, 2002.

8        2.    Cross-defendant JAMES R. HARKESS (hereinafter "Harkess") with the

9   assistance of others, wrongfully converted the corporate books and records of Windsor

10  LLC in or about July of 2003, and illegally declared himself as the 100% sole owner of the

11  company by directing the false issuance of a stock certificate in his name.  Such fraudulent

12  conduct and theft of Windsor Trust's true ownership of the company has substantially

13  affected cross-complainants' title, interest, benefits and control in and to substantial other

14  property rights and assets which belong to the Windsor Trust, not to Harkess.  These

15  ownership rights are essential to also determine which party has the right and authority to

16  bind and act on behalf of Windsor LLC in connection with other business affairs and

17  litigation that is pending in separate actions in the states of Ohio, Delaware and this state.

18       3.    Cross-complainants seek a declaration that it is the Windsor Trust which

19  owns the entire right, title and interest in Windsor LLC and that cross-defendant

20  HARKESS has no right, title or interest in Windsor LLC.

21

22                    GENERAL ALLEGATIONS

23       4.    Cross-complainant Quinn is, and at all times herein mentioned was, a

24  resident of the County of Los Angeles, State of California.

25       5.    Cross-complainant Windor Trust, is a valid irrevocable trust in good

26  standing, organized in accordance with and pursuant to the laws of the State of California,

27  having its co-trustee being James H. Smith herein, with a business address in Los Angeles

28  County, California.

2

CROSS-COMPLAINT FOR DECLARATORY RELIEF

1  6.   Cross-complainants are informed and believe, and based thereon allege, that

2  at all times herein mentioned, cross-defendant Harkess is a resident of the County of Los

3  Angeles, State of California.

4  7.   The true names and capacities of Roes 1 through 100, inclusive, are unknown

5  to cross-complainants who, therefore, sues such cross-defendants by such fictitious names,

6  and cross-complainants will amend this complaint to show their true names and capacities

7  when the same has been ascertained.  Based on information and belief, each of the

8  fictitiously named cross-defendants acted as an agent, employee, servant, principal, partner,

9  shareholder, or co-conspirator of the other cross-defendants, or is otherwise responsible for

10  the acts and omissions alleged in this complaint.

11  8.   Cross-complainants are informed and believe, and based thereon allege, that

12  at all times herein mentioned, cross-defendants, and each of them, were the agents,

13  employees, servants, principals, partners, shareholders, or co-conspirators of the other

14  cross-defendants, acted within the scope of their authority as such agents, employees,

15  servants, principals, partners, shareholders, or co-conspirators of the other

16  cross-defendants, and approved and ratified the alleged acts and omissions of the other

17  cross-defendants.

18  9.   Windsor LLC was organized as a California limited liability company on July

19  17, 2001.  Cross-complainant Quinn retained Mitchell R. Miller, attorney at law, to

20  incorporate Windsor LLC.  At the time of Windsor LLC's organization, Quinn was

21  undecided as to how to take title and issue any stock or certificate(s) of interest.  This

22  decision however was made in or about May of 2002 when Quinn decided to form an

23  irrevocable trust to hold the ownership title to Windsor LLC.  On or about June 24, 2002,

24  Quinn created the Windsor Trust, naming himself as a co-beneficiary and James H. Smith

25  and Jeffrey J. Weinsten as co-trustees.  At this time Quinn also assigned the ownership of

26  Windsor LLC to the Windsor Trust.  A true and correct copy of the Trust is attached hereto

27  and marked as Exhibit "A".

28  10.   Cross-complainants are informed and believe, and based thereon allege, that

3

CROSS-COMPLAINT FOR DECLARATORY RELIEF

1  in or about July of 2003, cross-defendant Harkess, by and with the assistance of others,

2  fraudulently converted the original books and records of Windsor LLC and inserted his

3  name as the owner of the company, which was back dated to be effective November 21,

4  2002. Harkess has since then illegally held himself out to be the sole owner of Windsor

5  LLC. This act of conversion was wilfully intended by Harkess to harm Quinn and outright

6  steal Quinn's ownership of Windsor LLC (now held by the Windsor Trust), which held

7  significant intellectual property rights as well as other assets.

8      11.    At no time whatsoever has Quinn or the Windsor Trust sold, gifted,

9  transferred, or conveyed its ownership of Windsor LLC to Harkess, or any other third

10  party. Nor has Quinn or the Windsor Trust ever authorized or instructed anyone to do so

11  on his behalf.

12      12.    Cross-complainants are informed and believe, and based thereon allege, that

13  at all times herein mentioned, cross-defendants, and each of them, knew that Quinn had

14  previously created the Windsor Trust, that he had assigned the ownership of Windsor LLC

15  to the Windsor Trust, and that he had never transferred his ownership, nor authorized any

16  issuance of stock ownership in Windsor LLC, to anyone since its inception.

17      13.    An immediate, real, and justiciable controversy now exists between the

18  parties to this action regarding the true ownership of Windsor LLC.

19      14.    Harkess claims that he owns Windsor LLC as a result of his wrongful

20  conversion of the original corporate books and records of the company and issuance of a

21  certificate of interest in his name, dated November 21, 2002.

22      12.    Cross-complainants therefore seeks a declaration that the right, title and

23  interest in and to Windsor LLC is vested in the name of the Windsor Trust alone, and that

24  Harkess be enjoined from asserting any estate, right, title and interest in Wiindsor LLC

25  adverse to the Windsor Trust.

26

27  WHEREFORE, Cross-Complainants pray for judgment as follows:

28      1.    A declaration and determination that the Windsor Trust is the rightful owner

4

CROSS-COMPLAINT FOR DECLARATORY RELIEF

1    of Windsor LLC, and that Harkess be declared to have no right, title or interest in Windsor

2    LLC;

3        2.    A preliminary and permanent injunction enjoining cross-defendants, and each

4    of them, from claiming any right, title or interest in Windsor LLC;

5        3.    For attorney's fees and costs incurred herein; and

6        4.    For such other relief as the court may deem just and proper.

7

8    Dated: July 19, 004.

9                                              Respectfully submitted,

10                                             SLATER HATHAWAY, LLP

11                                             By

12                                                Mark M. Hathaway, Esq.
                                                 Attorneys for Cross-complainants
13                                               TERRANCE QUINN and THE
                                                 WINDSOR TRUST, dated June 24, 2002

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>PROOF OF SERVICE</u>

STATE OF CALIFORNIA }
COUNTY OF LOS ANGELES } ss.

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 200 South Los Robles Avenue, Ste 530, Pasadena, California 91101-2432.

On July 19, 2004 I served the foregoing document, described as CROSS-COMPLAINT FOR DECLARATORY RELIEF on all interested parties listed below by transmitting to all interested parties a true copy thereof as follows:

Michael J. Hartley, Esq.
Weston Benshoof et al LLP
333 S. Hope Street 16FL
Los Angeles, CA  90071-1406

☐ BY FACSIMILE TRANSMISSION from FAX No. (626) 795-1616 to the fax numbers set forth above.
    ☐ The facsimile machine I used complied with Rule 2003(3) and no error was reported by the machine. Pursuant to Rule 2005(i), I caused the machine to print a transmission record of the transmission, a copy of which is attached to this declaration.

☐ BY EXPRESS SERVICE:  I caused such document to be deposited in a box or other facility regularly maintained by the express service carrier or delivered to an authorized courier or driver authorized by the express service carrier to receive documents, in an envelope or package designated by the express service carrier with delivery fees paid or provided for, addressed to the person on whom it is to be served.

☒ BY MAIL as follows:
    ☐ placing a true copy thereof in a sealed envelope addressed as stated on the ATTACHED MAILING LIST.
    ☒ placing ☐ the original ☒ a true copy thereof enclosed in a sealed envelope addressed as set forth above.
    ☐ I deposited such envelope in the mail at Pasadena, California. The envelope was mailed with postage thereon fully prepaid.

    ☒ I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Pasadena, California in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

☐ BY PERSONAL SERVICE as follows:  I delivered such envelope by hand to the offices of the addressee.

☐ FEDERAL - I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

☒ STATE - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 19, 2004, at Pasadena, California.

Lindsay Zimmer

6
CROSS-COMPLAINT FOR DECLARATORY RELIEF

Exhibit 2

RUFF0406.TXT

22  STANDARD TRUST TO TRANSFER THE SHARES BACK TO -- TO

23  SANITEC WORLDWIDE, WHAT THE STANDARD TRUST WAS DOING

24  HERE WAS RELEASING ALL OF ITS RIGHTS AND CLAIMS FOR ALL

25  TIME, THAT IT MAY'VE HAD SEPARATE AND APART FROM THE

26  STOCK WHICH IT NEVER HAD IN THE FIRST PLACE.

27      Q.    AND THAT'S WHAT YOU TESTIFIED TO IN

28  DEPOSITION IN DELAWARE?

        HARKESS VS. QUINN ROUGH DRAFT ASCII (TRIAL 4/06/05)    155

1       A.    I DON'T RECALL THAT.

2       THE COURT:  LET'S MOVE ON TO SOMETHING ELSE.

3       MR. HARTLEY:  OKAY.

4   BY MR. HARTLEY:

5       Q.    UH LAST QUESTIONS, MR. QUINN?

6       A.    MR. WEINSTEN.

7       Q.    UH MR. WEINSTEN YOU HAVE -- YOU SAY YOU

8   HAVE A 49 PERCENT INTEREST IN WIND SOAR IN UH SANITEC

9   WORLDWIDE THROUGH YOUR THROUGH SALE AND ASSOCIATES?

10      A.    I HAVE 98 SHARES ISSUED AND UH-H-H --

11  WINDSOR HOLDINGS HAS A HUNDRED AND 2 SHARES ISSUED.

12      Q.    AND YOU OBTAINED THOSE SHARES FROM WIND OR

13  HOLDING I MEAN FROM SANITEC WORLD WIDE IN APPROXIMATELY

14  MAY OF 2 NOW AND 2?

15      A.    THAT'S CORRECT.

16      Q.    AND DURING THAT AND AT THE R THAT PERIOD OF

17  TIME THERE WAS LITIGATION PENDING THE DELLOICOVO

18  LITIGATION AND OTHER OTHER LITIGATIONS OVER THE ASSETS

19  OF SANITEC LIMITED?

20      A.    THAT'S CORRECT.

21      Q.    AND YOUR TESTIMONY IN IN DELAWARE WAS THAT

22  YOU PAID A NOMINAL CONSIDERATION FOR THOSE SHARES

23  CORRECT?

                    Page 145

RUFF0406.TXT

24        A.    THAT'S CORRECT.

25            MR. HARTLEY:  NO FURTHER QUESTIONS, YOUR HONOR.

26    {NOTE:    2 NOW AND 1 IS 2,000 AND 1 THROUGHOUT.   END

27    NOTE}.

28            MR. HATHAWAY:  I'D LIKE TO SHOW WHAT I MARKED

            HARKESS VS. QUINN ROUGH DRAFT ASCII (TRIAL 4/06/05)    156

1    TRUST EXHIBIT FOR IDENTIFICATION.

2            THE COURT:  IS THIS THE TRUST OR --.

3            MR. HATHAWAY:  THIS IS THE ALL UM LETTER THAT THE

4    WITNESS WROTE TO DANIEL DRIESBACH** AFTER HIS UM

5    DEPOSITION IN DELAWARE THAT CORRECTS THE RECORD {NOTE:

6    5 31.  END NOTE}.

7            THE COURT:  DID YOU SHOW THIS TO COUNSEL.

8            MR. HATHAWAY:  I'LL SHOW IT TO COUNSEL.

9            MR. HARTLEY:  YOUR HONOR WE'VE NEVER SEEN THIS.

10            THE COURT:  DON'T SHOW IT TO ANYONE.

11            THE COURT:  SHOW IT TO COUNSEL.

12            MR. HATHAWAY:  I'VE SHOWN HAVE --

13            MR. HARTLEY:  YOUR HONOR, I MOVE THAT THIS -- THIS

14    SHOULD NOT BE ADMITTED.  THIS IS -- THIS IS -- STUFF

15    THAT'S CLEARLY BEEN REQUESTED -- DOCUMENT REQUESTED.  IT

16    HAD ACTUALLY EXISTED AT THE TIME.

17                (SPOKE SIMULTANEOUSLY; UNINTELLIGIBLE.)

18    .

19            MR. HARTLEY:  THERE'S NO INDICATION THAT THIS

20    HAS --

21            MR. HATHAWAY:  I -- I WILL REPRESENT TO THE COURT

22    THAT THERE HAS BEEN AN UNDERSTANDING AND AGREEMENT, I

23    BELIEVE IN WRITING THAT THE PARTIES WERE NOT GONNA

24    REPRODUCE TO EACH OTHER DOCUMENTS THAT WERE CONTAINED OR

25    PART OF THE OTHER LITIGATIONS.  THERE'S A DELAWARE

                              Page 146

Exhibit 3

**SLATER HATHAWAY** LLP

ATTORNEYS

200 SOUTH LOS ROBLES AVENUE, SUITE 530
PASADENA, CALIFORNIA 91101-2432
TELEPHONE: (626) 795-1600
FACSIMILE: (626) 795-1616

MARK M. HATHAWAY    SBN 151 332
Attorneys for WINDSOR TRUST and
TERRANCE QUINN

**ORIGINAL FILED**

APR 2 1 2005

LOS ANGELES
SUPERIOR COURT

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

|  |  |
|---|---|
| JAMES HARKESS, <br><br> Plaintiff, <br><br> v. <br><br> TERRANCE QUINN, WINDSOR TRUST, u/d/t dated June 21, 2002, and DOES 1-10, inclusive. <br><br> Defendants. <br><br> AND RELATED CROSS-ACTION. | Case No. BC311681 <br><br> **POST TRIAL BRIEF** <br><br> [Assigned for All Purposes to Dept. 26, Hon. Hon. James R. Dunn] <br><br> Trial Date: March 28, 2005 <br> Time: 9::00a.m. <br> Location: 111 N. Hill St., Dept. 26 |

### INTRODUCTION

Plaintiff James R. Harkess brought this declaratory relief action to determine the ownership of Windsor Holdings LLC, a California limited liability company formed by defendant Terrance Quinn in July 2001. Defendant Terrance Quinn and defendants James H. Smith and Jeffrey Weinsten, as trustees of the Windsor Trust u/d/t dated June 24, 2002, contend that Mr. Quinn irrevocably assigned his economic and ownership interest in Windsor Holdings LLC to the Windsor Trust in June 2002 and that the Windsor Trust is the sole member of Windsor Holdings LLC. Plaintiff Harkess contends that he became the sole member of Windsor Holdings LLC in mid-July 2003 with the assistance of David Kaye and Peter Babos, Mr. Quinn's attorney.

1

1  Based upon testimony and document evidence presented at trial and for the reasons
2  set forth herein, the sole membership of Windsor Holdings LLC is vested in James H.
3  Smith and Jeffrey Weinsten, as trustees of the Windsor Trust u/d/t dated June 24, 2002.

4

5                    FORMATION OF WINDSOR HOLDINGS, LLC
6  Windsor Holdings LLC was established as part of a corporate restructuring of Mr.
7  Quinn's 1999 acquisition of Sanitec, Ltd. Exh. 21. Following the reorganization
8  performed by New Jersey law firm Lowenstein Sandler, Windsor Holdings LLC was to
9  hold the shares of Sanitec Worldwide, Ltd., which in turn owned Sanitec Ltd., a
10 manufacturing company and owner of the Sanitec" trademark and patents.
11     Windsor Holdings LLC came into existence on July 17, 2001 when Mr. Quinn's
12 attorney filed articles of organization with the Secretary of State pursuant to Corp. Code §
13 17050(c). Exh. 223. The undisputed evidence shows that Windsor Holdings LLC was
14 organized by attorney Mitchell R. Miller, Esq. at the request of his client, Terrance Quinn,
15 and that Mr. Quinn paid for the organization of Windsor Holdings LLC. Exh. 408.
16     A "limited liability company" or "domestic limited liability company" is an entity
17 with one or more members organized under the Beverly-Killea Limited Liability Company
18 Act. Corp. Code § 17001(t); Corp. Code § 17101. A limited liability company may
19 conduct business, sue and be sued, and exercise all the powers of a natural person, in its
20 own name. See Corp. Code § 17003.
21     An LLC has two basic organizational documents. The first is the "articles of
22 organization," a one-page statutory form, which must be filed with the Secretary of State.
23 Corp. Code § 17050(c). The second is the "operating agreement," which may be any
24 agreement, written or oral, among the member(s) as to the affairs of the LLC and the
25 conduct of its business. Corp. Code § 17001(ab) The operating agreement may be as
26 simple as an agreement or intent to organize an LLC.
27     An LLC must have at least one member (Corp. Code § 17050(b)) and members may
28 be natural persons, partnerships, limited partnerships, trusts, estates, associations,

                                    2

1  corporations. other LLCs. or other types of entities. whether domestic or foreign. Corp.

2  Code § 17001(x). (ae).

3      On formation of an LLC, its member(s) is the persons. or person. who enter into its

4  operating agreement before or after filing of its articles of organization. Corp. Code §

5  17050(a). After an LLC is formed, a person may become a member only by acquiring a

6  membership interest from the LLC in conformity with its articles of organization or

7  operating agreement or. if those documents do not otherwise provide. by vote of a majority

8  in interest of the members. – excluding the vote of the person acquiring the membership

9  interest. – and only on becoming a party to the operating agreement.  Corp. Code §

10  17100(a)(1).

11      A "membership interest" refers to a member's rights in the limited liability company,

12  collectively. including the member's economic interest, any right to vote or participate in

13  management. and any right to information concerning the business and affairs of the

14  limited liability company. Corp. Code § 17001(z).

15      An LLC may be managed either by all of its members or by one or more managers.

16  Corp. Code §§ 17150, 17151. The managers may be or include some of the members

17  (Corp. Code § 17151(a)) and do not need to be natural persons. Corp. Code § 17151(c).

18  The LLC's business and affairs are to be managed by all of its members unless the articles

19  of organization state that an LLC will be managed by one or more managers. Corp. Code §

20  17151(b). In this case, the articles of organization does state that management of Windsor

21  Holdings LLC is vested in only "one manager," who does not need to be a member under

22  Corp. Code § 17151(c).  See Exhibit 223, ¶ 5.

23      As of its formation on July 17, 2001, Mr. Quinn was the sole person entitled to an

24  economic interest in Windsor Holdings LLC and the sole person who could enter into an

25  operating agreement, – written or oral, – and was, therefore, its owner and sole member.

26      Shortly after Windsor Holdings LLC came into existence, Mr. Quinn, as the sole

27  director of Sanitec Worldwide, Ltd., authorized the issuance of Sanitec Worldwide, Ltd.

28  shares to Windsor Holding LLC. As a result of the corporate restructuring, Sanitec

1  Worldwide, Ltd. was the sole shareholder of Sanitec, Ltd., the company Mr. Quinn had

2  acquired in 1999. On or about July 27, 2001, Jeffery Weinsten and Joe Delloiacovo

3  executed share Certificate No. 3 to complete the issuance of Sanitec Worldwide, Ltd.

4  shares to Windsor Holdings LLC. Exh. 78, 408.

5      As of August 2001, Mr. Quinn was the sole owner or member of Windsor Holdings

6  LLC, which owned Sanitec Worldwide Ltd., which in turn owned Sanitec Ltd. (See, Exh.

7  21, 22 for complete history.) Mr. Quinn, who was undergoing medical treatment for

8  cancer and other health problems and was facing Federal indictment, was looking for

9  someone to act as manager and facilitate the sale of Sanitec, Ltd. to a third party.

10

11                          DAVID KAYE AS MANAGER

12      David Kaye is the principal of Strategic Financial Advisors and was retained by

13  Terrance Quinn to raise capital for the development of ABB Sanitec West, Inc. ("Sanitec

14  West") through private investment offerings. Mr. Kaye testified that Mr. Quinn was his

15  client and that he was Mr. Quinn's fiduciary.

16      It is not disputed that after the formation of Windsor Holdings LLC and following a

17  meeting with Mark J. Richardson, Esq., Mr. Kaye's securities lawyer, Mr. Quinn asked Mr.

18  Kaye to serve as manager of Windsor Holdings LLC and to represent himself as the

19  managing member in the potential sale of Sanitec Ltd. to Eden Environmental LLC.

20  (Quinn and Kaye Testimony)

21      On October 12, 2001, Mr. Kaye and Mr. Quinn memorialized their arrangement in a

22  hand-written memorandum. Exh. 217. The substance of the memorandum is that Mr.

23  David Kaye would execute the term sheet for Eden Environmental LLC's acquisition of

24  Sanitec, Ltd. as "managing member" of Windsor Holdings, LLC, if Mr. Quinn and the

25  Windsor Holdings LLC agreed to fully indemnify Mr. Kaye for representing himself as the

26  managing member.

27      Since the Windsor Holdings LLC articles of organization state that management is

28  vested in only "one manager," (Exh. 223, ¶ 5), David Kaye could serve as the one manager

4

1  without being a member. See. Corp. Code § 17151(c). This would be akin to a

2  corporation hiring a president or CEO who was not a shareholder. David Kaye's testimony

3  and the memorandum made it clear that Mr. Kaye was operating as a consultant to and

4  under the direction of Mr. Quinn and did not have any independent managing authority or

5  ownership interest. (Kaye Testimony p. 15-16) In addition to Mr. Kaye's testimony

6  regarding his being Mr. Quinn's fiduciary. an LLC manager owes the same fiduciary duties

7  to an LLC and to its members that a partner owes to a partnership and to the other partners.

8  Corp. Code § 17153; see Corp. Code § 16404 (describing partners' fiduciary duties).

9      David Kaye's actions as manager was limited to negotiation of the sale of Sanitec,

10  Ltd. to Eden Environmental LLC and the execution of several documents as managing

11  member. Exhs. 216, 458. 220. There is no evidence that David Kaye acted as manager or

12  managing member of Windsor Holdings LLC after January 2002. Since Windsor Holdings

13  LLC is merely a holding company for the shares of Sanitec Worldwide Ltd., the need for

14  action by a manager is somewhat limited. Mr. Kaye's more significant roles were that of

15  president and chairman of Sanitec, Ltd. and the raising of private capital for Sanitec West

16  through his company Strategic Financial Advisors.

17      Mr. Kaye's compensation for his work on the Eden Environmental LLC transaction

18  was 1% of $9 Million sale price if the transaction was successful. Exh. 217, p. 2. This

19  compensation was in addition to substantial fees paid to Strategic Financial Advisors for

20  raising private capital for Sanitec West.

21      The arrangement did not grant Mr. Kaye any ownership or membership interest in

22  Windsor Holdings, LLC. Mr. Kaye's handwritten memorandum contradicts any claim that

23  Mr. Kaye acquired a membership interest in Windsor Holdings LLC or was, in fact, a

24  bonafide managing member.

25      No evidence was presented that David Kaye became a member of Windsor Holdings

26  LLC under the required procedures of Corp. Code § 17100(a)(1). Mr. Kaye was never a

27  party to any operating agreement with Mr. Quinn, oral or written, and did not agree to act

28  as manager until after Windsor Holdings LLC was formed. David Kaye never purchased,

1  subscribed to, or sought to acquire a membership interest in Windsor Holdings LLC. No

2  evidence was presented that Mr. Quinn ever intended to transfer his ownership of Windsor

3  Holdings LLC to Mr. Kaye. Mr. Kaye's only claim under the arrangement was for

4  indemnity and a 1% fee if the transaction was successful. Exh. 217. Even if he did acquire

5  some claim or right to an economic interest in Windsor Holdings LLC, David Kaye only

6  held any such claim or right as a fiduciary for the benefit of his client Terrance Quinn.

7  As of early May 2002, Sanitec Ltd. and Sanitec West were in Federal litigation

8  against Joe Delloiacovo and others for their theft of Sanitec, Ltd.'s intellectual property

9  and other torts (Exh. 114), and the sale to Eden Environmental LLC had fallen through due

10  to the litigation. Facing very uncertain health and a certain prison term, Mr. Quinn needed

11  to take steps to put some of his affairs in order.

12

13                        THE WINDSOR TRUST

14  In May 2002, Mr. Quinn turned to his friend James H. Smith, an experienced

15  businessman, and associate Jeffrey Weinstein, who had a significant history with Sanitec,

16  Ltd., and asked them to serve as trustees of an irrevocable trust. The sole asset of the

17  Windsor Trust was to be Mr. Quinn's economic interest and ownership of Windsor

18  Holdings LLC. Exh. 261, 262.

19  On May 13, 2002, Mr. Quinn wrote to Mr. Kaye and advised him that he was

20  creating a trust for his 100% ownership of Windsor Holdings LLC and notifying Mr. Kaye

21  that Mr. Kaye would no longer have any role with regard to Windsor Holdings LLC. Exh.

22  221. Mr. Kaye would continue as president and chairman of Sanitec, Ltd. and continue his

23  efforts to raise private capital for Sanitec West. By that time, the potential sale to Eden

24  Environmental LLC has fallen through and Windsor Holdings LLC was merely a holding

25  company for the shares of Sanitec Worldwide Ltd. which owned Sanitec Ltd. No evidence

26  was presented that Mr. Quinn had directed David Kaye to take any action as manager or

27  managing member of Windsor Holdings LLC since early January 2002.

28  With the assistance of New Jersey attorney Gerald Litwin and Jeffrey Weinstein, Mr.

6

1  Quinn created the Windsor Trust u/d/t dated June 24, 2002, assigning "100% of the

2  shares/ownership interest in Windsor Holdings LLC. Exh. 262.

3       Any contention that the Windsor Trust is invalid, or was created at some later date,

4  is directly contradicted by the correspondence among Mr. Weinsten, Mr. Litwin, and Mr.

5  Quinn (Exhs. 265-268) and the testimony of Mr. Quinn, Mr. Weinsten, Mr. Smith, Mr.

6  Peter Babos, and Mr. Miller (regarding validity of the trust), as well as the obvious

7  necessity that Mr. Quinn make such arrangements before surrendering to Federal custody

8  in the Summer of 2002.

9       As of July 2002, Mr. Quinn's interest in Windsor Holdings LLC (and thereby

10  Sanitec Worldwide Ltd. and Sanitec, Ltd) had been assigned to the Windsor Trust. David

11  Kaye continued to serve as officer and director of Sanitec, Ltd., which had no daily

12  business operations due to the litigation and continued to raise private capital for Sanitec

13  West. Dr. Mary Riedinger, Mr. Quinn's long-time "significant other", held their 80%

14  interest in Sanitec West, which managed by James R. Harkess. On August 19, 2002, Mr.

15  Quinn began serving his Federal sentence at a medical facility in Ft. Worth, Texas.

16       It was Mr. Quinn's hope and expectation that once the Sanitec litigation was

17  resolved, Mr. Smith and Mr. Weinsten would be able to successfully develop Sanitec, Ltd.

18  and sell the company to pay off Mr. Quinn's creditors, including the so-called "note-

19  holders" in Ohio.

20       Under the circumstances of the pending Sanitec litigation, it was appropriate for the

21  Windsor Trust trustees to monitor the litigation and settlement talks as they did and, if

22  necessary, take action through a vote of the LLC's shares of Sanitec Worldwide, Ltd.,

23  which in turn controlled Sanitec, Ltd. From late January 2003 until July 7, 2003, the

24  trustees monitored the process of the settlement proposals until it became apparent that the

25  attorneys purporting to represent Sanitec Ltd.'s interest were contemplating settlement

26  scenarios that would result in the transfer of Sanitec, Ltd.'s assets and intellectual property

27  to Mr. Harkess and result in Sanitec Ltd.'s bankruptcy and dissolution.

28       In June 2003, the trustees conducted the necessary corporate meetings, minutes, and

1 | resolutions to install new officers and directors of Sanitec Ltd. and to assert their control
2 | over Sanitec, Ltd.

3 |      On July 7, 2003, James H. Smith wrote to Ohio litigation counsel John R. Climaco
4 | to advise him that the Climaco firm was terminated from further representation of Sanitec,
5 | Ltd. and advising Mr. Climaco that neither Mr. Kaye nor Mr. Harkess had any authority to
6 | act on behalf of Sanitec, Ltd. Exh. 210.

7 |

8 |               OHIO COUNSEL'S DEMAND FOR DOCUMENTATION

9 |      On Monday July 7, 2003, Peter Babos, John Climaco, David Kaye and James R.
10 | Harkess received copies of James H. Smith's termination to letter. Exh. 201.

11 |      On Wednesday July 9, 2003, Peter Babos replied to Mr. Smith with a cease and
12 | desist letter disputing Mr. Smith's claims to the control Sanitec, Ltd. Exh. 169.

13 |      On Tuesday morning, July 15, 2003, John R. Climaco send an email to Peter Babos,
14 | David Kaye and James R. Harkess asking "WHO DO I REPRESENT AND WHO DO I
15 | LISTEN TO?????" Exh. 211.1

16 |      On Thursday morning, July 17, 2003, Mr. Climaco demanded that Peter Babos, Mr.
17 | Kaye and Mr. Harkess send documentation by 9:00 a.m. the next morning showing that
18 | they had authority to act on behalf of Sanitec, Ltd. Exh. 212

19 |      Thursday evening at 9:32 p.m., Peter Babos transmitted by facsimile the documents
20 | that had been created for Mr. Climaco showing that Windsor Holdings LLC was owned
21 | 100% by James R. Harkess.

22 |      The next morning, July 18, 2003, there was a conference call to discuss the
23 | documents so that Mr. Climaco could make truthful representations to Judge Nugent on
24 | Monday morning, July 21, 2003. Exh. 212.

25 |      The only reason James R. Harkess can make any claim to Windsor Holdings LLC
26 | was because he, David Kaye and Peter Babos participated in a ruse to satisfy their litigation
27 | attorney in Ohio and because no one could reach Mr. Quinn in Ft. Worth, Texas. Although
28 | the cross-complaint alleges fraud, it is not known whether Mr. Harkess intended to take

1  Windsor Holdings LLC for himself at that particular time. Mr. Harkess testified that he put

2  the certificates in a drawer, and that he did not think them significant. The only purpose of

3  the documents was to satisfy Mr. Climaco's demand to provide documents by Friday

4  morning, July 18, 2003.

5      Mr. Kaye testified that before the false documents were prepared, Mr. Harkess told

6  him that he and Mr. Quinn had an arrangement, and that he would take the shares for Mr.

7  Quinn and settle the issue later when Mr. Quinn returned from prison. Mr. Harkess later

8  wrote an email to Mr. Babos where he affirmatively referenced settling the issue with Terry

9  at some point later – "Until the issue gets resolved with Terry." Exh. 176, 177. Mr. Babos

10  testified that both Mr. Kaye and Mr. Harkess told him that the documents were in Mr.

11  Quinn's best interest, that they would undo the transaction when Mr. Quinn got home, but

12  for reasons critical at that time, they needed to appease Mr. Climaco. At some point,

13  however, it became clear the Mr. Harkess had decided that he no longer was representing

14  Mr. Quinn's interest and claimed Windsor Holdings LLC for himself. Mr. Babos

15  attempted to undue the transaction and get the parties to talk, but to no avail.

16      In January 29, 2004, Mr. Harkess made false representations to Judge Nugent

17  concerning the documents that had been prepared on or about July 17, 2003. Exh. 444,

18  Harkess testimony.

19                              QUINN RETURNS

20      In September of 2003, Mr. Quinn was release from Ft. Worth facility and contacted

21  Mitchell R. Miller again to complete any work that had been interrupted. Mr. Miller

22  testified that the trust was a valid irrevocable trust with no protection from creditors and

23  that the membership of Windsor Holdings LLC is vested in James H. Smith and Jeffrey

24  Weinsten, as trustees of the Windsor Trust u/d/t dated June 24, 2002.

25

26                      NO ACTUAL OR OSTENSIBLE AUTHORITY

27      Any claim by Mr. Harkess that he relied on the authority of Mr. Kaye and Mr.

28  Babos' (Mr. Quinn's attorney) to give him the LLC is directly contradicted by his own

1  statements to Mr. Kaye and Mr. Babos that he was accepting the certificate on behalf of

2  Mr. Quinn and would settle with Mr. Quinn later. (Babos and Kaye Testimony)   Neither

3  Mr. Kaye nor Mr. Babos had any membership interest of their own to give to Mr. Harkess

4  in July, 2003. Neither Mr. Kaye nor Mr. Babos have any authority as Mr. Quinn's

5  fiduciaries to give Mr. Quinn's interests and rights away. Because Harkess participated in

6  the deceit himself, he cannot satisfy Civil Code § 2334. Harkess testified that he did not

7  pay a penny for the stock, and he has suffered no detriment. Any claim as to this is false as

8  it was Sanitec Industries, Inc. (not Harkess individually) that might be able to claim it

9  incurred liability by virtue of its separate settlement agreement entered into with some of

10  the Ohio note-holders.

11

12                              CONCLUSION

13      Plaintiff has failed to prove that Defendant Quinn is guilty of unclean hands as set

14  forth in his opening statement. There was no dispute that the funds used to acquire

15  Sanitec, Ltd. are traceable and should be repaid to the individual note-holders in Ohio.

16  Plaintiff further failed to prove that the Trust was an invalid instrument created by Quinn in

17  good faith and with proper purpose. Finally, plaintiff has failed to prove that Kaye and/or

18  Babos had any actual or ostensible authority to transfer to him, for absolutely no

19  consideration whatsoever, the entire ownership of Windsor Holdings. Such an act would

20  be well beyond anything imagined or intended by Quinn, or risked by his attorney, Babos

21  under any conceivable notion. Ownership of Windsor Holdings, LLC should be decided in

22  favor of Quinn's trust.

23

24  Dated: March 22, 2005      SLATER HATHAWAY

25

26

27  MARK M. HATHAWAY
    Attorneys for WINDSOR TRUST and TERRANCE QUINN

28

                              10

# SANITEC

# Sanitec, Ltd.

March 1985 - Est. as Combustion Engineering Plant Mgmt Systems, Inc.

March 1988 - Name Change to Environmental Projects, Inc.

Sept. 1990 - Name Change to ABB Sanitec, Inc. by Asea Brown Boveri

Dec 1993 - Obtains U.S. Patent 5,270,000. Apparatus for treating medical hazardous wastes

April 1995 – Acquired by HS Holdings (NV), Name Change to Sanitec, Inc

June 1996 - Obtains U.S. Patent 5,529,687, Filling sluice for appliances for the treatment of infectious waste

Aug 1996 - Obtains U.S. **Trademark 1,991,211** for "Sanitec, Inc"

April 1999 - Obtains U.S. **Trademark 2,238,405** for Sanitec®

Feb 1999 - Acquired by **SICC (ND) [Quinn]** using some funds loaned to Quinn by Venture companies. [Steven Ventre, Quinn's cousin].

April 2001 - Corporate reorganization - Sanitec Inc. merges with Sanitec Int'l Holdings (NV) and Standard Industrial Consulting Corp (DE.)

April 2001 - Change Name to Sanitec, Ltd.

Sole shareholder of Sanitec Ltd. is Sanitec Worldwide, Ltd. (DE) which is in turn owned by Windsor Holdings LLC (102 shares) [Windsor Trust] and Salem Associates, Inc. (DE) (98 shares) [Weinstein]

## Sanitec, Ltd Distributors

- Sanitec West (CA,OR,WA) [Harkess]
- Narita Trading (Taiwan)
- Steryl Medi Equip (India)
- SheGoTec, Inc. (Japan)
- Fkepco/Bassi (Kuwait)
- Sanitec of Kentucky [Guardian Investments/ Ventre companies] sold to Stericycle circa 2002

In April 2002, Sanitec Ltd. and Sanitec West sue Dellohcovo, Sanitec Group LLC, et al. The competing claims and counter claims are pending before the Hon. Donald C. Nugent, U.S. District Judge in the Northern District of Ohio, *Sanitec West et al v. Dellohcovo et al*, USDC Case No. 1:02-cv-01582-DCN. Case is stayed pending resolution of California issue of ownership of Windsor Holdings LLC and who, therefore, represents the interests of Sanitec Ltd. – Jim Harkess or James Smith and Jeffrey Weinstein.

## Sanitec Group, LLC

Formed February 20, 2002 by Joe Deleateove, while he was an officer and director of SANITEC, LTD, and without its consent or knowledge. Dellohcovo resigned from Sanitec, Ltd on March 21, 2002 and began operating Sanitec Group, LLC, claiming that it now owned all of Sanitec, Ltd.'s assets and intellectual property.

Dellohcovo placed derogatory information about Sanitec West on the Internet, which interfered with Sanitec West's private placement memorandum efforts. Sanitec Ltd and Sanitec West sued Dellohcovo et al., which is pending before Judge Nugent.

Sanitec Group LLC is a subsidiary of Guardian Investments, LLC, a Steve Ventre enterprise, which claim rights to Sanitec Ltd's assets by virtue of money loaned to Quinn by Ventre.

## Sanitec Industries, Inc.

California corporation formed by **James Harkess on February 19, 2003**, while an officer and director of Sanitec West [ABB Sanitec West, Inc.] Harkess now claims Sanitec Industries Inc holds all Sanitec, Ltd.'s intellectual assets, based on an assignment from Sanitec Group, LLC. At the same time, Harkess is claiming to represent the interests of Sanitec Ltd., in the litigation in Ohio against Sanitec Group, LLC, hence the dispute.

## Sanitec USA, Inc.

California corporation formed by **James Harkess on January 2, 2004**, while he was a director and officer Sanitec West. Harkess now claims Sanitec USA, operates the business that used to belong to Sanitec West. Those issues are pending in *Riedinger v. Harkess, et al.* Case No. BC372202 (involving claims against Harkess for diluting the majority stock ownership of ABB Sanitec West, Inc.)