## SANITEC TIMELINE

1. 2/99    HS Holdings, owner of Sanitec, sold to SICC (NJ)
2. 3/99    SICC (NJ) issues only stock certificate to SIH (NV)
3. 2/99    SIH (NV) issues stock certificate to T. Quinn making Quinn the sole owner of Sanitec. Inc.
4. 4/01    Reorganization of Sanitec companies by Lowenstein Sandler at the direction and control of TQ.
5. 4/01    Companies merged into Sanitec, Inc. which changed its name to Sanitec, Ltd.
6. 4/01    Sanitec, Ltd. issues shares only to Sanitec Worldwide.
7. 7/17/01    Quinn forms Windsor Holdings through attorney Mitch Miller.
8. 7/29/01    Sanitec Worldwide issues only shares to Windsor Holdings, T. Quinn retaining full control and ownership.
9. 7-8/01    Quinn asks Kaye if he would be manager of Windsor Holdings upon a possible sale of Sanitec, Ltd.
10. 10/12/01    Kaye writes Quinn a memo. Says he understands Quinn is the "actual controlling shareholder of Windsor" and agrees to execute the Eden term sheet as Managing Member of Windsor "as an accommodation" to Quinn if Quinn would indemnify him from "any liabilities that may arise due to my representing myself as the managing member..."
11. 10/31/02    Kaye signs term sheet as managing member of Windsor.
12. 1/03/02    Kaye signs corporate resolution as Managing Member.
13. 5/13/02    Quinn sends Kaye a letter terminating him from any role he might have had as managing member.
14. 6/24/02    Windsor Trust created and Quinn transfers in 100% of his ownership interest in Windsor Holdings.
15. 7/7/03    Smith writes termination letter to Climaco because his proposed settlement will take all assets from Sanitec, cheating Sanitec Ltd. creditors and shareholders.
16. 7/14-    Climaco demands Babos, Kaye and Harkess present
7/15/03    documentary evidence as to who owns and controls Sanitec Ltd. And Windsor Holdings.

17. 7/15-   Babos, Kaye and Harkess fabricate documents creating the
    7/17    appearance that Kaye was the member and manager of Windsor
            and had transferred total ownership of Windsor to Harkess back
            on November 21, 2002.

18. 9/03    Terry Quinn returns home.  Discovers false documentation
            contrary to his intentions via the Windsor Trust.

19. 12/03-  Babos attempts to get all parties to correct mistakes and resolve
    1/04    other issues.  His attempts are ignored by Harkess, Kaye, et al.

20. 5/04    Quinn advises Mitch Miller, the original attorney and organizer
            for Windsor Holdings, to finalize ownership and control of
            the compoany in the name of the Windsor Trust.

***

PROOF OF SERVICE

STATE OF CALIFORNIA }
                     } ss.
COUNTY OF LOS ANGELES }

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 200 South Los Robles Avenue, Ste 530, Pasadena, California 91101-2432.

On April 21, 2005 the foregoing document, described as   POST TRIAL BRIEF  on all interested parties listed below by transmitting to all interested parties a true copy thereof as follows:

Michael J. Hartley
Weston Benshoof et al LLP
333 S. Hope Street 16FL
Los Angeles, CA  90071-1406

☐ BY FACSIMILE TRANSMISSION from FAX No. (626) 795-1616 to the fax numbers set forth above.
    ☐ The facsimile machine I used complied with Rule 2003(3) and no error was reported by the machine. Pursuant to Rule 2005(i), I caused the machine to print a transmission record of the transmission, a copy of which is attached to this declaration.

☐ BY EXPRESS SERVICE: I caused such document to be deposited in a box or other facility regularly maintained by the express service carrier or delivered to an authorized courier or driver authorized by the express service carrier to receive documents, in an envelope or package designated by the express service carrier with delivery fees paid or provided for, addressed to the person on whom it is to be served.

☒ BY MAIL as follows:
    ☐ placing a true copy thereof in a sealed envelope addressed as stated on the ATTACHED MAILING LIST.
    ☒ placing ☐ the original ☒ a true copy thereof enclosed in a sealed envelope addressed as set forth above.
    ☐ I deposited such envelope in the mail at Pasadena, California. The envelope was mailed with postage thereon fully prepaid.

    ☒ I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Pasadena, California in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

☐ BY PERSONAL SERVICE as follows: I delivered such envelope by hand to the offices of the addressee.

☐ FEDERAL - I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

☒ STATE - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on April 21, 2005 at Pasadena, California.

_____
Marie K. Hathaway

11

1
2
3
4
5
6

**SLATER HATHAWAY LLP**
ATTORNEYS
200 SOUTH LOS ROBLES AVENUE, SUITE 530
PASADENA, CALIFORNIA 91101-2432
TELEPHONE: (626) 795-1600
FACSIMILE: (626) 795-1616
MARK M. HATHAWAY    SBN 151 332
Attorneys for SANITEC WORLDWIDE, LTD

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

MAR 1 8 2005

John A. Clarke, Executive Officer/Clerk
By_____, Deputy
**D. GILES**

.7
8
9

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

10

B C 3 3 0 5 2 7

11
12
13
14
15
16
17
18
19
20

JAMES H. SMITH, co-trustee of THE
WINDSOR TRUST, dated June 21, 2002,
a California irrevocable trust,

Plaintiff,

v.

JAMES R. HARKESS, an individual,
DAVID KAYE, an individual, MARK J.
RICHARDSON, an individual, LAURA
MURTAGH, an individual, and DOES 1-
25,

Defendants.

Case No.

COMPLAINT FOR DAMAGES:

1) Fraud; and
2) Conversion

21
22
23
24

COMES NOW Plaintiff THE WINDSOR TRUST, dated June 24, 2002 (hereafter

sometimes the "TRUST"), which alleges claims against Defendants, and each of them, as

follows:

25

INTRODUCTION

26
27
28

Plaintiff maintains that it is the rightful owner of Windsor Holdings, LLC.,

(hereafter sometimes "Windsor"), a California limited liability company. Defendant James

R. Harkess ("hereafter "Harkess") claims he is the rightful owner of Windsor. A separate

1

COMPLAINT FOR DAMAGES

1  action for declaratory relief between Plaintiff and Defendant Harkess is now pending in

2  Los Angeles Superior Court identified as Case No. BC311681. Plaintiff has the right to

3  bring this separate action pursuant to California Code of Civil Procedure, Section 1062.

4     Plaintiff maintains in this action that Defendant Harkess, with the assistance of the

5  other Defendants named herein, wrongfully converted the corporate books and records of

6  Windsor in or about July of 2003, and illegally declared himself as the 100% sole owner of

7  Windsor by directing the false issuance of a stock certificate in his name. Such fraudulent

8  conduct and theft of Plaintiff's true ownership of Windsor has substantially affected

9  Plaintiff's title, rights, interest, benefits and control in and to valuable assets, including the

10  intellectual property rights to certain patents and trademarks in the field of medical waste

11  treatment processes.

12     Plaintiff seeks monetary damages in this action for Defendant's intentional and

13  wrongful conduct. These damages are separate, distinct, and in addition to the declaratory

14  relief it seeks in the other pending action referenced above.

15

16                    **GENERAL ALLEGATIONS**

17     1.     Plaintiff, the TRUST, is a valid irrevocable trust in good standing,

18  organized in accordance with and pursuant to the laws of the State of California, having as

19  its co-trustee James H. Smith herein, a resident of the County of San Mateo, State of

20  California.

21     2.     Plaintiff is informed and believes, and based thereon alleges, that at all times

22  herein mentioned, Defendant JAMES R. HARKESS (hereafter sometimes "HARKESS")

23  was and is a resident of the County of Los Angeles, State of California.

24     3.     Plaintiff is informed and believes, and based thereon alleges, that at all times

25  herein mentioned, Defendant MARK J. RICHARDSON (hereafter sometimes

26  "RICHARDSON") was and is a resident of the County of Los Angeles, State of

27  California, and an attorney at law duly licensed to practice in the State of California.

28     4.     Plaintiff is informed and believes, and based thereon alleges, that at all times

1    herein mentioned, Defendant LAURA MURTAGH (hereafter sometimes "MURTAGH")

2    was and is a resident of the County of Los Angeles, State of California, and an attorney at

3    law duly licensed to practice in the State of California..

4        5.    Plaintiff is informed and believes, and based thereon alleges, that at all times

5    herein mentioned, Defendant DAVID KAYE (hereafter sometimes "KAYE") was and is a

6    resident of the County of Los Angeles, State of California.

7        6.    The true names and capacities of Does 1 through 25, inclusive, are unknown

8    to Plaintiff who, therefore, sues such Defendants by such fictitious names, and Plaintiff

9    will amend this complaint to show their true names and capacities when the same has been

10   ascertained. Based on information and belief, each of the fictitiously named Defendants

11   acted as an agent, employee, servant, principal, partner, shareholder, or co-conspirator of

12   the other Defendants, or is otherwise responsible for the acts and omissions alleged in this

13   complaint.

14       7.    Plaintiff is informed and believes, and based thereon alleges, that at all

15   times herein mentioned, Defendants, and each of them, were the agents, employees,

16   servants, principals, partners, shareholders, or co-conspirators of the other Defendants,

17   acted within the scope of their authority as such agents, employees, servants, principals,

18   partners, shareholders, or co-conspirators of the other Defendants, and approved and

19   ratified the alleged acts and omissions of the other Defendants.

20       8.    Plaintiff is the sole owner of all the stock and assets of Windsor Holdings,

21   LLC, a California corporation. Windsor Holdings is the majority shareholder of a

22   Delaware corporation known as Sanitec Worldwide, Ltd. ("Worldwide"). Worldwide is

23   the sole owner of all the stock and assets of Sanitec, Ltd. ("Limited"), a Delaware

24   corporation. Limited's assets include the ownership of intellectual property rights to

25   certain patents and trademarks relating to a line of microwave disinfection systems for

26   medical waste treatment (hereafter the "Sanitec Technology").

27

28

3

COMPLAINT FOR DAMAGES

## FIRST CAUSE OF ACTION

(Fraud and Deceit based on False Promises against all Defendants)

9.    Plaintiff hereby repeats and realleges paragraphs 1 through 8 of the General Allegations, and incorporate the same herein by reference as though set forth in full hereat.

10.    At all times herein mentioned, Plaintiff's settlor and assignor, Terrance Quatkemeyer aka Terrance Quinn (hereafter "Quinn"), had retained as his attorney and legal representative Peter J. Babos (hereafter "Babos"). Babos at all times herein mentioned was aware of the events and circumstances surrounding the incorporation of Windsor. He also knew that Quinn was the originator and real owner of Windsor which was organized on or about July 17, 2001.

11.    From the period of January through June of 2003, Defendants, and each of them, engaged in a campaign to steal and wrestle away the ownership of Windsor from Quinn and Plaintiff herein. Defendants knew full well that Windsor was the true and legal majority shareholder of Worldwide, and that Worldwide was the sole shareholder and owner of Limited. Defendants further knew full well that Limited was the true and full owner of all of the Sanitec Technology. Therefore, Defendants knew full well that Windsor, as the majority shareholder of Worldwide, would be deemed the true and correct legal owner of the Sanitec Technology. Throughout this time period culminating in July of 2003, Defendants conspired to have defendant Harkess come to be the recognized owner of Windsor by drafting false corporate documents evidencing such wrongful ownership.

12.    In or about July of 2003, while Quinn was incarcerated in federal prison in the State of Texas, and while Defendants knew such facts, including Babos and Quinn's inability to communicate with each other, Defendants falsely and fraudulently represented to Babos, acting on behalf of Quinn as his attorney, the following:

a)   that the ownership of Windsor was critical in determining the rightful owner to the Sanitec Technology, and that since Quinn was imprisoned, it was imperative that HARKESS should own and control the rights to the Sanitec Technology;

b)   that the ownership of Windsor was critical in determining the effect and

4

COMPLAINT FOR DAMAGES

1  outcome of certain litigation pending in Ohio federal court affecting Sanitec, Ltd. Windsor,

2  and other Sanitec related entities;

3      c)  that documents needed to be prepared to demonstrate that HARKESS was the

4  owner of Windsor;

5      d)  that before Quinn left to serve his sentence, he had told HARKESS and KAYE

6  that they could decide who would have to hold title to the stock of Windsor if that became

7  absolutely necessary; and,

8      e)  that upon Quinn's return from serving his sentence, HARKESS and KAYE

9  would immediately return the rightful and legal ownership of Windsor, and the original

10  books and records of the company, to Quinn.

11      13.    The above representations made by defendants, and each of them, were

12  false, fraudulent, and were known to Defendants to be false at the time they were made.

13  Plaintiff is informed and believes that BABOS, acting on behalf of Quinn at that time as

14  his attorney, was ignorant of the falsity of said representations, and instead believed them

15  to be true. The true facts were and are that:

16      a)  that Quinn never expressed to Defendant HARKESS or KAYE that they could

17  decide who could hold title to the stock of Windsor if that became absolutely necessary, or

18  at any time whatsoever;

19      b)  that HARKESS never intended to relinquish ownership of Windsor back to

20  Plaintiff or its settlor, Quinn;

21      c)  that HARKESS intended to steal all ownership, management, and control over

22  Windsor, the Sanitec Technology, and all other related Sanitec entities for his own self

23  gain.

24      14.    The representations alleged by Plaintiff hereinabove were made by

25  Defendants, and each of them, with intent to deceive, defraud, and induce BABOS to act in

26  reliance on these representations in the manner hereafter alleged, and with the expectation

27  that BABOS would so act.

28      15.    At all times material hereto, Babos was ignorant of the falsity of defendants'

1 | representations and believed them to be true. Based on the continuing representations and
2 | assurances asserted by Defendants, BABOS justifiably relied upon these representations,
3 | and was further induced to and did take the following action:

4 |      a)  obtain and transfer to Defendants KAYE and HARKESS the original corporate
5 | books and records of Windsor;

6 |      b)  cooperate with Defendants and assist in the preparation of such false corporate
7 | documents establishing stock ownership in the name of HARKESS;

8 |      c)  represent to litigation counsel for Windsor and other Sanitec related entities that
9 | HARKESS was the true owner of Windsor although he was not, and that HARKESS and
10 | KAYE had the authority to act for other Sanitec related entities, which they did not.
11 | Had BABOS known the true facts, BABOS would not have taken the action set forth
12 | above, nor otherwise act as alleged herein.

13 |     16.    As a direct and proximate result of BABOS' justifiable reliance upon the
14 | truth of the false representations, promises, and assurances made by Defendants as alleged
15 | hereinabove, Plaintiff has sustained substantial economic loss and damages in an amount
16 | not yet ascertained, but believed to exceed the sum of $1,000,000, and according to proof
17 | at time of trial.

18 |     17.    In doing the acts alleged herein, Defendants, and each of them, acted with
19 | fraudulent intent, malice, and oppression. Such conduct was despicable subjecting plaintiff
20 | to
21 | cruel and unjust hardship in conscious disregard of Plaintiff's known rights. By reason of
22 | such conduct by Defendants, Plaintiff is entitled to an award of exemplary and punitive
23 | damages in an amount according to proof at time of trial.

24 |

25 | SECOND CAUSE OF ACTION

26 | (For Conversion against all Defendants)

27 |     18.    Plaintiff hereby repeats and realleges Paragraphs 1 through 8 of the General
28 | Allegations, and Paragraphs 10 and 11 of the First Cause of Action, and incorporate the

6
COMPLAINT FOR DAMAGES

1   same herein by reference as though set forth in full hereat.

2       19.    On or about July 17, 2003, Defendants engaged in the preparing and signing

3   of certain legal corporate documents having the affect of bestowing 100% of the entire

4   stock ownership of Windsor to defendant HARKESS.

5       20.    Plaintiff is informed and believes, and based thereon alleges, that at all

6   times herein mentioned, Defendants, and each of them, had full knowledge that Defendant

7   HARKESS was not the true owner of Windsor; that he had no legal basis for asserting any

8   claim to ownership; that Quinn was the original creator of Windsor and its original rightful

9   owner; that Quinn never consented to or authorized the transfer of the ownership of

10  Windsor to HARKESS; that KAYE had no title, power, or authority to act on behalf of

11  Windsor as a Member or as its Manager; among other things.

12      21.    The acts committed by Defendants, and each of them, as set forth above

13  constitute an unlawful taking and conversion of the rightful stock ownership of Windsor

14  owned and belonging to Plaintiff herein.

15      22.    Plaintiff has demanded that Defendants return the above described property,

16  including the original of the Certificate of Interest reflecting ownership in Windsor

17  wrongfully placed in the name of HARKESS, and further demanded that Defendants cease

18  representing that Defendant HARKESS is the owner of Windsor. Defendants have refused

19  and continue to refuse to return said property and cease making said representations.

20      23.    The above described acts constitute a conversion of Plaintiff's property and

21  property rights. As a proximate result of Defendants' conversion, Plaintiff has suffered

22  and continues to suffer damages in an amount not yet ascertained but believed to be in

23  excess of $1,000,000 and according to proof at time of trial, including costs and attorney's

24  fees in seeking recovery of its stock ownership in the Windsor.

25      24.    The above described acts by Defendants' conversion of the above-described

26  property were undertaken with the intent to defraud, and done knowingly, willfully, and

27  with malicious intent, thereby justifying the imposition of exemplary and punitive damages

28  according to proof at time of trial.

7

COMPLAINT FOR DAMAGES

<u>PRAYER</u>

WHEREFORE, Plaintiff prays for judgment as follows:

1. For general and special damages according to proof;

2. For punitive and exemplary damages according to proof;

3. For attorney's fees and costs incurred herein; and

4. For such other relief as the court may deem just and proper.

Dated: March 18, 2005.

Respectfully submitted,

SLATER HATHAWAY, LLP

By_____Original Signed By:_____
Mark M. Hathaway, Esq.
Attorneys for Plaintiff
THE WINDSOR TRUST,
dated June 24, 2002

8

COMPLAINT FOR DAMAGES

**EXHIBIT B**

1
2
3
4
5
6
7
8        SUPERIOR COURT OF THE STATE OF CALIFORNIA
9        FOR THE COUNTY OF LOS ANGELES
10
11   JAMES HARKESS,                        | Case No.:  BC 311681
12            Plaintiff,
                                           | TENTATIVE RULING
13       v.                                | AND (PROPOSED)
                                           | STATEMENT OF DECISION
14   TERRENCE QUINN aka TERRANCE LEE
     QUATKEMEYER, and DOES 1 through 10,
15   inclusive,
16            Defendants.
17   _____
18   AND RELATED ACTION.

19       The  court  finds  FOR  PLAINTIFF/CROSS-DEFENDANT  AND  AGAINST

20   DEFENDANTS/CROSS-COMPLAINANTS on Plaintiff's Complaint for Declaratory Relief

21   and on Defendants' Cross-Complaint for Declaratory Relief. The court declares that plaintiff

22   James Harkess ("Harkess" herein) is the rightful owner of Windsor Holdings, LLC,

23   ("Windsor" herein) and that defendants have no right, title or interest therein. Further,

24   defendants, and each of them, are permanently enjoined from claiming any right, title or

25   interest in Windsor.

26

27       The court finds that the Windsor Trust ("Trust" herein) was not legally in existence

28   and had no assets at the time of the transfer of Windsor from David Kaye ("Kaye" herein) to

                                          1

1    Harkess.    Defendant Terrence Quinn aka Quatkemeyer ("Quinn" herein), in July 2001,

2    through a series of companies and transactions, none of which bear his name or other indicia

3    of his ownership, transferred ownership and apparent authority to Kaye as managing member

4    of Windsor.    Thereafter, back-dated documents were created virtually overnight, transferring

5    ownership of Windsor from Kaye to Harkess in July 2003.    This transfer of ownership of

6    Windsor was relied on not only by Harkess, but by many other parties and attorneys,

7    including a federal judge.    The court finds that the transfer from Kaye to Harkess was

8    effective to transfer ownership of Windsor to Harkess in July 2003.    The court further finds

9    that, in any event, Quinn and those acting on his behalf are barred by the equitable doctrines

10    of unclean hands and equitable estoppel from asserting ownership in Windsor.    Any

11    purported ownership claimed by James H. Smith ("Smith" herein) or Jeffrey Weinsten

12    ("Weinsten" herein) is purely derivative based ) on their status as trustees of Trust, and the

13    court has found that the Trust was not legally in existence during the time of the transfer

14    from Kaye to Harkess.

15

16    FACTUAL BACKGROUND

17        There are many different companies and individuals involved in the various lawsuits

18    here, in Ohio and elsewhere, but the essential entities for purposes of this lawsuit are

19    Windsor, Sanitec Worldwide ("Worldwide" herein) and Sanitec Limited ("Limited" herein).

20    Windsor is a California limited liability company formed on July 17, 2001.    Through a series

21    of transfers and a corporate re-organization by Quinn, in late July 2001, Windsor was issued

22    stock equally a 100% ownership interest in Worldwide, and became the sole owner of

23    Worldwide at that point; and Worldwide, in turn, was the sole became, the majority owner of

24    Limited (Weinsten testified that his company, Salem Associates, was issued a minority

25    interest in Worldwide by Quinn in May 2002, but the validity of that interest was not directly

26    before the Court in this case owned a minority interest in Worldwide). (Ex. 189, 223).

27    Whoever owns Windsor controls the other two by virtue of this Ownership structure.

28

1      This court has been asked to make a finding on a single, narrow question: who owns

2 Windsor? The court is mindful that there are other lawsuits in Ohio, and perhaps elsewhere,

3 which may be impacted by this decision, and that there may be issues between various

4 parties impacted by what the court decides here. <u>Beyond the findings that support the</u>

5 <u>Court's decision, however,</u> this court makes no findings regarding the merits of any other

6 lawsuits or any purported claims that the parties may have against one another or others.

7      Plaintiff contends that he is the owner of Windsor by virtue of a transfer from Kaye,

8 the managing member of Windsor. Defendants contend that the Trust is the owner of

9 Windsor. Defendants presented evidence that in June 2002, defendant/cross-complainant

10 Quinn was suffering from a terminal illness and was facing an impending prison term, and

11 therefore set up the Trust with cross-complainant Smith and Weinsten as the trustees, and

12 concurrently therewith transferred all the assets of Windsor to Trust. Therefore, at the time

13 of transfer of Windsor from Kaye to Harkess, defendants assert that Windsor had already

14 been transferred to the Trust and there was nothing to transfer.

15

16 THE TRUST

17      The circumstances in existence in or about June 2002, that is the illness and the

18 impending sentencing, are consistent with a desire by Mr. Quinn to form a trust to hold his

19 property. What is missing, however, is a signed original trust document and any credible

20 evidence that such a document was ever signed by Quinn in June 2002, or at any time before

21 he was released from prison in late September 2003. Also, like the ownership structure that

22 Quinn set up for Windsor, the structure he set up for his Trust was also incomplete. The

23 final, and necessary, steps were never taken to consummate the Trust.

24

25      The court makes the following findings which support its conclusion that no Trust

26 was formed in June 2002 or at any time before the Kaye-Harkess transfer.

27

28 1.     The court found Smith to be a credible witness, but by his own testimony and that of

3

TENTATIVE RULING AND (PROPOSED) STATEMENT OF DECISION

others, he was only a figurehead. It was Weinsten that wrote all the letters for him to sign, and it was Weinsten that monitored the litigation in Ohio. Virtually everything that Smith knew, he knew because Weinsten told him. He had virtually no firsthand knowledge of facts.

2. There is no original Trust signed by Quinn which bears a date in June 2002. In fact, no signed original at all was offered in evidence.

3. While there is evidence that the Litwin law firm prepared drafts of a trust in June 2002, and Smith signed some version of a trust, Smith testified that he does not know whether Quinn signed it <u>in June 2002.</u> (Ex. 265)

4. Weinsten testified that he sent the Trust document which had been signed by others to Quinn for him to sign. He <u>did not see Quinn sign the Trust document.</u> ~~had no knowledge whether Quinn signed it or not.~~ <u>Weinsten claims that he received a signature back from Mr. Quinn in June 2002, but the Court does not find this claim credible in light of Mr. Weinsten's other testimony (see below).</u> No one had personal knowledge about whether Quinn ever signed before he was released.

5. Quinn testified that he did sign it in June 2002, but the court does not find his testimony to be credible. On the stand Mr. Quinn repeatedly shifted responsibility for various actions from himself to his attorneys, and said he would sign virtually anything his lawyers told him to sign. This, along with his observed demeanor while testifying, and his two felony convictions for fraud-related offenses, cause the court to disregard his testimony. Thus, there is no independent, corroborating evidence that Quinn ever signed before he got out of prison.

6. There is no credible evidence that shares or other indicia of ownership of Windsor

4

1    were ever transferred to the Trust.

2    7.    Quinn testified that he fired Kaye as managing member of Windsor in June 2002 by

3    letter, but there is no evidence other than the testimony of Quinn himself that the letter

4    was ever sent, and court does not find his testimony credible. Kaye denies ever

5    receiving it, and the only copy introduced in evidence apparently came from

6    Weinsten's file.

7

8    In addition to these points, Weinsten who along with Smith was a co-trustee, denied

9    twice in depositions in other cases that he knew who owned Windsor. One can infer from

10   this that he either knew the trust had never been signed by Quinn, or that there was never any

11   transfer of Windsor assets to the Trust. It was Weinsten who was monitoring the Ohio

12   litigation and apparently was concerned enough about protecting his 48% interest in

13   Worldwide that he attempted to intervene in the Ohio litigation. In several pleadings filed in

14   connection therewith he never mentioned the Trust. (Ex. 118, 122) Even when Smith sent the

15   letter to John Climaco, Ohio counsel for Limited, et al., he did not mention the Trust. And

16   finally, the two independent witnesses who may have been able to corroborate the Trust,

17   attorney Litwin who drafted it, and attorney Mark Geragos (who was llegedly present when

18   the Trust was signed in his office) were not called by the defendants to testify.

19

20   The defendants have not met their burden of showing that the Trust was legally

21   formed and in existence at the time of the Kaye-Harkess transfer.

22

23   THE TRANSFER TO HARKESS

24   By virtue of the failure of the Trust to be formed in June 2002, the assets of Windsor

25   were still in Windsor at the time of the transfer from Kaye to Harkess. In July 2003, never

26   referencing the Trust in his letter, Smith wrote to Jim Climaco, Esq., Ohio counsel for

27   Limited and Windsor ("Climaco" herein), claiming that Harkess had no authority to

28   represent Limited in the Ohio Litigation and that he (Climaco) was discharged as counsel.

1    (Apparently this was one of the letters written for him by Weinsten.) (Ex. 210) In response to

2    this letter Climaco sent an urgent message to Babos demanding to know who had authority

3    to speak for Limited and who he should listen to. (Ex. 211.1, 212) He was obviously very

4    agitated and wanted answers, immediately. He was particularly upset over the fact that be

5    was being put in a position to embarrass himself before a federal judge. In response to that

6    inquiry, within hours Babos, with the concurrence of Harkess and Kaye, created back-dated

7    documents that showed that Harkess was the owner of Limited. (Ex. 163) [ (for Limited) and

8    Harkess (for Sanitec West) had been managing the Ohio litigation and they needed to show

9    they had authority to do so. (It is not altogether clear which parties Babes was actually

10   representing as counsel in all these transactions; Climaco had repeatedly asserted that Quinn

11   needed separate counsel due to a perceived conflict of interest; Babos had served as

12   corporate counsel for some of the Sanitec companies and Quinn individually over the years.)

13   (Ex. 212) These hastily created documents showed that Kaye, acting as managing member

14   and owner of Windsor, transferred his member/owner status to Harkess. Babos continued to

15   reaffirm that Harkess was the owner of Windsor for weeks after Quinn was released from

16   prison in September 2003. He testified that it was only later he realized that he had made a

17   mistake in having the documents prepared and started making efforts to reverse position. By

18   then, however, the representations to the Ohio federal court and counsel had already been

19   made and actions had been taken in reliance on Harkess' apparent authority to represent

20   Limited, (based on his ownership of Windsor) and commitments had been made and

21   documents signed.

22

23        Quinn is responsible for creating the environment and business structure that made

24   this possible. Windsor was formed on July 17, 2001, at Quinn's direction, with the filing of

25   Windsor's Articles of Organization with the Secretary of State. ~~Originally Quinn had a~~

26   ~~registration for Windsor flied with the Secretary of State showing Kaye as the manager.~~ This

27   was the only documentation for Windsor. Nowhere did Quinn's name appear. In late July

28   2001, he then asked Kaye to front for him in an attempt to sell. Limited and in fact Kaye

6

674082.2

1    acted as managing member/owner in the Eden transaction and in dealing with Stericycle. He
2    also was sent by Quinn to Limited back East to monitor operations and represent himself as
3    the managing member of Windsor. Quinn claims that Kaye was only appointed to deal with
4    specific sales or activities, but Quinn is the one who put him in a position to represent
5    himself as owner of Windsor. It was Quinn who set up Windsor but never set up any formal
6    ownership structure or had any documents prepared which identified him as being involved
7    in Windsor. All of the assets that went through the various re-organizations ended up in
8    Windsor. Windsor became a holding company with no ownership structure, and no
9    connection with Quinn. When it was to his advantage in having Kaye step forward for
10    specified transactions that benefited Quinn, he validates his authority. The court does not
11    recognize, however, such selective delegations of authority, especially in a case where there
12    is no documentation showing an owner of Windsor at all. Mr. Babos and Mr. Mitchell R.
13    Miller (a corporation lawyer who drew up the Windsor documents for the Secretary of State)
14    both testified that Quinn never set up any ownership structure because he wasn't sure how be
15    wanted to do it. The only person placed in a position of apparent authority/ownership was
16    Kaye. There is no evidence that either Quinn, or Babos or Miller did anything at all to
17    remedy this uncompleted ownership structure after Quinn went to prison, thus enabling the
18    later events to occur. <u>The Court finds that Mr. Kaye was the sole managing member, and</u>
19    <u>therefore sole owner, of Windsor Holdings from its inception in July 2001 through the</u>
20    <u>transfer to Mr. Harkess in July 2003.</u>

21

22    When the Climaco emergency came, Mr. Kaye did not step forward to act as
23    owner/manager, rather he wanted out, so it was agreed that he would transfer his
24    member/owner status to Harkess. Rather than explain the dilemma to Mr. Climaco and seek
25    a resolution with the Ohio court, counsel Babos, with the concurrence of Harkess and Kaye
26    prepared the back-dated documents within a matter of hours and sent them to Climaco.
27    Those documents were sent to Ohio with the knowledge hat they were to be presented by
28    Mr. Climaco, an officer of the court, to a federal judge representing hat Mr. Harkess was the

7

1    owner of Windsor. And then everyone sat back and allowed others to rely on that
2    representation. This court finds that Mr. Harkess is the owner of Windsor <u>and became the</u>
3    <u>owner with the transfer from Mr. Kaye in July 2003</u>. That entire chain of events was created
4    by the anonymous and incomplete creation of Windsor by Quinn, and the attempt to
5    selectively assign ownership/authority to Kaye.

6

7        The court is mindful that defendant contends that there was an agreement that Harkess
8    was only taking the shares of Windsor temporarily and that he was to give them back after
9    Quinn was released. Mr. Babos supports this purported agreement, as does Quinn, but
10   Harkess vehemently denies it. There is evidence that Harkess said "If I own Limited by
11   virtue of my ownership of Windsor, then I want the documents." This would suggest,
12   however, that Harkess did indeed believe he owned Windsor although had some question as
13   to what impact it had on ownership of Limited. Whether there was or was not such a private
14   agreement between Quinn and Harkess is between them. As far as the rest of the world is
15   concerned, Mr. Kaye transferred ownership of Windsor to Harkess and Harkess, Kaye and
16   Babos represented to the federal court and the litigants that Harkess as the owner of Windsor.
17   The transfer to Harkess was effective.

18

19   UNCLEAN HANDS AND EQUITABLE ESTOPPEL
20       Further, in the exercise of its equitable powers, this court will not permit Quinn to
21   now assert in ownership interest in Windsor.  Plaintiff spent a great deal of the trial laying
22   out the series of transactions involving the original purchase of Limited by Quinn with
23   investor money and the use of various corporations to do so.  Plaintiff made the point that
24   Mr. Quinn's name personally did not appear on any of the documentation of these
25   companies. For the most part the court found that to be true, based on the limited evidence
26   presented on those issues. This court is being asked to take note of a pattern of ownership
27   and apparent evasion of accountability to creditors and suppression of identity in order to
28   establish the defense of unclean hands. This court is not making any findings as to whether

1    Mr. Quinn defrauded the original investors in connection with his use of their funds to
2    purchase Limited.   This court does take note, however, of this trail of companies, re-
3    organizations and the resultant anonymity of Quinn for purposes of whether Quinn was
4    attempting to hide his assets (i.e., Windsor's controlling interest in Worldwide and through
5    Worldwide, ownership of Limited) in order to avoid any claims these investors might have.
6    The court also takes note of the fact that Quinn never used any of his own money to purchase
7    these companies. The court did not find credible his testimony that he also put his own
8    money into Limited from the sale of luxury cars. No documentary or other evidence was
9    presented to support that assertion.

10

11        All of this is corroboration for the testimony of Mr. Quinn himself. Quinn testified on
12    the stand that he created Windsor to "keep the assets of Sanitec away from Barbara Sager,
13    Steve Ventre, Joe Delloiacovo and the investors in Ohio that were laying claim to those
14    assets." He further testified that he asked Mr. Kaye to be the managing member because he
15    was "having difficulties" and "troubles" at the time. It is clear that Quinn did not want his
16    assets in his own name and in fact he also put his 80% interest in Sanitec West in the name
17    of his friend Mary Reidinger rather than himself. This is sufficient evidence for the court to
18    conclude that Quinn was secreting his assets to defeat the claims of his creditors and that he
19    comes to this court with unclean hands. (See Alistead vs. Laumeister (1911) 16 Cal.App. 59
20    and Belling vs. Croter (1943) 57 Cal.App.2d 296.)

21

22        In addition, the court invokes the doctrine of equitable estoppel. While, Mr. Quinn
23    himself did not make the representations to those who relied and acted on them (the Ohio
24    federal court and counsel and others related to that litigation), he is directly responsible for
25    setting in motion the chain of events that led to those representations. He put Kaye and
26    Harkess in the position of having apparent authority for and ownership of, Windsor from the
27    point of view of the court and the parties in the East, to accomplish his own ends of selling
28    off Limited without having his name in any way associated with the sale. Many have relied

1   on the resulting representations about Harkess' ownership of Windsor to their potential

2   detriment in the event that transactions consummated in reliance hereon were to be

3   overturned. Quinn is estopped from now claiming that the representations regarding

4   ownership of Windsor are false, or that Kaye did not have authority to transfer the company

5   to Harkess.

6

7       Plaintiff Harkess to prepare the judgment consistent with this Tentative Ruling. This

8   Tentative Ruling shall be the Statement of Decision unless within ten days either party

9   specifies controverted issues or makes proposals not covered in the Tentative Ruling.

10

11  Dated: 7/11/05

12

13

14                                    JAMES R. DUNN
                                      Judge of the Superior Court
15

16

17

18

19

20

21

22

23

24

25

26

27

28

TENTATIVE RULING AND (PROPOSED) STATEMENT OF DECISION

**EXHIBIT C**

1  MICHAEL J. HARTLEY (State Bar No. 189375)
   LISA GILFORD (State Bar No. 171641)
2  SCOTT J. LEIPZIG (State Bar No. 192005)
   **WESTON BENSHOOF ROCHEFORT**
3  **RUBALCAVA & MacCUISH LLP**
   333 South Hope Street
4  Sixteenth Floor
   Los Angeles, CA  90071
5  Telephone:  (213) 576-1000
   Facsimile:  (213) 576-1100
6
   Attorneys for Plaintiff and Cross-Defendant
7  **JAMES HARKESS**

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                     **FOR THE COUNTY OF LOS ANGELES**

10

11 JAMES HARKESS,                          Case No.:  BC 311681
                                           [Related to Case Nos. BC 330528
12            Plaintiff,                    and BC 330527]

13    v.                                    (Assigned for All Purposes to the
                                            Honorable James R. Dunn – Dept. 26)
14 TERRENCE QUINN aka TERRANCE LEE
   QUATKEMEYER, and DOES 1 through 10,      **[PROPOSED] JUDGMENT IN FAVOR**
15 inclusive,                               **OF JAMES HARKESS**

16            Defendants.

17 AND RELATED CROSS-ACTION.

18

19

20            This action came on regularly for trial before the Court on March 28, 2005, at

21 8:30 a.m. in Department 26 of the above captioned court.  Michael Hartley and Scott Leipzig

22 of Weston Benshoof Rochefort Rubalcava & MacCuish LLP appeared on behalf of Plaintiff

23 and Cross-Defendant James Harkess ("HARKESS").  Mark Hathaway of Slater Hathaway

24 LLP and Peter Babos of the Law Offices of Peter Babos appeared on behalf of Defendants

25 and Cross-Complainants Terrance Lee Quatkemeyer aka Terrence Quinn ("QUINN") and

26 James H. Smith, as Trustee of The Windsor Trust, u/d/t dated June 21, 2002 ("SMITH" and

27 the purported "TRUST") and Jeffrey Weinsten ("WEINSTEN"), as co-trustee of the

28 TRUST.

                                           1
                        [PROPOSED] JUDGMENT IN FAVOR OF JAMES HARKESS

672459.3

1    The Court having heard and considered testimony, documentary evidence, and
2  arguments presented by or on behalf of the parties, and having issued a Ruling and Statement
3  of Decision (hereinafter, "Decision," a true and correct copy of which is attached hereto as
4  Exhibit A and incorporated fully by reference herein), hereby orders the following Judgment
5  to be entered in favor of HARKESS, with specific reference to the following findings of the
6  Court:

7    (1)  The purported TRUST "was not legally in existence and had no assets at
8  the time of the transfer" of Windsor Holdings, LLC ("Windsor") from David Kaye ("Kaye")
9  to HARKESS. (Decision, p. 1.) Any purported ownership of Windsor claimed by SMITH
10 and Jeffrey Weinsten ("WEINSTEN") "is purely derivative based on their status as trustees
11 of the Trust, and the court has found that the Trust was not legally in existence during the
12 time of the transfer from Kaye to Harkess." (Decision, p. 2.)

13   (2)  The transfer of Windsor from "Kaye to Harkess was effective to transfer
14 ownership of Windsor to Harkess." (Decision, p. 1.) Windsor was formed in July 2001 and
15 David Kaye became the managing member, and sole owner, of Windsor later that month;
16 Harkess became the managing member, and sole owner, of Windsor upon transfer from
17 Kaye in July 2003. Since July 2001, Windsor has held a controlling interest in Sanitec
18 Worldwide, Ltd. ("Worldwide"), and Worldwide has been the sole shareholder of Sanitec,
19 Ltd. ("Limited"). Accordingly, HARKESS "controls" Worldwide and Limited "by virtue of
20 the ownership structure" of Windsor, Worldwide and Limited. (Decision, p. 2.)

21   (3)  QUINN and those acting on his behalf, including SMITH and
22 WEINSTEN, "are barred by the equitable doctrines of unclean hands and equitable estoppel
23 from asserting ownership in Windsor." (Decision, p. 2.) The Court took note of the "trail of
24 companies, re-organizations and the resultant anonymity of Quinn" and concluded that "[i]t
25 is clear that Quinn did not want his assets in his own name and in fact he also put his 80%
26 interest in Sanitec West in the name of his friend Mary Riedinger rather than himself. This is
27 sufficient evidence for the court to conclude that Quinn was secreting his assets to defeat the
28 claims of creditors and that he comes to the court with unclean hands." (Decision, p. 8.)

2

672459.3

1   Moreover, QUINN "put Kaye and Harkess in the position of having apparent authority for

2   and ownership of, Windsor from the point of view of the court and the parties in the East, to

3   accomplish his own ends of selling off Limited without having his name in any way

4   associated with the sale. Many have relied on the resulting representations about Harkess'

5   ownership of Windsor to their potential detriment in the event that transactions consummated

6   in reliance thereon were to be overturned." (*Id.*) "In the exercise of its equitable powers,

7   this court will not permit Quinn to now assert an ownership interest in Windsor." (Decision,

8   p. 7.)

9        NOW THEEFORE, consistent with these findings and all findings set forth in

10  the Decision herein, IT IS HEREBY ADJUDGED AND DECREED THAT:

11       (1)   Judgment is entered FOR Plaintiff and Cross-Defendant HARKESS

12             and AGAINST Defendants and Cross-Complainants QUINN, SMITH

13             and WEINSTEN on Plaintiff's Complaint for Declaratory Relief and on

14             Defendants' Cross-Complaint for Declaratory Relief. The Court

15             declares that HARKESS is the sole and rightful owner of Windsor and

16             Windsor's assets, including but not limited to, Windsor's ownership

17             interests in Worldwide and Limited. The Court further declares that

18             Harkess controls Windsor, Worldwide and Limited. Neither QUINN,

19             SMITH, WEINSTEN, nor any successor trustees or beneficiaries of the

20             purported TRUST have any right, title or interest in Windsor and/or any

21             Windsor asset, including but not limited to, Windsor's ownership

22             interests in Worldwide and Limited;

23       (2)   QUINN, SMITH, WEINSTEN and the successor trustees and

24             beneficiaries of the purported TRUST, and each of them, as well as

25             anyone acting on their behalf or in concert with them (hereinafter,

26             "ENJOINED PARTIES"), are restrained and permanently enjoined

27             from claiming any right, title or interest in Windsor and/or any Windsor

28             asset, including but not limited to, Windsor's ownership interests in

3

672459.3

1    Worldwide and Limited.   The ENJOINED PARTIES are specifically

2    restrained and permanently enjoined from making any representations

3    that they have any ownership interest in or control over Windsor and/or

4    any Windsor asset, including but not limited to, Windsor's ownership

5    interests in Worldwide and Limited.

6

7    IT IS SO ORDERED.

8

9

10   DATED: _____          _____
                                            JUDGE OF THE SUPERIOR COURT
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

672459.3

1   Submitted by:

2   MICHAEL J. HARTLEY
    LISA GILFORD
3   SCOTT J. LEIPZIG
    **WESTON, BENSHOOF, ROCHEFORT,**
4       **RUBALCAVA & MacCUISH LLP**

5

6

7   _____
        Michael J. Hartley
8   Attorneys for Plaintiff and Cross-Defendant
    **JAMES HARKESS**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] JUDGMENT IN FAVOR OF JAMES HARKESS

672459.3

**PROOF OF SERVICE**

I, Yolanda S. Ramos, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Weston Benshoof Rochefort Rubalcava & MacCuish LLP, 333 South Hope Street, Sixteenth Floor, Los Angeles, California 90071. I am over the age of eighteen years and not a party to the action in which this service is made.

On July 26, 2005, I served the document(s) described as PLAINTIFF AND CROSS-DEFENDANT JAMES R. HARKESS' OPPOSITION AND COUNTER-PROPOSALS TO DEFENDANTS' OBJECTIONS TO COURT'S PROPOSED STATEMENT OF DECISION on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows:

SEE ATTACHED SERVICE LIST

☒   BY MAIL: I am "readily familiar" with this firm's practice for the collection and the processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, the correspondence would be deposited with the United States Postal Service at 333 South Hope Street, Los Angeles, California 90071 with postage thereon fully prepaid the same day on which the correspondence was placed for collection and mailing at the firm. Following ordinary business practices, I placed for collection and mailing with the United States Postal Service such envelope at Weston Benshoof Rochefort Rubalcava & MacCuish LLP, 333 South Hope Street, Los Angeles, California 90071.

☐   BY FEDERAL EXPRESS      ☐ UPS NEXT DAY AIR      ☐ OVERNIGHT DELIVERY: I deposited such envelope in a facility regularly maintained by ☐ FEDERAL EXPRESS   ☐ UPS   ☐ Overnight Delivery [specify name of service:  ] with delivery fees fully provided for or delivered the envelope to a courier or driver of ☐ FEDERAL EXPRESS   ☐ UPS   ☐ OVERNIGHT DELIVERY [specify name of service:] authorized to receive documents at Weston Benshoof Rochefort Rubalcava & MacCuish LLP, 333 South Hope Street, Los Angeles, California 90071 with delivery fees fully provided for.

☐   BY FACSIMILE: I telecopied a copy of said document(s) to the following addressee(s) at the following number(s) in accordance with the written confirmation of counsel in this action.

☒   [State]      I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☐   [Federal]   I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 26, 2005, at Los Angeles, California.

_____
YOLANDA S. RAMOS

1

*Harkess v. Quinn, et al.*
Los Angeles Superior Court, Case No. BC 311681

2

3

*Sanitec Worldwide, Ltd. v. Harkess, et al.*
Los Angeles Superior Court
Case No. BC 330528

4

5

*James H. Smith, et al. v. James R. Harkess, et al.*
Los Angeles Superior Court
Case No. BC 330527

6

7

8

**SERVICE LIST**

9

10

Mark M. Hathaway, Esq.
Slater Hathaway LLP
200 South Los Robles Avenue
Suite 530
Pasadena, CA   91101-2432

Attorneys for  TERRENCE  QUINN  aka
TERRANCE    LEE    QUATKEMEYER;
JAMES  H.  SMITH,  as  Trustee  of  THE
WINDSOR  TRUST,  u/d/t  dated  June  21,
2002; SANITEC WORLDWIDE
Telephone:     (626) 795-1600
Facsimile:      (626) 795-1616

11

12

13

14

**Courtesy Copy:**

15

Mark Hathaway, Esq.
801 South Figueroa Street, 11th Floor
Los Angeles, CA  90015

Telephone:     (213) 624-7200
Facsimile:      (213) 624-7220

16

17

18

Peter Babos, Esq.
Law Offices of Peter J. Babos
9401 Wilshire Boulevard, Suite 650
Beverly Hills, CA   90212

Telephone:     (310) 248-4822
Facsimile:      (310) 248-4406

19

20

21

Mark Overland, Esq.
Overland Borenstein Scheper & Kim LLP
300 South Grand Avenue
Suite 2750
Los Angeles, CA  90071-3144

Telephone:     (213) 613-4655
Facsimile:      (213) 613-4656

22

23

24

25

Mark Jay Richardson, Esq.
Laura Murtaugh, Esq.
Richardson & Associates
Attorneys at Law
233 Wilshire Boulevard, Suite 820
Santa Monica, CA  90401

Telephone:     (310) 393-9992
Facsimile:      (310) 393-2004

26

27

28

1

Joel Thvedt, Esq.                    Telephone:    (213) 312-9200
Knott & Glazier LLP                  Facsimile:    (213) 312-9201

2

601 South Figueroa Street

3

Suite 1950
Los Angeles, CA  90017

4

5

Joseph Delloiacovo                   Telephone:    (973) 989-2680
32 Dogwood Trail                     Facsimile:    (973) 989-2681

6

Randolph, NJ  07869

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28