# EXHIBIT D

# CONSENT AND RELEASE AGREEMENT

This Consent and Release Agreement (the "Agreement") is entered into as of the 31st day of July 2004 by and between Sanitec Industries, Inc., a California corporation (the "Company"), Sanitec USA, Inc., a California corporation ("Sanitec USA"), and the existing shareholder of shares of common stock of Sanitec USA (the "Sanitec USA Shares"), and/or the holder of warrants (collectively, the "Warrants") to purchase the common stock of A.B.B. Sanitec West, Inc., a California corporation ("Sanitec West"), and/or debenture holder of (a) one or more 14% secured notes, (b) one or more 12% secured notes or (c) one or more 14% secured notes and one or more 12% secured notes originally issued by Sanitec West, and assumed by Sanitec USA, Inc. (collectively, the "Note"), who is listed as the "Holder" in the signature block of this Agreement (the "Holder"), with respect to the following facts.

## RECITALS

A.    Holder owns the amount of Note listed beneath the Holder's signature to this Agreement and, if applicable, the number of Sanitec USA Shares listed beneath the Holder's signature to this Agreement.

B.    The Company desires to convert the Note into shares of the Company's common stock at a conversion rate of one share of the Company's common stock for each $2.00 of principal and interest due and payable on the Note as of June 30, 2004. Interest accrued after June 30, 2004 will not be paid on Notes tendered for conversion.

C.    The holder of the Sanitec USA Shares desires to exchange all of the Sanitec USA Shares into shares of the Company's common stock at a conversion rate of one share of the Company's common stock for each Sanitec USA Share tendered for exchange.

D.    The Company is willing to allow the holders of the Warrants who also convert their Notes into shares of the common stock of the Company to exercise them on the date of conversion only to purchase an equivalent number of shares of the common stock of the Company.

E.    The Board of Directors of the Company has approved the offer of Note conversion, warrant exercise to be permitted for Company common stock, and exchange of Sanitec USA Shares for shares of the Company's common stock (collectively, the "Conversion and Exchange Plan").

F.    By executing this Agreement, the Holder approves the Conversion and Exchange Plan, as described in that certain Executive Summary, dated June 15, 2004, relating to the Rights Offering for Debenture Holders. The shares of the Company's common stock issued in the Conversion and Exchange Plan are hereby collectively referred to as the "Shares".

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged by the parties to this Agreement, and in light of the recitals stated above, the parties to this Agreement hereby agree as follows:

1.    Consent to Conversion and Exchange Plan.

The Holder hereby consents to and approves of the Conversion and Exchange Plan as described in the Executive Summary, dated June 15, 2004, for the Rights Offering for Debenture Holders, including

financial statements of the Company, Sanitec USA, and the Company and Sanitec USA on a combined pro forma basis, and Exhibits A through G thereto (the "Summary").

2.    Access to Information.

The Holder hereby represents and warrants that prior to the execution of this Agreement by the Holder, the Holder has carefully reviewed the updated business plan and related financial and other information provided by the Company to the Holder and the Summary (collectively, the "Information"), and has had a complete opportunity to ask questions of, and receive additional information from, the Company's management.

3.    Sophistication and Knowledge.

The Holder has sufficient experience in financial and business matters to be capable of utilizing such information to evaluate the merits and risks of the Holder's investment, and to make an informed decision relating thereto. The Holder expressly represents and warrants that the Holder satisfies all of the criteria necessary to qualify for participation in the Conversion and Exchange Plan, as further confirmed in the Holder's completed and signed Purchaser Questionnaire.

4.    Evaluation of Risks.

The Holder has evaluated the risks of this investment in the Company, including those risks particularly described in the Information, and has determined that the investment is suitable for the Holder. The Holder has adequate financial resources for an investment of this character, and at this time the Holder could bear a complete loss of this investment. The Holder understands that any projections in the Information are mere estimates and may not reflect the actual results of the Company's operations.

5.    No Federal Registration.

The Holder understands that the Shares are not being registered under the Securities Act of 1933, as amended (the "1933 Act") on the ground that the issuance thereof is exempt under Section 4(2) of the 1933 Act and Regulation D promulgated thereunder as a transaction by an issuer not involving any public offering, and that reliance on such exemption is predicated in part on the truth and accuracy of the undersigned's representations and warranties, and those of the other recipients of Shares.

6.    No State Registration.

The Holder understands that the Shares are not being registered under the securities laws of certain states on the basis that the issuance thereof is exempt as an offer and sale not involving a public offering in such state. The Holder understands that reliance on such exemptions is predicated in part on the truth and accuracy of the Holder's representations and warranties and those of other recipients of Shares. The undersigned covenants not to sell, transfer or otherwise dispose of a Share unless such Share has been registered under the applicable state securities laws, or an exemption from registration is available.

7.    Acknowledgment of No Liquidity.

The Holder has no need for any liquidity in this investment and is able to bear the economic risk of this investment for an indefinite period of time. The Holder has been advised and is aware that (a) it may not be possible to liquidate the investment readily; (b) the Holder must bear the economic risk of his investment in the Shares for an indefinite period of time because the Shares have not been registered under the 1933 Act or state law and, therefore, cannot be sold unless they are subsequently registered under the 1933 Act and applicable state law or an exemption from such registration is available; (c) a

legend as to the restrictions on transferability of the Shares referred to herein will be made on the document evidencing the Shares, and (d) a notation in the appropriate records of the Company will be made with respect to any restrictions on transfer of Shares. The restrictive legend on the certificate will essentially state as follows:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE AACT"), NOR UNDER ANY STATE SECURITIES LAWS. THESE SECURITIES MAY NOT BE SOLD, TRANSFERRED, CONVEYED, HYPOTHECATED OR OTHERWISE ASSIGNED UNLESS THEY ARE REGISTERED UNDER THE ACT OR UNLESS AN OPINION OF COUNSEL OR OTHER EVIDENCE REASONABLY SATISFACTORY TO THE COMPANY IS PRESENTED INDICATING THAT AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

8.    Reliance - No Oral Representations.

The Holder has relied solely upon the Information and independent investigations made by the Holder or his purchaser representative with respect to the Shares acquired herein, and no oral or written representations beyond the Information have been made to the Holder.

9.    Authority.

If the Holder is a partnership, corporation or trust, it has been duly formed, is validly existing, has full power and authority to make this investment, and has not been formed for the specific purpose of investing in the Shares. This Agreement and all other documents executed in connection with this acquisition of Shares are valid, binding and enforceable agreements of the Holder.

10.    Indemnification.

The Holder hereby agrees to indemnify and hold harmless the Company and all of its affiliates, attorneys, accountants, employees, officers, directors, shareholders and agents from any liability, claims, costs, damages, losses or expenses incurred or sustained by them as a result of the Holder's representations and warranties herein being untrue or inaccurate, or because of a breach of this Agreement by the Holder.

11.    Acknowledgment of Investment Risks.

The Holder hereby understands and acknowledges the risk factors relating to this investment, including but not limited to those described in the Information, and that the acquisition of the Shares is highly speculative and subject to a high degree of risk.

12.    Reaffirmation of Purchase of Sanitec USA Shares.

If the Holder purchased Sanitec USA Shares directly or through exercise of Warrants prior to the date of this Agreement, such Holder hereby reaffirms said purchase and does not desire rescission thereof, after carefully reviewing the Summary and all of the rest of the Information, including but not limited to the risk factors described therein.

13.    Survival of Representations and Warranties.

The representations and warranties of each party hereto shall survive and shall not be affected by the closing.

14.    Release of Claims.

Effective on July 15, 2004, the Holder fully and forever releases and discharges the Company, Sanitec USA, Sanitec West and any of their past, present and future affiliates, employees, officers, directors, shareholders, attorneys, accountants, agents, representatives, successors and predecessors (collectively, the "Sanitec Affiliates") from any and all claims, demands, obligations, losses, damages, or causes of action of any nature relating to the Company, its business, its securities, or relating to any other claims which the Holder may have against the Company or any of the Sanitec Affiliates, whether based in tort, contract or any other theory of recovery, and whether for compensatory or punitive damages, that now exist or may hereafter accrue based on actions occurring prior to the effective date of this release.

15.    Representations Relating to Release.

The Holder agrees that the releases in Paragraph 14 of this Agreement shall not be considered admissions by any party of any liability or wrongdoing. The Holder warrants that no promise or inducement has been offered except as herein set forth. The Holder is of legal age and legally competent to execute this release and accept full responsibility therefor. The Holder declares that the terms of this full and final release of claims have been completely read by the Holder and are fully understood and voluntarily accepted for the purpose of making a full and final compromise and settlement. The Holder hereto hereby represents and warrants that he has not assigned any of his above referenced released claims to any third party. The Holder further agrees that all rights under Section 1542 of the Civil Code of California, and any similar law of any state or territory of the United States or other jurisdiction, are hereby expressly waived. Said Section reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

---
Initials of
Holder

16.    Injunctive Relief.

16.1    Damages Inadequate

Each party acknowledges that it would be impossible to measure in money the damages to the other party if there is a failure to comply with any covenants or provisions of this Agreement, and agrees that in the event of any breach of any covenant or provision, the other party to this Agreement will not have an adequate remedy at law.

16.2    Injunctive Relief

It is therefore agreed that the other party to this Agreement who is entitled to the benefit of the covenants or provisions of this Agreement which have been breached, in addition to any other rights or remedies which they may have, shall be entitled to immediate injunctive relief to enforce such covenants and provisions, and that in the event that any such action or proceeding is brought in equity to enforce them, the defaulting or breaching party will not urge a defense that there is an adequate remedy at law.

17.    Waivers.

If any party shall at any time waive any rights hereunder resulting from any breach by the other party of any of the provisions of this Agreement, such waiver is not to be construed as a continuing waiver of other breaches of the same or other provisions of this Agreement. Resort to any remedies referred to herein shall not be construed as a waiver of any other rights and remedies to which such party is entitled under this Agreement or otherwise.

18.    Successors and Assigns.

Each covenant and representation of this Agreement shall inure to the benefit of and be binding upon each of the parties, their personal representatives, assigns and other successors in interest.

19.    Entire and Sole Agreement.

This Agreement constitutes the entire agreement between the parties and supersedes all other agreements, representations, warranties, statements, promises and undertakings, whether oral or written, with respect to the subject matter of this Agreement. This Agreement may be modified only by a written agreement signed by all parties.

20.    Governing Law.

This Agreement will be governed by the laws of California without giving effect to applicable conflict of laws provisions. With respect to any litigation arising out of or relating to this Agreement, each party agrees that it will be filed in and heard by the state or federal courts with jurisdiction to hear such suits located in Los Angeles County, California.

21.    Counterparts.

This Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

22.    Attorneys' Fees and Costs.

In the event that either party must resort to legal action in order to enforce the provisions of this Agreement or to defend such action, the prevailing party shall be entitled to receive reimbursement from the nonprevailing party for all reasonable attorneys' fees and all other costs incurred in commencing or defending such action, or in enforcing this Agreement, including but not limited to post judgment costs.

23.    Further Acts.

The parties to this Agreement hereby agree to execute any other documents and take any further actions which are reasonably necessary or appropriate in order to implement the transactions contemplated by this Agreement.

24.    Authorized Signatures.

Each party to this Agreement hereby represents that the persons signing below are duly authorized to execute this Agreement on behalf of their respective party.

25.    <u>Severability</u>.

The provisions of this Agreement are severable and in the event that one or more of its provisions are deemed to be unenforceable or invalid for any reason, such finding will not affect the enforceability or validity of any other provision of this Agreement, which shall remain in full force and effect.

**IN WITNESS WHEREOF,** this Agreement has been entered into as of the date first above written.

**SANITEC USA:**                    **SANITEC USA, INC., a California corporation**


By: _____
        James R. Harkess, President


**COMPANY:**                        **SANITEC INDUSTRIES, INC., a California corporation**


By: _____
        James R. Harkess, President


**HOLDER:**                         _____
                                    Signature

                                    _____
                                    Print Name

                                    _____
                                    Street Address

                                    _____
                                    City, State and Zip Code

                                    _____
                                    Telephone Number

**EXHIBIT B**



ORIGINAL FILED

OCT 1 7 2005

LOS ANGELES
SUPERIOR COURT

1  MICHAEL J. HARTLEY (State Bar No. 189375)
   LISA GILFORD (State Bar No. 171641)
2  SCOTT J. LEIPZIG (State Bar No. 192005)
   **WESTON BENSHOOF ROCHEFORT**
3      **RUBALCAVA & MacCUISH LLP**
   333 South Hope Street
4  Sixteenth Floor
   Los Angeles, California 90071
5  Telephone: (213) 576-1000
   Facsimile: (213) 576-1100
6
7  Attorneys for Plaintiff and Cross-Defendant
   JAMES HARKESS

8            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                **FOR THE COUNTY OF LOS ANGELES**

10

11 JAMES HARKESS,                          Case No.: BC 311681
                                           (Assigned for All Purposes to the
12            Plaintiff,                   Honorable James R. Dunn – Dept. 26)
       v.
13                                         **STIPULATION AND [PROPOSED]**
   TERRENCE QUINN aka TERRANCE LEE         **ORDER RE: ENTRY OF FINAL**
14 QUATKEMEYER, and DOES 1 through 10,     **JUDGMENT**
   inclusive,
15
              Defendants.
16

17 AND RELATED CROSS-ACTION.

18

19 TO: THE HONORABLE JAMES R. DUNN, ALL PARTIES IN INTEREST, AND THEIR

20 RESPECTIVE ATTORNEYS OF RECORD:

21         Plaintiff and Cross-Defendant James Harkess ("Harkess"), Defendant and

22 Cross-Complainant Terrence Quinn aka Terrance Lee Quatkemeyer ("Quinn"), and

23 Defendants and Cross-Complainants James H. Smith ("Smith") and Jeffrey Weinsten

24 ("Weinsten"), as Trustees of the purported Windsor Trust, u/d/t dated June 21, 2002

25 ("Windsor Trust") (collectively the "Parties"), by and through their counsel of record, hereby

26 stipulate as follows:

27         1.     Quinn, on behalf of himself, and Smith and Weinsten on behalf of

28 themselves and the Windsor Trust, hereby waive all rights to appeal or otherwise challenge

                                      1

1  the Court's Statement of Decision and Final Judgment (copies of which are attached as

2  Exhibits A and B hereto) and stipulate to immediate entry of the Statement of Decision and

3  Final Judgment as the final judgment of the Court.

4        2.    Harkess hereby withdraws his memorandum for costs and waives his

5  right to those costs as the prevailing party, so that all parties shall bear their own costs and

6  attorneys' fees in this case.

7        **IT IS SO STIPULATED.**

8
9  DATED: ~~September~~ oct 10, 2005

10                                    _____
                                     JAMES R. HARKESS, individually

11
12  DATED: September ___, 2005

13                                    _____
                                     TERRANCE QUATKEMEYER,
14                                   aka TERRY QUINN, individually

15  DATED: September ___, 2005

16
17                                    _____
                                     JAMES H. SMITH, individually

18  DATED: September ___, 2005

19
20                                    _____
                                     JEFFREY WEINSTEN, individually

21  DATED: September ___, 2005       **THE WINDSOR TRUST**

22
23                                   By:_____
                                        TERRANCE QUATKEMEYER,
24                                      aka TERRY QUINN
                                     Its: Beneficiary

25
26  DATED: September ___, 2005       **THE WINDSOR TRUST**

27
                                     By:_____
28                                      JAMES H. SMITH
                                     Its: Trustee

2

WESTON·BENSHOOF·ROCHEFORT·RUBALCAVA·MacCUISH LLP
333 South Hope Street, Sixteenth Floor
Los Angeles, California 90071

the Court's Statement of Decision and Final Judgment (copies of which are attached as Exhibits A and B hereto) and stipulate to immediate entry of the Statement of Decision and Final Judgment as the final judgment of the Court.

      2.    Harkess hereby withdraws his memorandum for costs and waives his right to those costs as the prevailing party, so that all parties shall bear their own costs and attorneys' fees in this case.

IT IS SO STIPULATED.

DATED: October ___, 2005

_____
      JAMES R. HARKESS, individually

DATED: October _7th_, 2005

_____
      TERRANCE QUATKEMEYER,
      aka TERRY QUINN, individually

DATED: October ___, 2005

_____
      JAMES H. SMITH, individually

DATED: October ___, 2005

_____
      JEFFREY WEINSTEN, individually

DATED: October _7th_, 2005    THE WINDSOR TRUST

      By _____
      TERRANCE QUATKEMEYER,
      aka TERRY QUINN

      Its:  Beneficiary

DATED: October ___, 2005    THE WINDSOR TRUST

      By: _____
      JAMES H. SMITH

      Its:  Trustee

2

624191 1

1  the Court's Statement of Decision and Final Judgment (copies of which are attached as

2  Exhibits A and B hereto) and stipulate to immediate entry of the Statement of Decision and

3  Final Judgment as the final judgment of the Court.

4        2.    Harkess hereby withdraws his memorandum for costs and waives his

5  right to those costs as the prevailing party, so that all parties shall bear their own costs and

6  attorneys' fees in this case.

7  **IT IS SO STIPULATED.**

8

9  DATED: October ___, 2005

10                   JAMES R. HARKESS, individually

11

12  DATED: October ___, 2005

13                   TERRANCE QUATKEMEYER,
14                   aka TERRY QUINN, individually

15  DATED: October 7, 2005

16

17                   JAMES H. SMITH, individually

18  DATED: October ___, 2005

19

20                   JEFFREY WEINSTEN, individually

21  DATED: October ___, 2005    **THE WINDSOR TRUST**

22

23           By:_____
                   TERRANCE QUATKEMEYER,
24                   aka TERRY QUINN
           Its: Beneficiary

25

26  DATED: October 7, 2005    **THE WINDSOR TRUST**

27           By:_____
                   JAMES H. SMITH
28          Its: Trustee

2

694191.1

1  the Court's Statement of Decision and Final Judgment (copies of which are attached as

2  Exhibits A and B hereto) and stipulate to immediate entry of the Statement of Decision and

3  Final Judgment as the final judgment of the Court.

4          2.    Harkess hereby withdraws his memorandum for costs and waives his

5  right to those costs as the prevailing party, so that all parties shall bear their own costs and

6  attorneys' fees in this case.

7          IT IS SO STIPULATED.

8

9  DATED: October ___, 2005

10                              _____
                                JAMES R. HARKESS, individually

11

12  DATED: October ___, 2005

13                              _____
                                TERRANCE QUATKEMEYER,
14                              aka TERRY QUINN, individually

15  DATED: October ___, 2005

16                              _____
                                JAMES H. SMITH, individually

17

18  DATED: October 7, 2005

19                              _____
                                JEFFREY WEINSTEN, individually

20

21  DATED: October ___, 2005   THE WINDSOR TRUST

22

23                              By:_____
                                TERRANCE QUATKEMEYER,
24                              aka TERRY QUINN
                                Its: Beneficiary

25

26  DATED: October ___, 2005   THE WINDSOR TRUST

27

28                              By:_____
                                JAMES H. SMITH
                                Its: Trustee

                                        2
6949191 1

1
2  DATED: October ___, 2005    THE WINDSOR TRUST

3                              By: _____
                                     JEFFREY WEINSTEN
4                                Is/ Trustee

5
6                                ORDER

7        IT IS SO ORDERED.  The clerk is directed to enter the Court's Statement of

8  Decision and Final Judgment as the final judgment in this case.  Each party shall bear its own

9  costs and attorneys' fees.

10
11  DATED: OCT 17 2005          JAMES R. DUNN
                                _____
12                              HONORABLE JAMES R. DUNN
                                Judge of the Superior Court
13

14  APPROVED AS TO FORM:

15
16  DATED: October ___, 2005    MICHAEL J. HARTLEY
                                LISA GILFORD
17                              SCOTT J. LEIPZIG
                                WESTON BENSHOOF ROCHEFORT
18                                 RUBALCAVA & MacCUISH LLP

19
                                _____
20                                   Michael J. Hartley
                                Attorneys for Plaintiff and Cross-Defendant
21                              JAMES HARKESS

22
23  DATED: October ___, 2005    THE LAW OFFICES OF PETER J. BABOS

24
                                _____
25                                   Peter J. Babos
                                Attorney for Defendant and Cross-Complainant
26                              TERRENCE QUINN aka TERRANCE LEE
                                QUATKEMEYER and Cross-Complainants JAMES H.
27                              SMITH and JEFFREY WEINSTEIN, as Trustees of THE
                                WINDSOR TRUST
28

                                          3
                    STIPULATION AND [PROPOSED] ORDER RE: ENTRY OF FINAL JUDGMENT

694191 1

1

2     DATED:  October __, 2005         **THE WINDSOR TRUST**

3                                      By:_____
                                            JEFFREY WEINSTEN
4                                      Its:  Trustee

5

6                                      <u>ORDER</u>

7          IT IS SO ORDERED.  The clerk is directed to enter the Court's Statement of

8     Decision and Final Judgment as the final judgment in this case.  Each party shall bear its own

9     costs and attorneys' fees.

10

11

12    DATED:  _____
                                      _____
13                                    HONORABLE JAMES R. DUNN
                                      Judge of the Superior Court

14    **APPROVED AS TO FORM:**

15    DATED:  October 1, 2005          MICHAEL J. HARTLEY
16                                      LISA GILFORD
                                       SCOTT J. LEIPZIG
17                                      WESTON BENSHOOF ROCHEFORT
                                          RUBALCAVA & MacCUISH LLP
18

19

20                                      _____
                                             Michael J. Hartley
21                                      Attorneys for Plaintiff and Cross-Defendant
                                       JAMES HARKESS

22

23    DATED:  October___, 2005         **THE LAW OFFICES OF PETER J. BABOS**

24

25                                      _____
                                             Peter J. Babos
26                                      Attorney for Defendant and Cross-Complainant
                                       TERRENCE QUINN aka TERRANCE LEE
27                                      QUATKEMEYER and Cross-Complainants JAMES H.
                                       SMITH and JEFFREY WEINSTEN, as Trustees of THE
28                                      WINDSOR TRUST

                                          3
         ─────────────────────────────────────────────────────────
         STIPULATION AND [PROPOSED] ORDER RE: ENTRY OF FINAL JUDGMENT

694191.1

1

2   DATED: October ___, 2005          THE WINDSOR TRUST

3                                     By:_____
                                              JEFFREY WEINSTEN
4                                        Its: Trustee

5

6                                           ORDER

7          IT IS SO ORDERED.  The clerk is directed to enter the Court's Statement of

8   Decision and Final Judgment as the final judgment in this case.  Each party shall bear its own

9   costs and attorneys' fees.

10

11

12  DATED: _____          _____
                                      HONORABLE JAMES R. DUNN
13                                    Judge of the Superior Court

14  APPROVED AS TO FORM:

15
    DATED: October ___, 2005          MICHAEL J. HARTLEY
16                                    LISA GILFORD
                                      SCOTT J. LEIPZIG
17                                    WESTON BENSHOOF ROCHEFORT
                                         RUBALCAVA & MacCUISH LLP
18

19
                                      _____
20                                              Michael J. Hartley
                                      Attorneys for Plaintiff and Cross-Defendant
21                                    JAMES HARKESS

22
    DATED: October 7, 2005            THE LAW OFFICES OF PETER J. BABOS
23

24

25                                    _____
                                                Peter J. Babos
26                                    Attorney for Defendant and Cross-Complainant
                                      TERRENCE QUINN aka TERRANCE LEE
27                                    QUATKEMEYER and Cross-Complainants JAMES H.
                                      SMITH and JEFFREY WEINSTEN, as Trustees of THE
28                                    WINDSOR TRUST

                                            3
    _____
                  STIPULATION AND [PROPOSED] ORDER RE: ENTRY OF FINAL JUDGMENT
    694191.1

EXHIBIT A

1

2

3

4

5

6

7

**ORIGINAL FILED**

AUG 1 8 2005

**LOS ANGELES SUPERIOR COURT**

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               FOR THE COUNTY OF LOS ANGELES

10

| | | |
|---|---|---|
| 11 | JAMES HARKESS, ) | Case No.: BC 311681 |
| 12 | Plaintiff, ) | |
| 13 | v. ) | |
| 14 | TERRENCE QUINN aka TERRANCE LEE ) | **JUDGMENT IN FAVOR** |
| 15 | QUATKEMEYER, and DOES 1 through 10, ) inclusive, ) | **OF JAMES HARKESS** |
| 16 | Defendants. ) | |
| 17 | ) | |
| 18 | AND RELATED CROSS-ACTION. ) | |

19      This action came on regularly for trial before the Court on March 28, 2005, at 8:30 a.m. in

20   Department 26 of the above court.  Michael Harley and Scott Leipzig of Weston Benshoof

21   Rochefort Rubalcava & MacCuish LLP appeared on behalf of Plaintiff and Cross-Defendant James

22   Harkess ("HARKESS").  Mark Hathaway of Slater Hathaway LLP and Peter Babos of the Law

23   Offices of Peter Babos appeared on behalf of Defendants and Cross-Complainants Terrance Lee

24   Quatkemeyer aka Terrence Quinn ("QUINN") and James H. Smith, as Trustee of The Windsor

25   Trust, dated June 21, 2002 ("SMITH" and "TRUST") and Jeffrey Weinsten ("WEINSTEN"), as

26   Co-Trustee of the TRUST.

27

28      The Court having heard and considered testimony, documentary evidence, and arguments

1

JUDGMENT IN FAVOR OF JAMES HARKESS

1  presented by or on behalf of the parties, and having issued a Statement of Decision (hereinafter,

2  "Decision"), hereby orders the following Judgment to be entered in favor of HARKESS consistent

3  with the Statement of Decision, with specific reference to the following findings of the Court:

4

5       (1)    The purported TRUST "was not legally in existence and had no assets at the time

6  of the transfer" of Windsor Holdings, LLC ("Windsor") from David Kaye ("Kaye") to HARKESS.

7  (Decision, p. 1.)  Any purported ownership of Windsor claimed by SMITH and WEINSTEN "is

8  purely derivative based on their status as trustees of the Trust, and the court has found that the Trust

9  was not legally in existence during the time of the transfer from Kaye to Harkess." (Decision, p.

10  2.)

11

12       (2)    The transfer of Windsor from "Kaye to Harkess was effective to transfer ownership

13  of Windsor to Harkess." (Decision, p. 1.)  Windsor was formed in July 2001 and David Kaye

14  became the managing member, and sole owner, of Windsor; Quinn set up the Windsor structure in

15  such a way as to create apparent authority/ownership in Kaye; Harkess became the managing

16  member, and sole owner, of Windsor upon transfer from Kaye in July 2003.  The undisputed

17  evidence presented by both sides, which constituted the underlying premise for the need for this

18  Court to determine ownership of Windsor, was that since July 2001, Windsor owned Sanitec

19  Worldwide, Ltd. ("Worldwide"), and Worldwide was the majority shareholder of Sanitec, Ltd.

20  ("Limited").

21

22       (3)    QUINN and those acting on his behalf, including SMITH and WEINSTEN, "are

23  barred by the equitable doctrines of unclean hands and equitable estoppel from asserting ownership

24  in Windsor." (Decision, p. 2.) "In the exercise of its equitable powers, this court will not permit

25  Quinn to now assert an ownership interest in Windsor." (Decision, p. 7.)

26

27      NOW THEREFORE, IT IS HEREBY ADJUDGED AND DECREED THAT:

28

2

JUDGMENT IN FAVOR OF JAMES HARKESS

(1)  Judgment is entered FOR Plaintiff and Cross-Defendant HARKESS and AGAINST Defendants and Cross-Complainants QUINN, SMITH and WEINSTEN on Plaintiff's Complaint for Declaratory Relief and on Defendants' Cross-Complaint for Declaratory Relief. The Court declares that HARKESS is the sole owner of Windsor and Windsor's assets, including but not limited to, Windsor's ownership interests in Worldwide and Limited.  Neither QUINN, SMITH, WEINSTEN, nor any successor trustees or beneficiaries of the purported TRUST have any right, title or interest in Windsor and/or any Windsor asset, including but not limited to, Windsor's ownership interests in Worldwide and Limited;

(2)  QUINN, SMITH, WEINSTEN and the successor trustees and beneficiaries of the purported TRUST, and each of them, as well as anyone acting on their behalf or in concert with them (hereinafter, "ENJOINED PARTIES"), are restrained and permanently enjoined from claiming any right, title or interest in Windsor and/or any Windsor asset, including but not limited to, Windsor's ownership interests in Worldwide and Limited.  THE ENJOINED PARTIES are specifically restrained and permanently enjoined from making any representations that they have any ownership interest in or control

/ / / /

/ / / /

3

JUDGMENT IN FAVOR OF JAMES HARKESS

1    over Windsor and/or any Windsor asset, including but not limited to, Windsor's

2    ownership interests in Worldwide and Limited.

3

4    DATED: _____AUG 1 8 2005_____

5                                        **JAMES R. DUNN**
                                         ─────────────────────
6                                        JAMES R. DUNN
                                         Judge of the Superior Court
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JRD:cr    26
Harkess.jmt
8/18/05    27

28

4

JUDGMENT IN FAVOR OF JAMES HARKESS

**EXHIBIT B**

**ORIGINAL FILED**

· AUG 1 8 2005

**LOS ANGELES
SUPERIOR COURT**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| JAMES HARKESS, | ) Case No.: BC 311681 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| TERRENCE QUINN aka TERRANCE LEE | ) **STATEMENT OF DECISION** |
| QUATKEMEYER, and DOES 1 through 10, | ) |
| inclusive, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| AND RELATED CROSS-ACTION. | ) |
| | ) |

The court finds FOR PLAINTIFF/CROSS-DEFENDANT AND AGAINST DEFENDANTS/CROSS-COMPLAINANTS on Plaintiff's Complaint for Declaratory Relief and on Defendants' Cross-Complaint for Declaratory Relief. The court declares that plaintiff James Harkess ("Harkess" herein) is the rightful owner of Windsor Holdings, LLC, ("Windsor" herein) and that defendants have no right, title or interest therein. Further, defendants, and each of them, are permanently enjoined from claiming any right, title or interest in Windsor.

The court finds that the Windsor Trust ("Trust" herein) was not legally in existence and had no assets at the time of the transfer of Windsor from David Kaye ("Kaye" herein) to Harkess. Defendant Terrence Quinn aka Quatkemeyer ("Quinn" herein), in July 2001, through a series of

1

STATEMENT OF DECISION

1  companies and transactions, none of which bear his name or other indicia of his ownership,

2  transferred ownership and apparent authority to Kaye as managing member of Windsor. Thereafter,

3  back-dated documents were created virtually overnight, transferring ownership of Windsor from

4  Kaye to Harkess in July 2003. This transfer of ownership of Windsor was relied on not only by

5  Harkess, but by many other parties and attorneys, including a federal judge. The court finds that

6  the transfer from Kaye to Harkess was effective to transfer ownership of Windsor to Harkess in July

7  2003. The court further finds that, in any event, Quinn and those acting on his behalf are barred by

8  the equitable doctrines of unclean hands and equitable estoppel from asserting ownership in

9  Windsor. Any purported ownership claimed by James H. Smith ("Smith" herein) or Jeffrey

10  Weinsten ("Weinsten" herein) is purely derivative based on their status as trustees of Trust, and the

11  court has found that the Trust was not legally in existence during the time of the transfer from Kaye

12  to Harkess.

13

14  FACTUAL BACKGROUND

15       There are many different companies and individuals involved in the various lawsuits here,

16  in Ohio and elsewhere, but the essential entities for purposes of this lawsuit are Windsor, Sanitec

17  Worldwide ("Worldwide" herein) and Sanitec Limited ("Limited" herein). Windsor is a California

18  limited liability company formed on July 17, 2001. The undisputed evidence at trial was that,

19  through a series of transfers and a corporate re-organization by Quinn, in late July 2001, Windsor

20  became the sole owner of Worldwide. It was also undisputed at trial that Worldwide was the

21  majority owner of Limited and that Mr. Weinsten's company, Salem Associates, owned a minority

22  interest in Worldwide. (Ex. 189, 223) The basic premise argued by both parties at trial was that

23  whoever owns Windsor controls the other two by virtue of this ownership structure.

24

25       This court has been asked to make a ruling on a single, narrow question: who owns

26  Windsor? The court is mindful that there are other lawsuits in Ohio, and perhaps elsewhere, which

27  may be impacted by this decision, and that there may be issues between various parties impacted

28  by what the court decides here. Beyond the findings that support the Court's decision, however,

2

STATEMENT OF DECISION

1    this court makes no findings regarding the merits of any other lawsuits or any purported claims that
2    the parties may have against one another or others.

3

4        Plaintiff contends that he is the owner of Windsor by virtue of a transfer from Kaye, the
5    managing member of Windsor.   Defendants contend that the Trust is the owner of Windsor.
6    Defendants presented evidence that in June 2002, defendant/cross-complainant Quinn was suffering
7    from a terminal illness and was facing an impending prison term, and therefore set up the Trust with
8    cross-complainant Smith and Weinsten as the trustees, and concurrently therewith transferred all
9    the assets of Windsor to Trust.  Therefore, at the time of transfer of Windsor from Kaye to Harkess,
10   defendants assert that Windsor had already been transferred to the Trust and there was nothing to
11   transfer.

12

13   THE TRUST

14       The circumstances in existence in or about June 2002, that is the illness and the impending
15   sentencing, are consistent with a desire by Mr. Quinn to form a trust to hold his property.  What is
16   missing, however, is a signed original trust document and any credible evidence that such a
17   document was ever signed by Quinn in June 2002, or at any time before he was released from prison
18   in late September 2003.  Also, like the ownership structure that Quinn set up for Windsor, the
19   structure he set up for his Trust was also incomplete.  The final, and necessary, steps were never
20   taken to consummate the Trust.

21

22       The court makes the following findings which support its conclusion that no Trust was
23   formed in June 2002 or at any time before the Kaye-Harkess transfer.

24

25   1.     The court found Smith to be a credible witness, but by his own testimony and that of others,
26          he was only a figurehead.  It was Weinsten that wrote all the letters for him to sign, and it
27          was Weinsten that monitored the litigation in Ohio.  Virtually everything that Smith knew,
28          he knew because Weinsten told him.  He had virtually no firsthand knowledge of facts.

3
STATEMENT OF DECISION

2.   There is no original Trust signed by Quinn which bears a date in June 2002.  In fact, no signed original at all was offered in evidence.

3.   While there is evidence that the Litwin law firm prepared drafts of a trust in June 2002, and Smith signed some version of a trust, Smith testified that he does not know whether Quinn signed it.  (Ex. 265)

4.   Weinsten testified that he sent the Trust document which had been signed by others to Quinn for him to sign. He did not see Quinn sign the Trust document.  Weinsten claims that he received a signature back from Mr. Quinn in June 2002, but the Court does not find this claim credible in light of Mr. Weinsten's other testimony in depositions and pleadings regarding ownership of Windsor (see below), and his prior conviction introduced for purposes of impeachment.   No one had personal knowledge about whether Quinn ever signed before he was released.

5.   Quinn testified that he did sign it in June 2002, but the court does not find his testimony to be credible. On the stand Mr. Quinn repeatedly shifted responsibility for various actions from himself to his attorneys, and said he would sign virtually anything his lawyers told him to sign.  This, along with his observed demeanor while testifying, and his two felony convictions for fraud-related offenses, cause the court to disregard his testimony.  Thus, there is no independent, corroborating evidence that Quinn ever signed before he got out of prison.

6.   There is no credible evidence that shares or other indicia of ownership of Windsor were ever transferred to the Trust.

7.   Quinn testified that he fired Kaye as managing member of Windsor in June 2002 by letter,

4
STATEMENT OF DECISION

1   but there is no evidence other than the testimony of Quinn himself that the letter was ever
2   sent, and court does not find his testimony credible.  Kaye denies ever receiving it, and the
3   only copy introduced in evidence apparently came from Weinsten's file.
4
5        In addition to these points, Weinsten who along with Smith was a co-trustee, denied twice
6   in depositions in other cases that he knew who owned Windsor.  One can infer from this that he
7   either knew the trust had never been signed by Quinn, or that there was never any transfer of
8   Windsor assets to the Trust.  It was Weinsten who was monitoring the Ohio litigation and
9   apparently was concerned enough about protecting his 48% interest in Worldwide that he attempted
10  to intervene in the Ohio litigation.  In several pleadings filed in connection therewith he never
11  mentioned the Trust.  (Ex. 118, 122)  Even when Smith sent the letter to John Climaco, Ohio
12  counsel for Limited, et al., he did not mention the Trust.  And finally, the two independent
13  witnesses who may have been able to corroborate the Trust, attorney Litwin who drafted it, and
14  attorney Mark Geragos (who was allegedly present when the Trust was signed in his office) were
15  not called by the defendants to testify.
16
17       The defendants have not met their burden of showing that the Trust was legally formed and
18  in existence at the time of the Kaye-Harkess transfer.
19
20  THE TRANSFER TO HARKESS
21       By virtue of the failure of the Trust to be formed in June 2002, the assets of Windsor were
22  still in Windsor at the time of the transfer from Kaye to Harkess.  In July 2003, never referencing
23  the Trust in his letter, Smith wrote to John Climaco, Esq., Ohio counsel for Limited and Windsor
24  ("Climaco" herein), claiming that Harkess had no authority to represent Limited in the Ohio
25  litigation and that he (Climaco) was discharged as counsel.  (Apparently this was one of the letters
26  written for him by Weinsten.)  (Ex. 210)  In response to this letter Climaco sent an urgent message
27  to Babos demanding to know who had authority to speak for Limited and who he should listen to.
28  (Ex. 211.1, 212)  He was obviously very agitated and wanted answers immediately.  He was

1  particularly upset over the fact that he was being put in a position to embarrass himself before a
2  federal judge. In response to that inquiry, within hours Babos, with the concurrence of Harkess and
3  Kaye, created back-dated documents that showed that Harkess was the owner of Limited. (Ex. 168)
4  Kaye (for Limited) and Harkess (for Sanitec West) had been managing the Ohio litigation and they
5  needed to show they had authority to do so. (It is not altogether clear which parties Babos was
6  actually representing as counsel in all these transactions; Climaco had repeatedly asserted that
7  Quinn needed separate counsel due to a perceived conflict of interest; Babos had served as corporate
8  counsel for some of the Sanitec companies and Quinn individually over the years.) (Ex. 212) These
9  hastily created documents showed that Kaye, acting as managing member and owner of Windsor,
10 transferred his member/owner status to Harkess. Babos continued to reaffirm that Harkess was the
11 owner of Windsor for weeks after Quinn was released from prison in September 2003. He testified
12 that it was only later he realized that he had made a mistake in having the documents prepared and
13 started making efforts to reverse position. By then, however, the representations to the Ohio federal
14 court and counsel had already been made and actions had been taken in reliance on Harkess'
15 apparent authority to represent Limited, (based on his ownership of Windsor) and commitments had
16 been made and documents signed.

17

18     Quinn is responsible for creating the environment and business structure that made this
19 possible. Windsor was formed on July 17, 2001, at Quinn's direction, with the filing of Windsor's
20 Articles of Organization with the Secretary of State, showing Kaye as the manager. This was the
21 only documentation for Windsor. Nowhere did Quinn's name appear. In late July 2001, he then
22 asked Kaye to front for him in an attempt to sell Limited and in fact Kaye acted as managing
23 member/owner in the Eden transaction and in dealing with Stericycle. He also was sent by Quinn
24 to Limited back East to monitor operations and represent himself as the managing member of
25 Windsor. Quinn claims that Kaye was only appointed to deal with specific sales or activities, but
26 Quinn is the one who put him in a position to represent himself as owner of Windsor. It was Quinn
27 who set up Windsor but never set up any formal ownership structure or had any documents prepared
28 which identified him as being involved in Windsor. All of the assets that went through the various

1   re-organizations ended up in Windsor. Windsor became a holding company with no ownership
2   structure, and no connnection with Quinn.  When it was to his advantage in having Kaye step
3   forward for specified transactions that benefitted Quinn, he validates his authority. The court does
4   not recognize, however, such selective delegations of authority, especially in a case where there is
5   no documentation showing an owner of Windsor at all.  Mr. Babos and Mr. Mitchell R. Miller (a
6   corporation lawyer who drew up the Windsor documents for the Secretary of State) both testified
7   that Quinn never set up any ownership structure because he wasn't sure how he wanted to do it.
8   The only person placed in a position of apparent authority/ownership was Kaye.  There is no
9   evidence that either Quinn, or Babos or Miller did anything at all to remedy this uncompleted
10  ownership structure after Quinn went to prison, thus enabling the later events to occur. The Court
11  finds that Mr. Kaye was the sole managing member, and therefore sole owner, of Windsor Holdings
12  from its inception in July 2001 through the transfer to Mr. Harkess in July 2003.

13

14       When the Climaco emergency came, Mr. Kaye did not step forward to act as owner/
15  manager, rather he wanted out, so it was agreed that he would transfer his member/owner status to
16  Harkess.  Rather than explain the dilemma to Mr. Climaco and seek a resolution with the Ohio
17  court, counsel Babos, with the concurrence of Harkess and Kaye prepared the back-dated
18  documents within a matter of hours and sent them to Climaco. Those documents were sent to Ohio
19  with the knowledge that they were to be presented by Mr. Climaco, an officer of the court, to a
20  federal judge representing that Mr. Harkess was the owner of Windsor.  And then everyone sat back
21  and allowed others to rely on that representation.  This court finds that Mr. Harkess is the owner
22  of Windsor and became the owner with the transfer from Mr. Kaye in July 2003.  That entire chain
23  of events was created by the anonymous and incomplete creation of Windsor by Quinn, and the
24  attempt to selectively assign ownership/authority to Kaye.

25

26       The court is mindful that defendant contends that there was an agreement that Harkess was
27  only taking the shares of Windsor temporarily and that he was to give them back after Quinn was
28  released. Mr. Babos supports this purported agreement, as does Quinn, but Harkess vehemently

7
STATEMENT OF DECISION

1  denies it. There is evidence that Harkess said "If I own Limited by virtue of my ownership of

2  Windsor, then I want the documents." This would suggest, however, that Harkess did indeed

3  believe he owned Windsor although had some question as to what impact it had on ownership of

4  Limited. Whether there was or was not such a private agreement between Quinn and Harkess is

5  between them. As far as the rest of the world is concerned, Mr. Kaye transferred ownership of

6  Windsor to Harkess and Harkess, Kaye and Babos represented to the federal court and the litigants

7  that Harkess was the owner of Windsor. The transfer to Harkess was effective.

8

9  UNCLEAN HANDS AND EQUITABLE ESTOPPEL

10  Further, in the exercise of its equitable powers, this court will not permit Quinn to now

11  assert an ownership interest in Windsor. Plaintiff spent a great deal of the trial laying out the series

12  of transactions involving the original purchase of Limited by Quinn with investor money and the

13  use of various corporations to do so. Plaintiff made the point that Mr. Quinn's name personally did

14  not appear on any of the documentation of these companies. For the most part the court found that

15  to be true, based on the limited evidence presented on those issues. This court is being asked to take

16  note of a pattern of ownership and apparent evasion of accountability to creditors and suppression

17  of identity in order to establish the defense of unclean hands. This court is not making any findings

18  as to whether Mr. Quinn defrauded the original investors in connection with his use of their funds

19  to purchase Limited. This court does take note, however, of this trail of companies, re-

20  organizations and the resultant anonymity of Quinn for purposes of whether Quinn was attempting

21  to hide his assets, (i.e., Windsor's controlling interest in Worldwide and through Worldwide,

22  ownership of Limited) in order to avoid any claims these investors might have, and comes before

23  this Court with unclean hands. The court also takes note of the fact that Quinn never used any of

24  his own money to purchase these companies. The court did not find credible his testimony that he

25  also put his own money into Limited from the sale of luxury cars. No documentary or other

26  evidence was presented to support that assertion.

27

28  All of this is corroboration for the testimony of Mr. Quinn himself. Quinn testified on the

1    stand that he created Windsor to "keep the assets of Sanitec away from Barbara Sager, Steve Ventre,

2    Joe Delloiacovo and the investors in Ohio that were laying claim to those assets." He further

3    testified that he asked Mr. Kaye to be the managing member because he was "having difficulties"

4    and "troubles" at the time. It is clear that Quinn did not want his assets in his own name and in fact

5    his apparent 80% interest in Sanitec West was in the name of his friend Mary Reidiger rather than

6    himself. This is sufficient evidence for the court to conclude that Quinn was secreting his assets

7    to defeat the claims of his creditors and that he comes to this court with unclean hands. (See

8    Allstead vs. Laumeister (1911) 16 Cal.App. 59 and Belling vs. Croter (1943) 57 Cal.App.2d 296.)

9

10       In addition, the court invokes the doctrine of equitable estoppel. While Mr. Quinn himself

11    did not make the representations to those who relied and acted on them (the Ohio federal court and

12    counsel and others related to that litigation), he is directly responsible for setting in motion the chain

13    of events that led to those representations. He put Kaye and Harkess in the position of having

14    apparent authority for and ownership of Windsor, from the point of view of the court and the parties

15    in the East, to accomplish his own ends of selling off Limited without having his name in any way

16    associated with the sale. Many have relied on the resulting representations about Harkess'

17    ownership of Windsor to their potential detriment in the event that transactions consummated in

18    reliance thereon were to be overturned. Quinn is estopped from now claiming that the

19    representations regarding ownership of Windsor are false, or that Kaye did not have authority to

20    transfer the company to Harkess.

21

22       Plaintiff/Cross-Defendant Harkess to prepare the judgment consistent with this Tentative

23    Ruling. This Tentative Ruling shall be the Statement of Decision unless within ten days either party

24    specifies controverted issues or makes proposals not covered in the Tentative Ruling.

JRD:cr
Harkess.sd
8/18/05

25

26    Dated:   <u>AUG 1 8 2005</u>

**JAMES R. DUNN**

27                JAMES R. DUNN
                Judge of the Superior Court

28

9

STATEMENT OF DECISION

# PROOF OF SERVICE

I, Claudette Bonman, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Weston, Benshoof, Rochefort, Rubalcava & MacCuish LLP, 333 South Hope Street, Sixteenth Floor, Los Angeles, CA 90071. I am over the age of eighteen years and not a party to the action in which this service is made.

On October 13, 2005, I served the document(s) described as **STIPULATION AND [PROPOSED] ORDER RE: ENTRY OF FINAL JUDGMENT** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: See attached Service List

☒    BY MAIL: I am "readily familiar" with this firm's practice for the collection and the processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, the correspondence would be deposited with the United States Postal Service at 333 South Hope Street, Los Angeles, California 90071 with postage thereon fully prepaid the same day on which the correspondence was placed for collection and mailing at the firm. Following ordinary business practices, I placed for collection and mailing with the United States Postal Service such envelope at Weston, Benshoof, Rochefort, Rubalcava & MacCuish LLP, 333 South Hope Street, Los Angeles, California 90071.

☐    BY FEDERAL EXPRESS    ☐ UPS NEXT DAY AIR    ☐ OVERNIGHT DELIVERY: I deposited such envelope in a facility regularly maintained by ☐ FEDERAL EXPRESS    ☐ UPS    ☐ Overnight Delivery [specify name of service: ] with delivery fees fully provided for or delivered the envelope to a courier or driver of ☐ FEDERAL EXPRESS    ☐ UPS    ☐ OVERNIGHT DELIVERY [specify name of service:] authorized to receive documents at Weston, Benshoof, Rochefort, Rubalcava & MacCuish LLP, 333 South Hope Street, Los Angeles, California 90071 with delivery fees fully provided for.

☐    BY FACSIMILE: I telecopied a copy of said document(s) to the following addressee(s) at the following number(s) in accordance with the written confirmation of counsel in this action.

☒    [State]    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☐    [Federal]    I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 13, 2005, at Los Angeles, California.

_Claudette Bonman_
Claudette Bonman

*Harkess v. Quinn, et al.*
Los Angeles Superior Court, Case No. BC 311681

SERVICE LIST

| | |
|---|---|
| Peter J. Babos<br>Law Offices of Peter J. Babos<br>9401 Wilshire Boulevard<br>Suite 650<br>Beverly Hills, CA 90212 | Attorneys for Defendant and Cross-Complainant TERRENCE QUINN aka TERRANCE LEE QUATKEMEYER and Cross-Complainants JAMES H. SMITH, as Trustee of THE WINDSOR TRUST, u/d/t dated June 21, 2002 |
| | Telephone:    (310) 248-4822<br>Facsimile:    (310) 248-4406 |
| **Courtesy Copy:**<br>Mark M. Hathaway, Esq.<br>Slater Hathaway LLP<br>200 South Los Robles Avenue<br>Suite 530<br>Pasadena, CA 91101-2432 | Attorneys for Defendant and Cross-Complainant TERRENCE QUINN aka TERRANCE LEE QUATKEMEYER and Cross-Complainants JAMES H. SMITH, as Trustee of THE WINDSOR TRUST, u/d/t dated June 21, 2002 |
| | Telephone:    (626) 795-1600<br>Facsimile:    (626) 795-1616 |
| **Courtesy Copy:**<br>Mark Hathaway, Esq.<br>801 South Figueroa Street<br>11th Floor<br>Los Angeles, CA 90015 | Telephone:    (213) 624-7200<br>Facsimile:    (213) 624-7220 |

**EXHIBIT  C**

# SALEM ASSOCIATES INC.

**Post Office Box 448**
**North Salem, NY 10560**
**Tel: 914-276-1452**
**Fax: 914-276-1453**
**Email: jjwsalem@aol.com**

October 4, 2005

James R. Harkess
9065 Norris Avenue
Sun Valley, CA 91352

Dear Mr. Harkess,

A Special Meeting of the shareholders of Sanitec Worldwide, Ltd., a Delaware corporation, will be held pursuant to the corporate bylaws, as follows:

1. Date: October 17, 2005
2. Time: 10 AM
3. Place: Law Office of Litwin & Tierman, Two University Plaza, Hackensack, NJ 07601
4. Purpose:
   To dissolve the existing Board of Directors;
   To elect a new Board of Directors to serve until the next annual meeting, approximately August, 2006;
   To transact any other business that properly comes before the meeting.
5. This Special Meeting has been called under the following authority:
   The Vice President and Secretary; and
   The authorized representative of the stockholder owning a majority of the capital stock of the corporation, issued and outstanding and entitled to vote.

Very truly yours,

Jeffrey J. Weinsten

**EXHIBIT D**

October 13, 2005

*By Email, Fax and Mail*

Jeffrey J. Weinsten
Salem Associates Inc.
PO Box 448
North Salem, NY 10560

Dear Mr. Weinsten.

This is in response to your October 4, 2005 letter, purporting to call an October 17, 2005 special meeting of the shareholders of Sanitec Worldwide, Ltd. (Worldwide). Windsor Holdings owns Worldwide, not you or Salem Associates. Your purported attempt to call a shareholders' meeting places you in contempt of the Court's judgment and statement of decision in *Harkess v. Quinn*, which expressly preclude you and anyone in concert with you from asserting any claim to Windsor's assets, including ownership of Worldwide. Be advised that your purported meeting has no force or effect, and that if you do not immediately cease and desist from representing that you or your company, Salem, are a majority shareholder, officer, or director of Worldwide, we will pursue all appropriate remedies before the Court, including an order holding you in contempt of Court.

Sincerely,

James R. Harkess

cc:    Michael Weinsten, Esq. (by email, fax and mail)
       Mark Hathaway, Esq. (by email, fax and mail)

#3896840

709789.1